UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 08 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

SUI JURIS FURQUAN R. STAFFORD          *
                                       *
**Plaintiff,**                         *
                                       *
v.                                     *   **File:**
                                       *   **1:20-CV-4970**
KEDRION S.p.A, a corporation,          *
KEDRION BIOPHARMA, INC., a corporation, *
OCTAPHARMA AG, a corporation,          *   **Violations:** 15 U.S. Code §§ 1 - 2
OCTAPHARMA PLASMA, INC., a corporation, *
GRIFOLS, S.A., a corporation,          *
GRIFOLS SHARED SERVICES NORTH          *
AMERICA, INC., a corporation,          *
CSL LIMITED, a corporation,            *
CSL PLASMA, INC., a corporation        *

**Defendants.**

## COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT

**1.** Plaintiff, SUI JURIS FURQUAN R. STAFFORD, individually brings this action for civil and treble damages under the United States antitrust laws against Defendants. According to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial regarding all issues triable by a jury.

## THE CONNECTION BETWEEN SLAVERY AND MONOPOLY

**2.** Sen. Charles Sumner (January 6, 1811 – March 11, 1874) was an American statesman and the United States Senator from Massachusetts. As an academic lawyer and a powerful orator, Sumner was the leader of the anti-slavery forces and a Radical Republican in the U.S. Senate during the American Civil War. He devoted his enormous energies to the destruction of the *"Slave Power"*, the influence over the federal government of Southern slave owners who sought the

1

continuation and expansion of slavery. In 1866 Senator Charles Sumner explained the connection between slavery and monopoly as follows: *"The Rebellion began in two assumptions first, the sovereignty of the States, with pretended right of secession; and, secondly, the superiority of the white race with the pretended right of Caste, Oligarchy, and Monopoly, on a count of color."* See, * 209 Cong. Globe, 39th Cong., 1st Session., 686 (1866).

## NATURE OF THE CASE

**3.** This action arises under the Sherman Antitrust Act. A federal antimonopoly and antitrust statute, passed in 1890 as 15 U.S.C. §§ 1 and 2 and amended by the Clayton Act in 1914 (15 U.S.C. § 12-27), prohibits activities that restrict interstate commerce and competition in the marketplace. Violations of the Sherman Act under the provisions of Section 1 are considered "per se" violations. These are blatantly obvious attempts by a company or individual to constrain the free market. Antitrust law acknowledges that seller may select their customers. Thus some individuals and companies refusals to deal with are legal. However, a refusal may be illegal if the seller has monopoly power, intends to monopolize, or uses the denial as part of otherwise unlawful trade restraint. Group boycotts are unlawful.

**4.** Defendants can choose whom they wish to conduct business with. However, if they use their market power to prevent competition, this violates antitrust laws. Refusing to do business with a competitor because of monopoly power violates Section 2 of the Sherman Act, regulating monopolies, attempts at monopoly, and exclusionary conduct. Monopoly power is the power to control price (or output) or exclude competition within the affected market. Monopoly power is typically, but not always, determined by market share and not by any particular percentage. Several factors can affect the threshold market share, such as barriers to entry and market concentration.

The most common way to determine whether an entity has monopoly power is to look at their market share. Market share is just a proxy for monopoly power. This Court should examine that the Defendants are exercising monopoly power. The Defendants are a monopolist and has engaged in monopolizing conduct. A monopolist negatively impacts competition such that Section 2 of the Sherman Act should interfere with the personal functioning of the U.S. plasma collection industry. Contrary to 2 of the Sherman Act, a party has monopoly power if it has, over "any part of the trade or commerce among the several States," a power of controlling prices or unreasonably restricting competition. Pp. 351 U. S. 389-394. The Defendants have monopoly power in the U.S. plasma collection industry.

## SHERMAN ACT MONOPOLIZATION

**6.** Senator George F. Hoar (August 29, 1826 – September 30, 1904) pointed out that monopoly involved something more than extraordinary commercial success, *"that it involved something like the use of means which made it impossible for other persons to engage in fair competition."* This exception to the Sherman Act prohibitions of monopoly power is perhaps the monopoly "thrust upon" one of United States v. Aluminum Co. of America, 148 F.2d 416, 429. Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa. This approach to the determination of monopoly power is strengthened by this Court's conclusion, when an alleged monopolist (s) has power over price and competition, an intention to monopolize in a proper case may be assumed. *See, United States v. Columbia Steel Co., 334 U.S. 495, 525; United States v. Paramount Pictures, 334 U.S. 131, 173; and Apex Hosiery Co. v. Leader, 310 U.S. 469, 501. IMS.*

## STATE OF GEORGIA ANTI-MONOPOLY ACT

**7.** An act designed to prevent the creation of monopolies in any branch of trade, whether by individuals, companies, or combinations of any kind, passed by the legislature of Georgia, was approved December 23, 1896, and is as follows: An act to declare unlawfully and void all arrangements, contracts, agreements, trusts, or combinations made to lessen, or which tend to diminish, free competition in the importation or sale of articles of domestic growth, or of domestic raw material; to declare unlawfully and void all arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend to advance, reduce or control the price of such product or article to producer or consumer of any such product or article; to provide for forfeiture of the charter and franchise of any corporation organized under the laws of this State, violating any of the provision of this act. Every foreign corporation that shall violate any of this act is prohibited from doing business in this State.

## BACKGROUND

**8.** The decline in dynamism has coincided with the rise of vast and profitable firms that look discomfortingly like the monopolies and oligopolies of the 19th century. America has become the land of the big and the home of the consolidated. Several Supreme Court decisions ultimately stiffened U.S. antitrust law. Perhaps the most critical decision came in 1911 when the Court ruled that Standard Oil Company of New Jersey's ownership of nearly 90 percent of U.S. oil production violated the law. Monopolies don't just dominate their industries; they monopolize political power as well, which allows them to protect their incumbency and stifle competition in myriad ways.

Monopolies use patents, mergers, and acquisitions to obtain industry dominance and prevent market entry. The Sherman Anti-Trust Act in 1890, followed in the next quarter-century by other legislation trying to ensure competition in the market place.  Significantly, these laws

4

were based on the belief that economic power concentrations would inevitably lead to concentrations in political power. The antitrust policy was not found on a finely honed financial analysis, resting on concurrent advances in economics. It was really about the nature of our society and democracy.

Black American wealth continues to evade the Black community in many ways and places. *"The U.S. plasma collection industry is yet another industry where the Black community is overdue for a change in practice."*

Black Americans are less likely to own U.S. plasma collection centers than Whites in the United States. *"Black entrepreneurship has been unsuccessful in the U.S. plasma collection industry."* There is a long tradition of Black Americans creating business enterprises, as some immigrant groups, to move up the economic ladder. While serious, the hostility faced by most immigrant groups does not compare in kind or degree to the across-the-board exclusionary practices that historically have kept Black Americans out of many business arenas in particularly the U.S. plasma collection industry. There is the "rational" desire for some White Americans to destroy Black competitors in business. Still today, for many White Americans, the goal of systemic racism and Black discrimination continues to be a reality for Black Americans.

Despite continuing antitrust laws and racial discrimination, a strong interest in creating businesses can be found in Black communities today. While small companies may not be as standard or as profitable among Black Americans as among White Americans and certain non-European immigrant groups, the rate of initiation of small businesses remains high, and the idea of starting one's own business is still a significant part of the *"American dream for Black Americans."* The U.S. Plasma collection industry, in theory, provides a potential avenue of economic mobility for Black Americans.

The Plasma Protein Therapeutics Association (PPTA) represents Defendants, the private sector manufacturers of plasma-derived and recombinant analog therapies, collectively known as plasma protein therapies, and the collectors of source plasma used for fractionation. According to the PPTA, there are over "860" and counting FDA plasma collection facilities nationwide owned by Defendants.

Black Americans supply 80 percent of plasma donations at Defendants plasma collection facilities nationwide. Because of this, Defendants continue to monopolize this industry. The Black community is trying to economically and financially position the community into self-sustainability. The Black community continues to not reap from this multi-billion dollar U.S. plasma collection industry in the Black community. The Black community receives mere crumbs for their live-saving plasma donations.

History states that Black Americans were not allowed to donate their blood or plasma. Black Americans like Henrietta Lacks (HeLa cells) and Black-slaves were used to help make many medical advances that we benefit from today. Dr. Charles Richard Drew (June 3, 1904 – April 1, 1950), a noted Black American scholar in the plasma field, died from injuries sustained from a car accident. Unfortunately, Dr. Drew did not live to benefit from the advances he championed in a segregated era. Today, Black Americans are exploited by Defendants that continue to grow bigger economically. The U.S. plasma collection industry is a multi-billion dollar industry annually and maneuvers as a constricted oligopoly. The U.S. plasma collection industry is small compared to the biotechnology and pharmaceutical sectors, but it provides critical, lifesaving, therapeutic proteins to treat chronic, acute, hereditary, COVID-19, and acquired conditions. Indications for these proteins vary widely from their historical use in treating hemophilia and other rare protein deficiencies to treat immunodeficiency, immunomodulation, fluid resuscitation, and now COVID-

19 patients. The U.S. plasma collection industry has undergone a dramatic change in the last decade.

Defendant's violation of the Sherman Act has injured Plaintiff itself as a competitor and an injury to competition in the U.S. plasma collection industry. Monopoly profits are being reaped in an oligopolistic market by Defendants. Defendants have expanded from *"Black American plasma donations in the Black community."* This complaint is not for more diversity in hiring practices or even more locations in said communities; this complaint is about eliminating the barriers to entry, severely restricting competition, systemic racism and impacting Black Americans and Black companies like C.P. Plasma Center, Inc. competing and thriving in the U.S. plasma collection industry. The crucial language concerning competition is contained in the following language of subsection 2(a) of the Clayton Act as amended by the Robinson-Patman Act as an injury to competition. *"Where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy, or prevent competition with any person whom either grants or knowingly receives the benefit of such discrimination."*

<div align="center">

**PARTIES IN THIS COMPLAINT**

**PLAINTIFF**

</div>

**9.** Plaintiff, a Black American, is the Owner & CEO of C.P. Plasma Center, Inc. (CPPC) in College Park, Georgia. C.P. Plasma Center, Inc. has been registered with the Corporations Division in the State of Georgia since April 16, 1998. Plaintiff has been pursuing a plasma collection contract from Defendants to start C.P. Plasma Center, Inc. in the U.S. plasma collection industry since 1994. Plaintiff has been working to build a plasma collection facility in the Black community and envision it after a successful launch to other communities.

Plaintiff has identified a gap in the collection process and will appeal to donors in the Black community who are the primary donors for the U.S. plasma collection industry. Plaintiff is carrying on the blood plasma work of the late pioneer Dr. Charles R. Drew, a Black American medical scientist and leading authority in his field, credited for developing ways to process and store blood plasma in blood banks. Dr. Drew directed the blood plasma programs of the United States and Great Britain in World War II but resigned after a ruling that Black Americans' blood would be segregated.

Plaintiff has received letters of support from elected officials on many government levels, noteworthy news coverage, an agreement for funding, and key players in the plasma collection community who have offered to serve on the advisory board and part of the management team. As a result of Plaintiff's efforts, the Plaintiff has been told by his support system to produce a *"plasma contact"* from Defendants to take commitments from being paper to becoming a realization.

### DEFENDANTS

**10.** CSL Plasma, Inc., headquartered in Boca Raton, Florida, operates as a human blood plasma collector as a holding company for the U.S. operations of Australia-based CSL Limited. CSL Limited is a company incorporated and domiciled in Australia, with its principal business location located at 45 Poplar Road, Parkville, Victoria, 3052, Australia. CSL Limited, annual net profit in 2019 rose to 1.9 billion U.S. dollars with a turnover of 8.5 billion U.S. dollars. This represents an 11% increase in revenue.

CSL Limited is a global stakeholder and supplier of plasma derivative protein therapies in the world. It produces and sells biotherapies indicated to treat several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease. CSL Limited is a vertically integrated company. It owns and operates one of the world's largest plasma collection

networks (CSL Plasma, Inc.) at 270 U.S. plasma centers; CSL Plasma, Inc., 2019 annual revenue was $90.23 million U.S. dollars.

**11.** Grifols Shared Services North America, Inc., headquartered in Los Angeles, California, operates as a human blood plasma collector as a holding company for the U.S. operations of Spain-based Grifols, S.A. Grifols Shared Services North America, Inc. 2019 annual revenue was $3.17 billion U.S. dollars. Grifols Shared Services North America, Inc., the company owns 295 U.S. plasma centers nationwide.

Grifols S.A. is a company incorporated and domiciled in Spain, with its principal place of business located at 08174 Sant Cugat del Vallès, Barcelona, Spain. Grifols, S.A.'s annual revenue for 2019 was $5.711 billion U.S. dollars, a 7.77% increase from 2018. Grifols S.A. is a global stakeholder and supplier of plasma derivative protein therapies in the world. Grifols S.A. is the primary world supplier of IVIG, albumin, Factor VIII and other plasma-derived products.

**12.** Kedrion Biopharma, Inc., headquartered in Fort Lee, New Jersey, operates as a human blood plasma collector as a holding company for the U.S. operations of Italy-based Kedrion S.p.A. Kedplasma USA operates over 25 plasma centers in the United States. Kedplasma is a subsidiary of Kedrion Biopharma, Inc. This international company produces and distributes plasma-derived medicinal products to treat severe diseases, disorders, and conditions such as hemophilia and immune system deficiencies. Kedrion Biopharma, Inc., annual sales in 2020 is $379.11 million U.S. dollars.

Kedrion S.p. A, is a company incorporated and domiciled in Italy, with its principal place of business located at 55051 Castelvecchio Pascoli, Barga (Lucca), Italy. Kedrion S.p.A. develops, manufactures, and distributes blood plasma-derived therapeutic products. Kedrion S.p.A closed

the 2019 financial year with record-high revenues of EUR 808.2 million, representing a growth of 17.5% versus the previous year (EUR 687.9 million in 2018).

**13.** Octapharma Plasma, Inc., headquartered in Charlotte, North Carolina, operates as a human blood plasma collector as a holding company for the U.S. operations of Switzerland-based Octapharma AG. Octapharma AG is a company incorporated and domiciled in Switzerland, with its principal place of business located at Seidenstrasse 2, 8853 Lachen, Switzerland. Octapharma Plasma, Inc. is a subsidiary of Octapharma AG, and its 2018 annual revenue was $49.36 million U.S. dollars. Octapharma Plasma Inc. owns 86 U.S. plasma donations center.

Octapharma AG converts source plasma into plasma protein products through fractionation and processing. Each therapy created is controlled, fractionated, purified, virus-inactivated, and inspected before being used. Octapharma AG has delivered a strong performance in 2019. Sales of EUR 2.2 billion represent an increase of EUR 417 million (23.2%) compared to 2018.

## PLASMA PROTEINS AFFECTS PLASMA FRACTIONATION VOLUMES

**14.** The production of plasma proteins for therapeutic use will continue its healthy global development. Despite advances in biotechnology, the plasma fractionation industry will continue to deliver unique therapeutics essential for human life. Plasma consists of the clear liquid portion of the blood characterized by non-specific antibodies used to manufacture many products that treat various medical indications. Antibodies are soluble components in plasma produced by the immune system to fight specific diseases. It is the remaining component after the removal of red cells, leukocytes, and platelets.

Plasma is made up of water, salts, proteins, and antibodies (92% Water, 7% Proteins, and 1% Salt). Plasma constitutes much blood volume (44% Red Blood Cells, 1% White Blood Cells, and 55% Plasma). It is the starting material for a wide range of life-saving medicines.

Plasma is used to produce over 20 medically essential products and has been an important commodity. Plasmapheresis is a mechanical process by which plasma is separated from donated whole blood, and the formed elements (mostly erythrocytes) are returned to the donor.

Unlike the traditional pharmaceutical industry, the plasma industry uses living cells – human blood plasma – as its raw material to manufacture lifesaving drugs. These drugs' production depends on a supply of raw material that is not in infinite supply and is generally significantly more expensive and complicated to obtain than non-living molecules. Even biologics grow in biotechnology facilities.

It is roughly estimated that the raw material's cost exceeds 50% of the finished product's cost, compared with less than 5% in the traditional pharmaceutical industry. Due to its human origin, the supply of plasma for fractionation needs to be carefully planned and managed. Therefore, there is a close link between plasma fractionation volumes, plant throughput, and the various therapeutic proteins' demand. Plasma economics illustrates this relationship

Even though many proteins can be separated from plasma and commercialized, some are more in demand than others. Those generating the highest demand determine the volume of plasma needed for fractionation. By maximizing the volume of plasma fractionated to make each product in adequate quantity, a company can maximize its revenues and profitability.

**a**) The "first liter" of plasma describes a liter of fractionated plasma from which all the company's plasma proteins are sold. Since it includes all the company's commercial products, this first liter of plasma fractionated generates the maximum amount of revenues from each product.

**b)** As more plasma is fractionated, the quantities of proteins (or products), which have low demand, due to smaller patient populations such as factor IX, antithrombin III, etc., disappear from the list of products made from the next liter of plasma.

11

**c)** Since there is still enough demand for the other proteins, such as factor VIII, due to its large patient populations, the company fractionates plasma from the next liter to meet its demand until it is fully assembled. Once the factor VIII demand is completed, it is removed from the list of products made from the next liter of plasma.

**d)** As more plasma is fractionated, one-by-one, each protein product is manufactured in sufficient quantities to meet its respective demand, and it is removed from the list of manufactured products from the next liter of plasma. Eventually, only one product remains to justify fractionation. It is the product with the highest demand, requiring the highest volume of fractionated plasma. The point at which a company stops plasma fractionation to manufacture the final product remaining on the list is its "last liter." In practice, most companies do not fractionate as much plasma to fulfill all their products' demand.

Instead, their "last liter" is determined by their demand for Ig because it generates the highest revenues among all the plasma products. Albumin is often still in need at this fractionation level, leading the companies to sell two "last liter" products; Ig and albumin. Many companies opt for the "two last liters" strategy because the revenues from only one product (albumin or Ig) do not suffice to cover their cost of collecting and fractionating plasma.

Ig has been the driver of plasma fractionation volumes for the past twenty years. Before that, factor VIII was the driving protein for fractionation, but it gradually ended when recombinant factor VIII products were introduced in the early 1990s and cannibalized plasma-derived factor VIII. At present, Ig and albumin are sold from every liter of plasma fractionated, and factor VIII is still sold from nearly all the liters fractionated. Today, Ig accounts for 40-50% of the global plasma proteins market (approximately $20 billion), although this percentage varies significantly

by region. Albumin and plasma-derived factor VIII each have a smaller share of the market (10-15% each) again with wide regional variations.

## RELEVANT GEOGRAPHIC MARKET

**15.** The relevant geographic market in the United States. Like pharmaceutical products, each blood plasma protein must be approved for sale in the United States by the FDA. To obtain approval, the products must be produced from plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA. Performing the requisite clinical trials and undergoing the FDA approval process for plasma and plasma-derivative products, including blood plasma proteins, takes well over two years. Accordingly, blood plasma proteins sold outside of the United States are not viable competitive alternatives for United States customers, who cannot buy these products even in the event of a price increase for products available in the United States. The geographic market scope may be significant, particularly in hospital and healthcare cases where the geographic market is often narrow. Geographic markets can be analyzed using either qualitative and quantitative methods (or both).

A qualitative analysis would look at where competitors market products, regulatory requirements that affect commerce flow, transportation limitations, etc. A commonly used quantitative analysis is SSNIP (or "Small but Significant and Nontransitory Increase in Price"), which uses a hypothetical monopolist to determine mathematically whether that monopolist could impose a significant increase in price in a given area.

## RELEVANT PRODUCT MARKETS

**16.** Ig is a widely used drug that can be administered intravenously ("IVIG"). IVIG, the more predominant form, has over 20 FDA-approved indications and as many as 150 off-label uses. Ig products are antibody-rich plasma therapies that have long been used to treat primary immune deficiencies (to provide antibodies a patient cannot make) and certain autoimmune disorders where it is believed to act as an immune modulator. Physicians frequently prescribe Ig for a wide variety of diseases. However, these uses are not described in the product's labeling and differ from those tested in clinical studies and approved by the FDA or other regulatory agencies in other countries. These unapproved or "off-label" uses constitute the preferred standard of care or last resort treatment for many patients in varied circumstances.  Ig represents the most extensive plasma-derived protein product by value. It is estimated that hospitals purchased 85% of IVIG sold in the United States in 2019 through contracts negotiated with GPOs Physician offices represented about 17% of IGIV volume, home-care companies, and specialty pharmacies represented about 20% of IGIV volume.

> **a)** Ig constitutes a relevant product market.
>
> **b)** There are no suitable substitutes for Ig.

## ALBUMIN

**17.** Albumin is the most abundant protein in human plasma. It is synthesized by the liver and performs multiple functions, including the transport of many small molecules in the blood and the binding of toxins and heavy metals, which prevents damage that they otherwise might cause. Albumin is used to expand blood volume and to prime heart values during surgery.  Albumin generally is used in surgical and trauma settings and is typically sold to hospital groups. Albumin constitutes a relevant product market.  There are no suitable substitutes for albumin. Physicians

and hospitals regard albumin as far superior from a clinical standpoint to potential alternatives, such as hetastarch and saline products.

### RISING PLASMA APPLICATION IN COVID-19 RECOVER TO AID GROWTH

18. The COVID-19 outbreak has led to an extensive study of plasma therapy in the development of antidote. The surging cases around the world have made it a precedent to discover a vaccine against the virus. The use of blood plasma therapy in the recovery of patients has delivered promising results. Hence, the increased use of plasma in disease management is likely to expand the market.

### FAVORABLE GOVERNMENT REGULATIONS TO PROPEL MARKET IN NORTH AMERICA

19. The market size in North America is expected to grow profoundly during the forecast period due to increased research and plasma development. The well-established healthcare infrastructure. The favorable government regulations and FDA approvals are expected to enable the market's speedy expansion in the forthcoming years. The growing participation in plasma donations is expected to foster the healthy growth of the market. The heavy investments in plasma fractionation systems will create lucrative business opportunities for the market.

The global immunoglobulin market size stood at USD $10,750.0 Million in 2017 and is projected to reach USD $18,378.0 Million by 2025, exhibiting a CAGR of 7.0% in the forecast period (2018-2025).

North America is leading the blood plasma products market and occupied approximately 44.2% of the market in 2018. This is due to the rising incidence of hemophilia and the FDA's rapid approval for plasma products.

The global blood plasma products market is forecasted to grow at a CAGR of 6.8% and will reach USD $28.5 billion in 2023 from USD $20.5 billion in 2018. The increasing demand for

immunoglobulin for the treatment of immunodeficiency drive market growth. The blood plasma products market is segmented on immunoglobulin, albumin, hyperimmune globulin, coagulation factor VIII, coagulation factor IX, and other plasma products. The market is also segmented based on end-users such as hospitals, clinics, and other end users. The rise in technology at plasma collection centers to collect plasma and record patient history and dried plasma that reduced cold chain requirements are the major trends in the market that may boost the market growth.

Based on product types, the immunoglobulin market has the highest market share (approximately 47%) because of the growing incidence of immunological diseases and the rise in the geriatric population. The market share of albumin was 15.6% in 2018, driven by an increase in albumin adoption in developing countries and increased awareness of recombinant albumin. Still, postoperative risks associated with albumin-based therapy may hamper market growth. Albumin market share is followed by hyperimmune globulin, coagulation factor VIII, and coagulation factor IX in 2018.

### SEGMENTATION BASED ON END USERS

**20.** Based on end-users, the hospital segment dominated the market with a market share of ~82% in 2018. This is due to the increase in the number of hospitals in developing countries and the rise in awareness of hemophilia diseases. It is followed by clinics with a market share of 14.1% in 2018. The clinic's market is driven by the growing number of clinics, increased awareness among patients regarding plasma products, and a rise in the number of patients with blood and immunological disorders. Other end users included research institutes, blood transfusion centers, and academic institutes with the least market share in 2018.

## MARKET CHARACTERISTICS

**21.** The structure and characteristics of the Blood Plasma Proteins markets in the United States are particularly conducive to a price-fixing agreement. They have made collusion particularly attractive in this market. These factors are discussed below.

## COMMODITY-LIKE PRODUCTS

**22.** A commodity-like product is standardized across suppliers and allows for a high degree of substitutability among different market suppliers. When products offered by other suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on prices for the product and to monitor these prices. Blood Plasma Proteins are homogeneous, commodity-like products within a given product category *(e.g.,* Albumin or Ig), and one Defendant's Blood Plasma Proteins can easily be substituted for a Blood Plasma Protein made by the other Defendant. Indeed, Grifols, a competitor of Defendants, noted in a 2008 SEC filing that "[a]mong albumin products, competition is generally based on price, given that the products tend to be homogeneous." Because Blood Plasma Proteins are commodity-like products, purchasers make purchase decisions based predominantly, if not entirely, on price.

## LACK OF SUBSTITUTES

**23.** The lack of available substitutes for a product also helps facilitate a compelling price-fixing conspiracy. Without replacements, producers of the product can raise prices without losing significant sales to closely competing products. For hospitals, physicians, and others that use blood plasma proteins, there are no suitable substitutes for these products at any price. They must purchase blood plasma proteins regardless of the cost; nothing else will do.

## DEMAND INELASTICITY

**24.** Price elasticity of demand is the measure of responsiveness in quantity demanded a product due to the change in the same product's price. Inelastic demand is a market characteristic that facilitates collaboration, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Inelastic demand is another indicator that a price-fixing conspiracy would be successful. The need for blood plasma proteins is highly inelastic. Blood plasma proteins are considered medical necessities that must be purchased by hospitals, physicians, and others at whatever the cost. Moreover, there are no close substitutes for these products. *Patrick Robert of the Marketing Research Bureau Inc. has noted, "Therapeutic plasma proteins [including Blood Plasma Proteins] remain essential lifesaving drugs for which there is still no competitive drug."*

## INDUSTRY CONCENTRATION

**25.** Defendants control a high percentage of the United States plasma-derivative protein industry, collectively possessing about a 75% market share. In particular, Shire owns about 25% of the market. CSL controls about 27% of the market; Grifols controls about 28% of the market. The remaining manufacturers, Octapharma, possess shares of approximately 8%, Kedrion 4%, respectively. Concerning the domestic Ig market, according to 2013 sales volumes, Defendants collectively own roughly a 75% market share. The market is highly concentrated, with a Herfindahl Hirschman Index ("HHI") of 2,579. (The HHI test is used by the FTC and DOJ to gauge market concentration. An industry with an HHI exceeding 1,800 is deemed "highly concentrated.") Concerning the domestic albumin market, according to 2013 sales volumes, Defendants collectively possess approximately a 75% market share. The market is highly concentrated; Defendants collectively had the market power to raise prices above competitive

levels in the Blood Plasma Proteins markets in the United States without losing appreciable market share.

### BARRIERS TO ENTRY

26. The market for the U.S. plasma collection industry is characterized by high entry barriers. Indeed, no firm has entered *de novo* in recent history, and prospective entrants have little chance of making a meaningful market impact in a timely fashion. Each step of the collection process for entering into U.S. plasma collection industry involves substantial up-front, sunk costs, onerous and lengthy regulatory approvals by federal and state agencies, and specialized technical know-how and expertise.

Entry into the U.S. plasma collection industry requires a significant amount of intellectual property, including trade secrets relating to purification of products and pathogen safety and substantial product research and development. Regulatory hurdles impose substantial barriers to entry and extend the time it would take to enter the United States markets, let alone make a significant impact in the markets.

Besides, the construction and maintenance of production facilities, including regular improvements necessitated by evolving standards of manufacturing practices, requires extensive capital expenditures and may involve long lead times to obtain the necessary governmental approval.

Any new plasma collection competitors in the United States would also need to secure a *"plasma contract"* from Defendants because only plasma collected in the United States is certified for use in products sold domestically and internationally. Currently, only a minimal number of independent plasma suppliers, most of whose plasma collection and center development capacity is already contracted to existing manufacturers "Defendants."

## OPPORTUNITY FOR CONSPIRATORIAL COMMUNICATIONS

**27.** Defendants are members of trade associations and regularly attend meetings together. For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA"). The PPTA is *"the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics."*

Defendants are Global, North American, PPTA Source, and European Members of the association, and their high-level executives serve on the association's "*Global Board of Directors.*" The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level executives from Defendants attend this yearly meeting.

The PPTA Business Forum is presented to the Membership by the PPTA Source Board of Directors and staff. The Business Forum is an opportunity for members to become better informed and more involved in PPTA activities. Such trade association meetings provide the opportunity for participants to know about new potential entries into the plasma business, conspiracies on dividing markets, business to fix prices such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

Plaintiff attended this event in 2003 and 2004 shared his concerns about the economic disparities in the Black community, U.S. plasma collection industry monopoly, and to solicit *"plasma contract"* from the Global Board of Director's "Defendants" but to no avail. Plaintiff believes because of the Defendants dominance, his race as a Black American, systemic racism, marketing plan for the Black community plasma donations markets in the United States; it has caused a global group boycott by Defendant's refusal to deal for monopolistic ends.

20

## MARKET DYNAMICS DURING LATE 1990's-EARLY 2000's

**28.** In the late 1990's, a series of events brought about by temporary plant closures, following FDA intervention, resulted in extensive change in supply for both the domestic and global plasma-derivative protein products industries.

In 1997, in the wake of a recall of albumin produced by a company called Centeon, the FDA mandated the temporary closure of the plant then owned by Centeon at Kankakee, Illinois "which CSL Limited now owns." In 1999, the Alpha Therapeutic Corporation plant in Los Angeles, California "which CSL Limited also now owns" was temporarily closed.

The shortages that resulted from these disruptions, particularly concerning Ig supply, caused higher prices in the United States market, spurring producers to increase plasma collections and output of Blood Plasma Proteins.

Between 2000 and 2003, however, once the Los Angeles facility had recommenced production, there was an oversupply of Blood Plasma Proteins. This led to dramatic price declines and, in turn, to a 30% reduction in gross operating margins among producers. Due to fixed costs representing a high proportion of the total costs of Blood Plasma Proteins production, this translated into a significant downturn in the industry's profits. This period of excess supply, in turn, resulted in another substantial change in the industry, causing the remaining producers to reduce production and plasma collection capacity and to begin in earnest to integrate vertically.

## INDUSTRY CONSOLIDATION

**29.** In 1990, there were 13 producers of plasma-derivative protein products. In 2016, that number dropped to 6. Since 2005, there have been only five: CSL., Baxter, Talecris, Grifols, and Octapharrna. Several firms recently merged or were acquired. The large, integrated suppliers, most notably Defendants, have acquired numerous independent plasma collectors and facilities and

continue to do so. And soon after acquiring them, Defendants shut down many of them. CSL Limited acquired the Swiss Red Cross fractionator, ZLB, and 47 plasma collection centers from Nabi, in July 2000. It acquired Aventis Behring's plasma products business in 2003. CSL Limited subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters. Baxter acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma) in late 2002. As one investment firm with knowledge of the industry has noted, "[a]bout 97% of the [plasma collection] centers are now owned by plasma-products companies such as Shire, CSL Limited, Grifols, Octapharma, Biotest and Kedrion. This represents a complete reversal in ownership since 2000 when 80% of the centers were independent enterprises." In 2005, a significant non-profit entity, the American Red Cross, exited the plasma products industry. As it now exists, the plasma products industry has significantly fewer suppliers than it did even ten years ago. The remaining suppliers, most notably among them Defendants, are larger and more vertically integrated than ever before.

## FACTUAL ALLEGATIONS IN THE PLASMA-DERIVATIVE PROTEINS INDUSTRY
### BACKGROUND

**30.** Defendants collect source plasma, manufacture, and sell blood plasma proteins; the Defendants own all of their U.S. plasma collection centers and have eliminated any entrance into the U.S. plasma collection industry, and have dominated competition through monopoly power. These foreign companies and their subsidiaries (Defendants) now own over 860 U.S. plasma collection centers, eliminating any entry into the U.S. plasma collection industry.   The United States supplies 90 percent of plasma and plasma products to nations across the globe.

SUI JURIS FURQUAN R. STAFFORD (Plaintiff), A Black American medical researcher entrepreneur in the field of blood plasma, Owner and CEO of C.P. Plasma Center, Inc., The Plaintiff aspires to become the first Black American global leader in the U.S. plasma collection industry. The Plaintiff continues to be relentless in his pursuit against Defendants to enter into the *"U.S. plasma collection industry since 1994." Wi*thout a "plasma collection contract" from Defendants *"and the Defendants' monopoly power,"* Plaintiff remains a highly qualified Black American competitor looking in.

Plaintiff alleges that Defendants conspired and combined to boycott Plaintiff and C.P. Plasma Center, Inc. from entering into the U.S. plasma collection industry by refusing *"plasma collection contracts because of his race as a Black American, systemic racism and eliminating competition by monopolizing the Black American plasma donations demographic markets in the United States."* Plaintiff maintains that the constructive boycott of accredited recognition of Plaintiff and C.P. Plasma Center, Inc., as a potential global leader is rooted in many factors but highlights systemic racism and lack of government intervention on prohibitory practices that serve to hinder Plaintiff a Black American entry in the U.S. plasma collection industry.

Black Americans do not want to be isolated, just as Black plasma donors, but Black plasma collection business owners. The unfairness of not allowing a Black American into the U.S. plasma collection industry has restricted the economic growth for Black Americans in the U.S. plasma collection industry. *\*Group Boycotts, also referred to as "concerted refusals to deal," have a long and unsettled history that has included outright per se condemnation, qualified per se condemnation even treatment under the rule of reason. All "concerted refusals to deal" are the product of "collusion," in the sense of "agreement." By "collusive group boycotts," Defendants refer to concerted refusals to deal that result in collusive effects, i.e., those that directly restrict*

*entrance into the U.S. plasma industry plasma contracts, plasma production output, or raise prices.*

The Defendants, Kedplasma, LLC. is a subsidiary of Kedrion SpA of Italy, CSL Plasma, Inc., is a subsidiary of CSL Limited of Australia, Grifols Shared Services North America, Inc. is a subsidiary of Grifols of Spain, and Octapharma Plasma, Inc. is a subsidiary of Octapharma AG of Switzerland. Defendants collect plasma, manufacture, and sell blood plasma proteins. The Defendants own all of their U.S. plasma collection centers and have eliminated, dominated any industry entrance instead of buying plasma from independent Black American plasma collectors. These companies now own over 860 U.S. plasma collection centers, stopping entry into the U.S. plasma collection industry.

The United States supplies 90 percent of plasma and plasma products to nations across the globe. Without a *"plasma collection contract"* from ("Defendants"), Plaintiff remains a highly qualified outsider looking in. Furthermore, the anticompetitive conduct has not only limited Plaintiff efforts to revitalize the Black community through C.P. Plasma Center, Inc. But, it continues to tell the Black community as a whole that "*we prefer you as plasma donors, not as a plasma collection center owner.*" At the same time, firms such as Kedrion SpA of Italy and its subsidiary Kedplasma, LLC., CSL Limited of Australia and its subsidiary CSL Plasma, Inc., Grifols of Spain and its subsidiary Grifols Shared Services North America, Inc., and Octapharma AG of Switzerland and its subsidiary Octapharma Plasma, Inc. are considered violators of anticompetitive laws.

Plaintiff has become the voice for Black plasma donors in the Black community and is also looking at future Black Americans seeking to get involved with this business beyond just being hired or Black plasma donors. *See, Sherman Act 2 prohibits not only "monopoliz[ation]," but

two other things as well.  Recall that under its terms, no "person…shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of…trade or commerce…" 15 USC 2 (emphasis added).  Under current law, the attempt cause of action is essentially the same as the monopolization cause of action.  Plaintiff has shown a lower market power threshold, and defendants specifically acquired monopoly power—two critical cases on attempted monopolization. See*, Swift & Co. v. United States, 196 US 375 (1905), Spectrum Sports, Inc. v. McQuillan, 506 US 447 (1993).

In 2009, the Federal Trade Commission's ("FTC") filing of an administrative complaint that sought to block CSL Limited's attempted acquisition of a smaller manufacturer of Blood Plasma Proteins, Talecris Biotherapeutics Holdings Corporation ("Talecris"), on the basis that the deal would substantially reduce competition in the United States for Blood Plasma Proteins, among other products.  Soon after the FTC filed its complaint, CSL chose to abandon the proposed acquisition.

The FTC's complaint describes, among other things, "troubling signs of coordinated behavior", including signaling-i. e., the intentional sharing of competitive information for purposes of seeking to ensure that manufacturers all are restraining output and curbing growth, thereby promoting higher prices and refusal of new plasma collection businesses in the Black community plasma donations markets.

Cooperative strategies are devices that enable firms to reach the same levels of price and output that would be produced by a profiting explicit cartel. Those involved in collaborative processes generally face the same set of problems that explicit cartels face: most notably, cheating is profitable. *See Pemiscot Memorial Hospital v CSL Limited

In an FTC press release accompanying the filing of the lawsuit, the Director of the FTC's Bureau of Competition stated that "[s]ubstantial consolidation has already occurred in the plasma protein industry, and these highly concentrated markets are already exhibiting troubling signs of coordinated behavior." Moreover, the FTC alleged that if the proposed acquisition were approved, Defendants "would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions for the relevant products."

As a result of the conspiracy, Blood Plasma Proteins prices were higher than they otherwise would have been. Beginning in 2005 and continuing through the present, prices for Blood Plasma Proteins have increased substantially.

As a result of the Defendants' unlawful conduct, Plaintiff and C.P. Plasma Center, Inc. continues to faced systemic racism, barriers to entry into the U.S. plasma collection industry; discriminated as a Black American suffering injury from not being able to compete in a free market. Seeking recovery for the financial harm that the conspiracy has inflicted injury, Plaintiff brings this action on behalf of itself.

✓ In 2003, Congressman John Lewis wrote a letter to Plasma Protein Therapeutic Association President Jan Bult, *"about diversity programs or minority initiatives within the U.S. blood plasma industry."*

✓ In 2008, Plaintiff entered into a Non-Disclosure agreement with Paolo Marcucci, Managing Director of Kedrion, S.p.A. In 2018, Kedrion Biopharma, Inc., via Kedplasma, LLC., opened a plasma center in College Park, Georgia in the same location from information disclosed to Kedrion, S.p.A.

- ✓ In 2009, Plaintiff received a funding letter from Capitol City & Bank Trust Company. Capitol City Bank would fund up to *"80% of the project with a valid plasma agreement from Defendants."*

- ✓ In 2009, Plaintiff received a manual for *"Business Planning for New Customers"* from HAEMONETICS. HAEMONETICS Corporation is a global provider of blood and plasma supplies and services. The first bullet point from *"Critical Success Factors to Consider"* is *"Agreement with the purchaser of plasma product."*

- ✓ In 2009, Letter to Investitori Associati S.p.A., *"Plasma Contractual Agreement with Kedrion S.p.A."*

- ✓ In 2011, Plaintiff received an email from David Bell, EVP, U.S. Operations from Grifols. Mr. Bell stated that *"Grifols has no interest in soliciting or accepting third party supply agreements."*

- ✓ In 2011, Letter from Hilary O. Shelton, Director, NAACP Washington Bureau & Senior Vice President for Advocacy and Policy. States: *"As a matter of facts, we have not been able to identify a single plasma collection center owned and operated by an African American, despite the fact that the percentage of African Americans who donate plasma is unsurpassed by any other racial or ethnic group in our country."*

- ✓ In 2011, United States House Of Representatives – *PROCLAMATION.*

- ✓ In 2012, Plaintiff received an email from David H. Confessore, Senior Director, Business Services from CSL Plasma, that *"CSL is not interested in pursuing any supply contracts with third parties."*

- ✓ In 2012, Morgan Stanley Research, *"IVIG Market Today: Top Three Players Control ~75% of $6.0-6.5 Billion Market."*

✓ In 2012, Letter from Rainbow PUSH Coalition to Baxter International, Inc. *"Corporate Inclusion."*

✓ In 2012, Plaintiff was featured in Rolling Out online publication entitled: *"FURQUAN STAFFORD TAKES A STAND FOR BLACKS WHO DONATE BLOOD PLASMA."*

✓ In 2013, News Article SCLC entitled: *"BLOOD MONEY: Furquan Stafford's Journey to Seek Color in the Blood Plasma Industry Continues"*

✓ In 2016, Georgia State Senate passed Senate Resolution 74. *"Encouraging the development of minority-owned plasma centers; and for other purposes."*

## JURISDICTION AND VENUE

### (I) Rule 4 of the Federal Rules of Civil Procedure

**31.** H.R. 7154 carries forward the policy of the current rule and permits a party to serve a summons and complaint upon individuals and organizations described in Rule 4(d)(1) and (3) following the law of the state in which the district court sits. Thus, the bill authorizes four methods of serving a summons and complaint on such defendants: (1) service by a nonparty adult (Rule 4(c)(2)(A));

### (II) Serving a Corporation, Partnership, or Association

Serving a Corporation, Partnership, or Association. Unless federal law provides otherwise or the Defendant's waiver has been filed, a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served:

(I) Upon a domestic or foreign corporation or a partnership or other unincorporated association, personally or mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment

or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the Defendant.

### (III) Foreign corporations are corporations organized under the local law of a state other than the forum state.

A corporation is incorporated in, or if an unincorporated association, has its principal place of business in, a nation other than the forum nation. A state has the power to exercise jurisdiction over a foreign corporation if the corporation's relationship to the state is such as to make the exercise of such jurisdiction reasonable. *Id. § 42(1). RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 42 comment a (1971) [hereinafter cited as RESTATEMENT OF CONFLICTS].* For this Note, a "foreign" defendant is either a citizen of, or if a corporation, is incorporated in, or if an unincorporated association, has its principal place of business in, one of the United States' states.

A state has the power to exercise jurisdiction over a corporation that has appointed an agent to accept service of process in actions brought against the corporation in the state. *RESTATEMENT OF CONFLICTS, supra, § 44; see, Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93 (1917).*

A court will have jurisdiction over a parent corporation when its subsidiary acts as an agent of the parent corporation or when the parent corporation controls and dominates the subsidiary to such an extent that its independent corporate status is a fiction. In the "alter-ego" theory, a court will "pierce the corporate veil" to find that the two corporations are one. Under either the alter-ego theory or the agency doctrine, a subsidiary corporation's acts may be attributed to its parent, thereby giving the parent sufficient contacts with the forum for due process purposes.

The separate identities and its subsidiary should not be disregarded, even if the subsidiary is wholly owned, except in unusual circumstances. This court should disregard corporate separateness and treat a parent and subsidiary as one parent exerts so much control over the subsidiary that the latter does not have an independent corporate existence. Piercing the corporate veil is one method this court will find to have jurisdiction over a parent corporation.

*Clayton Act, 15 U.S.C. § 22 (1982).* Section 15 of the Clayton Act states that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district of which it is an inhabitant, but also in any district wherein it may be found or transacts business, and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." Id. In Scophony, the United States Government charged that Scophony Limited, its subsidiary, Scophony Corporation of America, three other United States corporations and three individuals had monopolized, attempted to dominate, and conspired to restrain and monopolize interstate and foreign commerce in patents and inventions useful in television and allied industries. *See, United States v. Scophony Corp., 333 U.S. at 796-97.*

**(IV) Georgia specifically adopted and embraced constitutional principles in its Long Arm Jurisdiction Statute.**

*O.C.G.A. §9-10-91; Roberston v. CRI, Inc., 267 Ga. App. 757, 759, 601 S.E.2d 163 (2004).* The Defendant's conduct must form the necessary connection with Georgia to establish a basis for Georgia courts exercising jurisdiction over him or her. *See, Walden v. Fiore, 134 S. Ct. 1115, 188 L. Ed. 2d 12, (2014).*

(I).   A Plaintiff must establish personal jurisdiction by a preponderance of the evidence. Still, at the motions stage, a Plaintiff only must establish a prima facie case for the exercise of personal jurisdiction. *See, New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.,*

416 F.3d 290, 294 (4th Cir. 2005); Gerber Garment Technology, Inc. v. Lectra Systems, Inc., 699 F. Supp. 1576 (N.D.Ga., 1988).

The Georgia Supreme Court held that under Georgia's Long Arm Statute, a business registered to do business in Georgia must be treated as a resident for personal jurisdiction purposes. Therefore, a corporation that registers to do business in Georgia is subject to Georgia courts' general jurisdiction.

The Long Arm statute defines a "nonresident" as, among other things, "a corporation which is not organized or existing under the laws of this state and is not authorized to do or transact business in this state at the time a claim or cause of action arises." O.C.G.A. § 9-10-90. Construing this definition, our Supreme Court determined in Allstate Ins. Co. v. Klein, 262 Ga. 599, 601 (422 SE2d 863) (1992), that a foreign corporation "authorized to do or transact business in this state at the time a claim arises is a "resident" for purposes of personal jurisdiction over that corporation in action filed in the courts of this state.

### (V) A Foreign Corporation authorized to do business in this state is a Georgia resident for Jurisdictional purposes.

A foreign corporation that is authorized to transact business in Georgia "may sue or be sued to the same extent as a domestic corporation." Id. Georgia law prohibits any foreign corporation, a corporation with an originating registration initiated in a state other than Georgia, from transacting business in the state until it obtains a certificate of authority from the Georgia Secretary of State. In return, the corporation reaps the benefits of transacting business throughout Georgia.

Under its registration, a foreign corporation is subject to general personal jurisdiction in Georgia. That means it must respond to any lawsuit filed against it in a Georgia court. The foreign

corporation must do so no matter how remote the lawsuit's connection is to Georgia. See, O.C.G.A. 14-2-1501 (a).

The Supreme Court of Georgia concluded that the exercise of general jurisdiction over a foreign corporation registered to do business in Georgia is authorized by state law. The court held that the corporation is subject to Georgia's jurisdiction based solely on its registration to do business in the state.

The United States Supreme Court's 1917 opinion in Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co., in which the Court affirmed the Missouri Supreme Court's holding that a foreign corporation consented to general jurisdiction under its appointment of an agent in Missouri in compliance with the state's registration statute. See, Pa. Fire Ins. Co. of Phila. v. Gold Issue Mining & Milling Co., 243 U.S. 93, 96–97 (1917).

**(VI) Clayton Act, 15 U.S.C. §§§ 15 and 26 and 28.**

Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit against Defendants for the injuries that Plaintiff has suffered pursuant to Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because Defendants resided, transacted business, were found or had agents in this District. A substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

This Court has personal jurisdiction over each Defendant because each Defendant: transacted business throughout the United States, including in this District; collected plasma and sold Blood Plasma Proteins throughout the United States, including in this District; had substantial

contacts with the United States, including in this District; or engaged in an illegal monopoly scheme and boycott conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Defendants, and each of their relevant operating subsidiaries and parent entities are, and at all appropriate times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the F.T.C. Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

## (VII) 28 U.S. Code § 1391. Venue generally

The general federal venue statute, 28 U.S.C. § 1391, provides that venue in a civil case is proper in (1) a judicial district in which any defendant resides if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a significant amount of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any Defendant is subject to the court's personal jurisdiction concerning such action.

28 U.S.C. § 1391(b). (Section 1391 was amended by the Federal Courts Jurisdiction and Venue Act of 2011, Pub. L. No. 112-63). The statute provides that a corporate Defendant is deemed to "reside" "in any judicial district in which such Defendant is subject to the court's personal jurisdiction for the civil action in question."

## FEDERAL TRADE COMMISSION INVESTIGATION

**31.** On March 27, 2009, the FTC authorized a lawsuit to block CSL Limited's proposed $3.1 billion U.S. dollars acquisition of Talecris Biological Therapeutics, charging that the deal would be illegal and substantially would reduce competition in the United States markets for Ig, albumin, Rho-D, and Alpha-I. On the same day, the FTC also sought a preliminary injunction in

federal district court in the U.S. District of Columbia to stop the transaction pending completion of an administrative trial. In an FTC press release accompanying the filing of the lawsuit, Richard Feinstein, Director of the FTC's Bureau of Competition, stated that "[s]ubstantial consolidation has already occurred in the global plasma protein industry, and these highly concentrated markets are already exhibiting troubling signs of coordinated behavior." The FTC described in its complaint, among other things, "troubling signs of coordinated behavior," including Defendants' signaling, product rationing, and other public statements and actions indicative of anticompetitive conduct. The FTC alleged that with the elimination of Talecris-the one firm that has consistently and significantly expanded output in the United States-CSL and Baxter International, Inc. "Baxter" would face no remaining significant obstacle in their efforts to coordinate and tighten supply conditions for the relevant products, to the great detriment of consumers."

Prominently, numerous sentences and parts of sentences from the FTC complaint have been redacted from public viewing. The FTC has moved to file an unreacted version of the complaint. The FTC has stated that the redacted "language suggests a strong possibility of ongoing coordinated interaction between firms in the global plasma industry." Evidence of transparency, interdependence, and signaling among firms is particularly relevant to this matter's allegations. The language at issue bears on these critical points and demonstrates how firms used specific keywords to:

- ✓ Suggest to each other that increasing the production of life-saving drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the essential products;

- ✓ Remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

✓ Encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms compete with each other for market share.

The FTC also has noted that the redacted "quoted language . . . . is similar to language that in other instances is evidence supporting an illegal price-fixing conspiracy." See, e.g., In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to a competitor as a "friendly competitor," mentioning an "understanding between the companies that ... causes [them] not to ... make irrational decisions," and querying whether competitors "will play by the rules (discipline)" can all be evidence of an explicit agreement to fix prices). CSL Limited has opposed the FTC's motion to file an underacted version of the complaint, claiming that every quote in the complaint derived from the respondents' documents constitutes confidential business information and disclosure of this information irreparably would harm their reputations. The FTC has responded by stating that the redacted material does not qualify as confidential business information and that while disclosure of the material would cause "embarrassment" and "could 'expose respondent to possible treble damages actions,'" those reasons are not sufficient to prevent disclosure.

## PREDATORY CONDUCT

**32.** The sore of conduct that can satisfy the first element of the attempt cause of action that the Defendants engaged in predatory or exclusive behavior designed to acquire monopoly power is the same as that which could satisfy the conduct element of the full-blown monopolization claim. Exclusionary comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further completion on the merits or does so in an unnecessarily restrictive way. 3 Philip Areeda & Donald F. Turner, Antitrust Law 626 (1978). Exclusionary

effects confer market power by raising a rival's costs (as by cutting it off from crucial inputs to its production) or limiting a rival's access to the market (as by cutting off its access to a critical channel of distribution). Exclusionary conduct is always indirect: by excluding a rival or impairing its ability to compete effectively by, for example, raising its costs, the predator hopes to obtain power over price or influence some other dimension of competition. With proof of no more than an actual conspiracy, Defendants have a specific intent to monopolize, and one overt act might have enough to prove a violation, even if the collaboration was of a sort that would not trigger a per se rule under 1. *See generally 1 Am. Bar Assn., Antitrust Law Developments (Sixth) 317-322 (6th ed. 2007).

## ANTITRUST VIOLATIONS

**33.** Defendants have engaged in a monopolization, attempts to monopolize, and conspiring to monopolize to restrict entrance into the U.S. plasma collection industry. These include straightforward arrangements among competing individuals, divide markets, maintain or stabilize the prices of Blood Plasma Proteins in the U.S. plasma collection industry. Based on the previous, and information and belief, in formulating and effectuating the contract, combination or conspiracy, Defendants continues to engage in anticompetitive activities, the purpose and effect of which were to refuse Black American entrepreneurs entry into the U.S. plasma collection industry to build a monopoly in the *"Black American community plasma donations demographic markets in the U.S. plasma collection industry."*

These activities included:

(a) Defendants participating in conversations or communications to discuss monopolizing the U.S. plasma collection industry by dominating, refusing entry into the

industry, production, and price of Blood Plasma Proteins in the U.S. plasma collection industry in the United States;

(b) Defendants agreeing during those conversations or communications refusal of entry into the U.S. plasma collection industry by saying that we want to collect our plasma because third parties do not follow regulatory compliance. This is a scheme that is used to avoid antitrust violations;

(c) Defendants agreeing during these conversations or communications to refuse entrance into the industry to monopolize and to fix or stabilize prices of Blood Plasma Proteins sold in the United States, and Defendants engaged in the activities described above to effectuate the unlawful agreements described in the Complaint. Defendant's conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and 2.

### DAMAGES FOR PRECLUDED ENTRY

**34.** The Plaintiff alleges that an antitrust violation destroyed its "business" before it made its first sale. Quantifying the number of profits that would likely be earned by a company that has never completed entry into the business is a truly extraordinary task. The "before-and-after" approach is inapplicable: there was no "before," and there will be no "after." The vulnerability of firms makes them particularly easy targets for antitrust violations. Many strategic, entry-deterring practices are designed to foreclose rivals before entry is accomplished. A well-designed deterrence policy must permit some kind of redress by unestablished companies injured by anticompetitive practices. For any antitrust damages policy concerning the unestablished business: 1) unestablished company should enforce the antitrust laws employing damages actions; 2) lost anticipated profits is not the best measure of damages. If a court finds a requisite injury and grants

standing, it is generally willing to consider a claim for lost profits under more-or-less the same standards as those applied to established firms driven out of business. Estimating lost profits in such situations is so speculative that the court's decision can be no more than arbitrary. Ex ante, no one could predict the market share or sales volume that could be attained by a prospective business, and the estimate of future profits can be made without some assessment of the volume of sales.

## OPTIMAL DAMAGES FOR EXCLUSIONARY PRACTICES

**35.** An "exclusionary practice" is designed by the perpetrator to discipline or exclude rivals so that it can attain or maintain monopoly power. These practices include monopolization and attempt to monopolize predatory pricing; some concerted refusals are to deal with and tying arrangements. The effect is to exclude a rival from the market for the linked product, exclusive dealing, and other vertical integration forms, including vertical restraints. These restraints have in common that they may drive another firm out of business, prevent it from expanding output, or deter it from entering in the first place. The optimal deterrence model suggests that these practices should be condemned if they gave the perpetrator the ability to earn monopoly profits, and there were no compensating efficiencies.

In most cases involving exclusionary practices, the Plaintiff seeks compensation for what is generally characterized as "lost profits." Such actions include competitor lawsuits alleging illegal monopolization, attempt to monopolize or predatory pricing, or exclusive dealing, illegal mergers, concerted refusals to deal, and violations of the Robinson-Pathan Act. Actions for "lost profit," or loss of the opportunity to do business, are generally of three kinds: 1) steps in which the Plaintiff continues to be a going concern but alleges that it lost sales or market share as a result of the Defendant's violation, or that the antitrust violation increased its cost of doing business; 2)

actions in which the Plaintiff alleges that it was put out of business by the violations; 3) acts in which the Plaintiff alleges that the violation precluded him from ever entering the industry in the first place.

In all cases, the principle underlying the computation of damages is that the Plaintiff is entitled to be put in a position that it would have been in had the anticompetitive conduct not occurred. This generally means that the court must entertain certain assumptions that cannot be established with anything approaching certainty; for example, the Plaintiff's business would have continued to do as well as it did before the violation occurred.

## CAUSE OF ACTION

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT - 15 USC § 1-2

**36.** Plaintiff incorporates and realleges each allegation outlined in the preceding paragraphs of this Complaint. Beginning at least as early as November 1, 1994, and continuing after that, Defendants and through their officers, directors, employees, agents, or other representatives, monopolized and refusal to deal, dominating the U.S. plasma collection industry in the United States violates Section 1 of the Sherman Act, 15 U.S.C. § 1, 2.

Plaintiff has suffered monetarily, emotionally, mentally, spiritually and has been injured because of a group boycott and refusal to deal for monopolistic ends, not having an opportunity to compete because Defendants refusal of a "plasma contract" to enter into the U.S. plasma collection industry and systemic racism. This is a Per se Rule violation because of a group boycott and a concerted refusal to deal. This injury is of the type the Federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful. Plaintiff is not required to show that Defendant's wrongful action was the sole proximate cause of the injury sustained, but

need only prove, with a fair degree of certainty, that Defendant's illegal conduct materially contributed to the injury. Sherman Anti-Trust Act, §§ 1, 2, 15 USCA §§1,2.

Plaintiff should recover treble damages based on antitrust violations; Plaintiff has stated a claim for relief, provided preponderance of evidence, and documented injury as the causally linked to an illegal presence in the U.S. plasma collection industry. The injury reflects the anticompetitive effect of the violation of anticompetitive actions made possible by the offense. It should, in short, be "the type of loss that the claimed violations... would be likely to cause." (Quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 US 100, 125, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)).

## **PRAYER CLAIM FOR RELIEF**

WHEREFORE, Plaintiff, SUI JURIS FURQUAN R. STAFFORD, pray as follows:

**(I)**   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 36 of this Complaint as if fully set forth herein;

**(II)**   Defendants have monopolized and will continue to dominate the Black American plasma donation demographic markets in the U.S. plasma collection industry. These acts are "per se" violations of the Sherman Act; (a) through their conduct injuries that result from interference with the freedom to compete. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A § 1 et seq;

**(III)**   Defendant's monopoly is and has been willful and deliberate;

**(IV)**   Plaintiff has been injured and damaged and will continue to be disabled and damaged by the Defendants monopoly power. Defendant's monopoly power has caused and will continue to cause irreparable harm to Plaintiff unless and until enjoined by this Court;

**(V)**    Defendants systemic racism conduct constitutes discrimination and a prima facie tort under the Sherman Anti-Trust Act, § 2, 15 U.S.C.A § 2;

**(VI)**    Defendant's conduct, acts, or practices have substantially interfered with Plaintiff's ability to compete in the industry on the merits of the parties' refusal to deal and compete in the Black American plasma donations demographic markets;

**(VII)**    Plaintiff has been injured due to the Defendant's dominant market power violation of the Sherman Antitrust Act;

**(VIII)** Defendant's conduct is bad faith, malicious, intentional, and reckless disregard of others' rights;

**(IX)**    As a proximate result of Defendants violations and conduct as set forth above, Plaintiff has been injured in that it has lost customers, sales, and profits which it would have made but for Defendants unlawful activities. Plaintiff has suffered and will continue to lose goodwill and suffer a diminution in value as a growing concern and is entitled to recover treble damages to be proven at trial;

**(X)**    Defendants and all parties contemplated by Rule 65(d) Fed. R. Civ. P., be permanently enjoined from further monopoly Sherman Anti-Trust Act, §§ 1, 2, 15 USCA §§ 1, 2, and;

**(XI)**    The Court adjudge and decree that Defendants to open up markets for "plasma contracts" with Black Americans and Defendants be enjoined from continuing their participation in a monopoly of the U.S. plasma collection industry in violation of Section 2 of the Sherman Act; that the case is brought to enforce constitutional rights under 42 U.S.C. § 1983;

**(XII)** That Plaintiff be awarded civil penalties and treble damages in the dollar amount of one hundred million U.S. dollars, ($100,000,000.00) from each Defendant, and for each violation, these acts are "per se" violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1,2;

**(XIII)** That Plaintiff be awarded to such other relief as this Honorable Court may deem and proper to redress and prevent recurrence of the alleged violations and to dissipate the monopoly;

**(XIV)** That Plaintiff recovers the costs of the suit, as provided by law;

**(XV)** That Plaintiff recover pre-judgment and post-judgment interest as permitted by law and;

**(XVI)** For such other and further relief as is just and proper under the circumstances.

**Dated:** December 7, 2020.

Respectfully submitted,

PLAINTIFF
SUI JURIS FURQUAN R. STAFFORD
2385 GODBY RD. #491468
COLLEGE PARK, GEORGIA 30349
TELEPHONE #: (404) 902-3824
Email: Furquan.Stafford.Sr@gmail.com

42

E

X

H

I

B

I

T

1





#PlasmaDonorsSaveLives

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FURQUAN R. STAFFORD,

    Plaintiff,

v.

GRIFOLS INTERNATIONAL S.A.,
KEDRION S.p.A., OCTAPHARMA AG,
BAXALTA, INC., CSL LIMITED
BIOTEST AG,

    Defendants.

CIVIL ACTION FILE

NO. 1:18-CV-321-SCJ

## ORDER

This matter appears before the Court on the Motions to Dismiss filed by

Defendants CSL Limited, Kedrion S.p.A., Biotest AG, and Grifols International,

S.A. (Doc. Nos. [20], [22], [31], and [34]).

In each of the above-stated motions, the Defendants argue lack of personal

jurisdiction and insufficient service of process under Federal Rules of Civil

Procedure 12(b)(2) and (5).[1] This matter is now ripe for review.[2] The Court will address service of process, first—then, personal jurisdiction.

## I. SERVICE OF PROCESS

### A. **Legal Standard**

"Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served." Pardazi v. Cullman Med. Ctr., 896 F.2d 1313, 1317 (11th Cir. 1990).

Here, Plaintiff is attempting foreign/international service. "[T]he Hague Service Convention specifies certain approved methods of service [abroad] and 'pre-empts inconsistent methods of service' wherever it applies." Water Splash,

---

[1] Defendants also incorporate Rule 12(b)(6) (failure to state a claim) issues, which this Court declines to consider at this time. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430–31 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction). 'Without jurisdiction the court cannot proceed at all in any cause'; it may not assume jurisdiction for the purpose of deciding the merits of the case.") (citations omitted); see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 940 (11th Cir. 1997).

[2] On June 5, 2018, Plaintiff filed a response brief; however, Plaintiff failed to address the Rule 12(b)(2) and (5) issues. Doc. No. [38]. The Court is not permitted to grant a defendant's motion to dismiss solely on the basis of a plaintiff's failure to respond. Cf. Giummo v. Olsen, 701 F. App'x 922, 924 (11th Cir. 2017) ("The district court abused its discretion by interpreting local rule 7.1(B) as permitting it to grant the defendants' motion to dismiss based solely on the plaintiffs' failure to respond in opposition.").

2

Inc. v. Menon, ---U.S. ---, 137 S. Ct. 1504, 1507 (2017).  "[i]n cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law."  Id. at 1513.

Rule 4 of Federal Rules of Civil Procedure sets out the requirements for the service of process.  Fed. R. Civ. P. 4.  To effect service of process under Rule 4(c), a summons must be served with a copy of the complaint.  Id.  The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4[] and must furnish the necessary copies to the person who makes service.  Anderson v. Osh Kosh B'Gosh, 255 F. App'x 345, 347 (11th Cir. 2006) ("A plaintiff is responsible for serving the defendant with both a summons and the complaint within the time permitted under Rule 4[].").  In addition, Rule 4(f) states in relevant part:

> Serving an Individual in a Foreign Country. Unless federal law provides otherwise, an individual--other than a minor, an incompetent person, or a person whose waiver has been filed--may be served at a place not within any judicial district of the United States:
>> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

3

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
> (C) unless prohibited by the foreign country's law, by:
>
>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or[3]

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

If a plaintiff fails to serve the defendant in accordance with Rule 4, the defendant may move to dismiss the plaintiff's claim under Rule 12(b)(5).

---

[3] Subsection (f)(2)(C)(ii) appears to be the focus of the pending motions. It has been held that "Rule 4(f)(2)(C)(ii) provides that service may be effected outside the United States 'by . . . any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served.' This Rule is **limited to instances** where 'there is no internationally agreed means of service or the applicable international agreement allows other means of service.' In addition, service cannot be effected under this Rule in a manner 'prohibited by the law of the foreign country.'" Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., No. 03CIV.8554(LTS)(JCF), 2005 WL 1123755, at *2 (S.D.N.Y. May 11, 2005) (citations omitted) (emphasis added).

Case 1:20-cv-04072-SCJ   Document 1   Filed 12/09/20   Page 49 of 186

However, the burden of establishing that service was insufficient falls on the defendant, who must specifically describe how the service of process failed to meet the procedural requirements of Rule 4.  Hollander v. Wolf, No. 09–80587–CIV, 2009 WL 3336012, at *3 (S.D. Fla. Oct. 14, 2009).  Once the defendant carries that burden, then the burden shifts to the plaintiff to prove a *prima facie* case of proper service of process.  Id.  If the plaintiff can establish that service was proper, then the burden shifts back to the defendant to "bring strong and convincing evidence of insufficient process."  Id. (citations omitted).  "The Court may look to affidavits, depositions and oral testimony to resolve disputed questions on fact."  Id. (citations omitted).

### B. Analysis

As stated above, to support a motion to dismiss pursuant to Rule 12(b)(5), a defendant must specifically describe how the service of process failed to meet the procedural requirements of Rule 4.[4]

Here, Defendant CSL Limited states that Plaintiff served his Complaint on CSL Limited via mail in Australia (Doc. No. [20-1], p. 11 (citing Doc. No. [6])).

---

[4] In reviewing the pending motions, the Court took judicial notice of the State Department and Hague Convention websites pursuant to Federal Rule of Evidence 201.

5

Defendant CSL Limited states that such service is improper under the Federal Rules of Civil Procedure and the Hague Service Convention as Australia does not permit service by regular mail.  Doc. No. [20-1], p. 11.[5]

Defendant Kedrion S.p.A. states that Plaintiff failed to meet the procedural requirements of Rule 4 because Italian law does not allow a private party to mail a complaint to effect service and the Plaintiff's mail was not addressed and sent by the Clerk of Court—or by Court order.  Doc. No. [22-1], pp. 11–12.[6]

---

[5] Defendant CSL Limited does not cite to the provision of the Hague Service Convention that it is relying on for its statement; however, the Court's independent review of the Hague Conference's website shows that "Australia does not object to service by postal channels, where it is permitted in the jurisdiction in which the process is to be served." See https://www.hcch.net/en/states/authorities/details3/?aid=878 (last visited Feb. 21, 2019).  The key is the location of the jurisdiction in which process is to be served. The Court does not have sufficient information as to the applicable jurisdiction.  To this regard, the Court finds that Defendant CSL has not sufficiently demonstrated that service by mail is improper in Australia.

[6] Defendant Kedrion S.p.A. cites persuasive authority in support of its statement regarding Italian law. See The Knit With v. Knitting Fever, Inc., Nos. 08-4221, 08-4775, 2010 WL 2788203, at *10 (E.D. Pa. July 13, 2010)).  However, the State Department's website and other caselaw appear to hold to the contrary.  See https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Italy.html (last visited February 21, 2019) ("International service of process by registered mail is allowed in Italy, but this method will only record delivery to an address and not to a person."); Bondanelli v. Ocean Park SRL, No. CV1207724GAFSSX, 2013 WL 12139129, at *1 (C.D. Cal. Oct. 7, 2013) ("Numerous courts have found that service by mail is accepted in Italy. Moreover, Article 10(a) allows service by mail unless a country has formally objected. Italy has not objected."); and Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 473 (D.N.J. 1998) ("numerous courts have held that service by

Defendant Biotest AG states that "Plaintiff attempted service by sending a copy of the Complaint to Biotest by certified mail." Doc. No. [31-1], p. 4 (citing Doc. No. [5] (return of service for Biotest)]. Defendant Biotest AG states that "[s]uch service is improper under the Hague because 'Germany formally objected to service under Article 10, and does not permit service via postal channels.'" Doc. No. [31-1], p. 4 (citing Davies v. Jobs & Adverts Online, Gmbh, 94 F. Supp. 2d 719, 722 at n. 6 (E.D. Va. 2000) and https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Germany.html (last visited Feb. 21, 2019) ("Germany formally objected to service under Article 10, and does not permit service via postal channels. Any other methods of service, including attempts at service by mail, are considered illegal in Germany and an affront to its judicial sovereignty.").

Defendant Grifols International S.A. asserts that Plaintiff failed to satisfy the service requirements of Federal Rule of Civil Procedure 4(f)(2)(C) because his

---

mail is valid in France and Italy."). To this regard, the Court finds that Kedrion S.p.A. has not specifically demonstrated that service by mail is improper in Italy.

mailing was not addressed and sent by this Court's Clerk's Office, did not require

a signature of receipt, and contained insufficient postage.[7]

Here, Defendants CSL Limited, Kedrion S.p.A., and Grifols International

S.A. have met their burden of establishing that service was insufficient under

Rule 4, as the Clerk did not address and send the mail and a signed receipt was

not required (or executed).[8] See Fed. R. Civ. P. 4 (f)(2)(C)(ii); Exp.-Imp. Bank of

U.S. v. Asia Pulp & Paper Co., No. 03CIV.8554(LTS)(JCF), 2005 WL 1123755, at *2

(S.D.N.Y. May 11, 2005) ("However, the attempted service by mail was ineffective

here both because, in some instances, the service was initiated by the plaintiff

rather than by the Clerk of the Court, and because the Subsidiaries never

executed return receipts."); and G & H Partners, Ltd. v. Boer Goats Int'l Ltd., 896

F. Supp. 660, 663 (W.D. Tex. 1995), aff'd sub nom. G & H Partners v. Boer Goats,

---

[7] Defendant Grifols acknowledges that "Spain has not objected to service via postal channels under Article 10(a) of the Hague Convention." Doc. No. [34-1], p. 15; see also https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Spain.html (last visited Feb. 21, 2019) ("Spain did not object to service under Article 10 of the Hague Service Convention, and therefore does permit service via postal channels.").

[8] As stated above, Defendants CSL Limited and Kedrion S.p.A. have not met their burden of establishing that service by mail is not proper in Australia and Italy; however, said Defendants have met their burden as to the absence of the Clerk's mailing and signed receipt. Accordingly, the above-stated ruling controls.

8

84 F.3d 432 (5th Cir. 1996) ("Rule 4(f) provides that service of process upon individuals and corporations in a foreign country may be obtained by 'any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served' or 'by other means . . . as may be directed by the court.'"). Plaintiffs failed to meet the requirements of Rule 4(f). Although the summons and complaint were sent return receipt requested via mail, the documents were addressed and dispatched by the plaintiffs, not the clerk as required by Rule 4(f)."). Defendant Biotest AG has met its burden of establishing that service by mail is not proper in Germany.

As stated above, once the defendant carries that burden, then the burden shifts to the plaintiff to prove a *prima facie* case of proper service of process. Here, Plaintiff has not presented any evidence to establish a *prima facie* case of proper service of process on the foreign companies/defendants, as the returns of service in the record are facially deficient.

Nevertheless, it has been held that a Rule 12(b)(5) dismissal is premature in the context of foreign service of process in which the rules provide no time bar and the circumstances do not prevent the plaintiff from a second attempt at service of process on the foreign defendant. See e.g., Umbenhauer v. Woog, 969

9

F.2d 25, 31 (3d Cir. 1992); see also Cerner Middle E. Ltd. v. Al-Dhaheri, No. CV 16-11984-FDS, 2017 WL 776409, at *1 n.1 (D. Mass. Feb. 28, 2017) ("defendants conceded that the Rule 12(b)(5) motion was premature as Fed. R. Civ. P. 4(m) does not provide a time limit for service of process in a foreign country"); cf. Betty K Agencies, Ltd. v. M/V Monada, 432 F.3d 1333, 1342 n.5 (11th Cir.2005) (discussing premature dismissals for insufficient service of process in the non-foreign service context).

The Court finds in the exercise of its discretion that the appropriate disposition of the pending motions is to quash the service of process on Defendants CSL Limited, Kedrion S.p.A., Biotest AG, and Grifols International, S.A. See Mitchell v. Theriault, 516 F. Supp. 2d 450, 457 (M.D. Pa. 2007) ("Although [d]efendants' motion was brought pursuant to Federal Rule of Civil Procedure 12(b)(5), district courts reviewing such motions 'possess broad discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply quash service of process. However, dismissal of a complaint is inappropriate when there exists a reasonable prospect that service may yet be obtained. In such instances, the district court should, at most, quash service, leaving the plaintiffs free to effect proper service.'").

10

## II. PERSONAL JURISDICTION

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may assert the defense of lack of personal jurisdiction by motion.[9]

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009). "A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict."[10] Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990) (citations omitted); see also United States v. One 28 Foot Contender Motor Vessel, 240 F. App'x 842, 843 (11th Cir. 2007) ("Directed verdicts are appropriate only where the evidence is so one-sided that no reasonable jury could reach a contrary conclusion.").

---

[9] The Eleventh Circuit has stated that no evidentiary hearing is required when a defendant moves to dismiss for lack of personal jurisdiction. Melgarejo v. Pycsa Panama, S.A., 537 F. App'x 852, 863 (11th Cir. 2013).

[10] "The 1991 amendments to Rule 50 changed the terminology from 'directed verdict' to 'judgment as a matter of law.' The Advisory Committee Notes make clear that this new terminology does not alter the traditional standards applied by district courts and courts of appeal in passing on such motion." Howell v. Burden, 12 F.3d 190, 191 n.1 (11th Cir. 1994).

11

Case 1:18-cv-04379-SCJ   Document 1   Filed 12/08/20   Page 56 of 186

"Where . . . the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" Mazer, 556 F.3d at 1274 (citations omitted). "The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits . . . . [W]here the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." Madara, 916 F.2d at 1514 (citations omitted).

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Mazer, 556 F.3d at 1274.

As this Court sits in Georgia, in the case *sub judice*, the applicable long-arm statute is the State of Georgia's Long-Arm statute, O.C.G.A. § 9-10-91.[11] Said statute provides in relevant part:

---

[11] "When a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's

> A court of this state may exercise personal jurisdiction over
> any nonresident . . . , as to a cause of action arising from any
> of the acts, omissions, ownership, use, or possession
> enumerated in this Code section, in the same manner as if he
> or she were a resident of this state, if in person or through an
> agent, he or she:
>
> (1) Transacts any business within this state;
>
> . . . .
>
> (3) Commits a tortious injury in this state caused by an act or
> omission outside this state if the tort-feasor regularly does or
> solicits business, or engages in any other persistent course of
> conduct, or derives substantial revenue from goods used or
> consumed or services rendered in this state . . . .

O.C.G.A. § 9-10-91(1), (3).

"[T]he exercise of personal jurisdiction in Georgia requires a court to find

that at least one prong of the long-arm statute is satisfied." Diamond Crystal

Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1260 (11th Cir. 2010).

Here, Plaintiff asserts that this Court has personal jurisdiction over each

defendant, because Defendants "transacted business throughout the United

---

supreme court." Lockard v. Equifax, Inc., 163 F.3d 1259, 1265 (11th Cir. 1998). The
Eleventh Circuit Court of Appeals has further stated that "[t]he [Georgia] long-arm
statute must be read literally. It imposes independent obligations that a plaintiff must
establish for the exercise of personal jurisdiction that are distinct from the demands of
procedural due process." Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc., 593
F.3d 1249, 1259 (11th Cir. 2010).

13

States, including in this District; collected plasma and sold Blood Plasma Proteins throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or engaged in an illegal monopoly scheme and boycott conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this district." Doc. No. [1], p. 9, ¶ 21.

Plaintiff does not state which particular subsections under Georgia's Long-Arm statute he is proceeding under in this litigation. After review, the Court construes the Complaint as asserting jurisdiction under the first and third prongs of the Georgia Long Arm Statute, O.C.G.A. § 9-10-91(1), (3). [12] Then, the Court

---

[12] Defendant Grifols construes Plaintiff's allegations as also asserting personal jurisdiction under subsection (2) of Georgia's Long-Arm statute (i.e., "Commits a tortious act or omission within this state . . . ."), based on Plaintiff's allegation that Defendants engaged in "an illegal monopoly scheme and boycott conspiracy that was directed at and had the intended effect of causing injury to persons residing in" the United States and this District. Doc. No. [34-1], pp. 7, 9. However, Plaintiff does not specifically state where the asserted tortious act/omission took place. See Sprint Nextel Corp. v. Ace Wholesale, Inc., No. 1:12-CV-02902-JEC, 2014 WL 688134, at *6 (N.D. Ga. Feb. 21, 2014) ("To determine whether subsection (2) or (3) applies, the Court must first decide where the tortious behavior and injury took place." . . . . "The Georgia Supreme Court has expressly rejected a line of Georgia cases that 'expanded subsection (2) to encompass nonresidents in those situations where the cause of action arising from injury in Georgia resulted from a tortious act or omission occurring outside [the] State.'

14

must determine if the exercise of personal jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## A. **Defendant CSL Limited**

Defendant CSL Limited asserts that "Plaintiff's allegations fail [under the first or third prongs of Georgia's Long-Arm statute], as CSL Limited has not engaged in activity in Georgia." Doc. No. [20-1], p. 5. In support of its motion, Defendant CSL presented the declaration of Gregory A. Boss, its Group General Counsel, in which Mr. Boss stated that "CSL Limited is not registered to transact business in Georgia or any other state in the United States, nor does CSL Limited itself conduct any business in Georgia or any other state in the United States." Doc. No. [20-2], ¶ 2. Defendant CSL Limited states "[a]t best, Plaintiff's Complaint asserts that CSL Plasma Inc., a company which CSL Limited indirectly owns, has contacts in Georgia." Doc. No. [20-1], p. 6. Defendant CSL Limited states that CSL Plasma, Inc.'s transactions are insufficient to establish jurisdiction over CSL Limited and cites authority in support. Id.

---

Instead, a defendant who commits a tortious injury in Georgia caused by an act or omission outside of Georgia must seek jurisdiction under subsection (3)."). Here, it appears to the Court that the tortious/act omission (of monopoly and boycotting conspiracy occurred) outside of Georgia and resulted in injury in Georgia—to this regard, the Court will consider subsection (3) of the Georgia Long-Arm statute.

15

## B. **Defendant Kedrion S.p.A.**

Defendant Kedrion S.p.A. asserts that Plaintiff's allegations under the first and third prong of the Georgia Long-Arm statute fail, as it has not engaged in activity in Georgia.  Doc. No. [22-1], p. 5.  Defendant states that "Kedrion S.p.A. is not registered to transact business in Georgia; nor has it transacted business within Georgia."  Id. at p. 6.  In support of its motion, Defendant includes the Declaration of Paolo Marcucci, its Chairman of the Board of Directors and Chief Executive Officer.  Doc. No. [22-2].  In his Declaration, Mr. Marcucci states that "Kedrion S.p.A. does not in its own capacity regularly conduct or solicit business, or engage in any other persistent course of conduct, or derive substantial revue from goods used or consumed or services rendered in Georgia or other states in the U.S." for the relevant period of the Complaint.  Id. at p. 3, ¶ 5.

## C. **Defendant Biotest AG**

Defendant Biotest AG asserts that this Court lacks personal jurisdiction over it for the following reasons:  Biotest is based in Germany with its headquarters in Dreieich and Biotest: (a) does not have an office in the State of Georgia; (b) is not registered or qualified to do business in the State of Georgia; (c) does not have a registered agent for service of process in Georgia; (d) has no

16

business operations in Georgia; (e) has not paid any taxes of any type in the State of Georgia; (f) does not have a mailing address or post office box in the State of Georgia; (g) has never owned, leased, rented, or used any realty or personal property in the State of Georgia; (h) does not have any employees in the State of Georgia; and (i) has never transacted (or attempted to transact) any business with Plaintiff. Doc. No. [31-1], pp. 2–3. In support of its motion, Defendant included the Declaration of Dr. Michael Ramroth, its Chief Financial Officer, Head of Finances & Central Services, and Member of the Board of Management. Doc. No. [31-2].

### D. **Defendant Grifols International, S.A. ("Grifols")**

Defendant Grifols asserts that Plaintiff failed to establish that this Court can exercise personal jurisdiction over Grifols under Georgia's Long-Arm statute. Doc. No. [34-1], p. 7. Defendant states that "Grifols has established through the Declaration of Alfredo Arroyo, Grifols' Chief Financial Officer, that it is not, and has never been, registered to conduct business in Georgia and does not transact, and has never transacted, business in Georgia." Doc. No. [34-1], pp. 8–9.

17

### E. __Analysis__

As to the first prong of Georgia's Long-Arm statute, "Georgia courts have

yet to fully explain the scope of the '[t]ransacts any business within this state'

language." Diamond Crystal, 593 F.3d at 1262. The Eleventh Circuit has stated

that "unless and until the Georgia courts provide further authoritative guidance,

courts in this circuit construing the statute literally will have to delineate the

precise contours of the '[t]ransacts any business within this state' requirement of

O.C.G.A. § 9-10-91(1) according to the facts of each case." Diamond Crystal, 593

F.3d at 1263. "Interpreted literally, 'transacts any business' requires that the

'nonresident defendant has purposefully done some act or consummated some

transaction in [Georgia].'" Id. at 1264.[13]  Tangible and intangible conduct (such as

mail, telephone calls, and other acts) must be examined to determine if a

nonresident has transacted any business within Georgia. Diamond Crystal, 593

F.3d at 1264. A defendant need not physically enter the state to transact business

---

[13] "In conducting this mixed law and fact inquiry, [the Eleventh Circuit has looked to dictionary sources and found] instructive the literal definition of the words in the statute. 'Transact' means 'to prosecute negotiations,' to 'carry on business,' 'to carry out,' or 'to carry on.' 'Any' means 'to any extent' or 'in any degree.' 'Business' means 'activity directed toward some end,' or 'a usually commercial or mercantile activity customarily engaged in as a means of livelihood,' or 'transactions, dealings, or intercourse of any nature.'" Diamond Crystal, 593 F.3d at 1265 n.18 (internal citations omitted).

18

in Georgia. Id.; see also Crossing Park Props., LLC v. JDI Fort Lauderdale, LLC, 316 Ga. App. 471, 475–76, 729 S.E.2d 605, 609 (2012).

The Eleventh Circuit has held that when a company was not registered to do business in Georgia, had no employees or customers in Georgia and derived no revenue from business activities in Georgia, such contact was not enough under Georgia law to subject the company to personal jurisdiction in Georgia courts. LABMD, Inc. v. Tiversa, Inc., 509 F. App'x 842, 845 (11th Cir. 2013).

In addition, "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there. Where the 'subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary.'" Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1274 (11th Cir. 2002). Relatedly, "under Georgia law, there is no agency relationship between an organization and its parent company simply because the parent may exercise some level of control over its subsidiary." Burgess v. Religious Tech. Ctr., Inc., 600 F. App'x 657, 661 (11th Cir. 2015). In the absence of an agency relationship, it is proper for a district court to conclude that

19

the Georgia Long-Arm statute does not confer personal jurisdiction over the parent company. Id.

In the case *sub judice*, Plaintiff has presented no evidence showing that as to each of the named defendants, the "domestic subsidiary's existence was simply a formality, and that the affiliated corporation was merely the non-resident's agent." Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1275 (11th Cir. 2002). Accordingly, the Court may not acquire jurisdiction over the Defendants based on the actions of their subsidiaries.

As to Defendants CSL Limted, Biotest AG, and Grifols International, S.A., the Court cannot exercise personal jurisdiction under subsections (1) or (3) of Georgia's Long-Arm statute, as Plaintiff has failed to show that said Defendants have transacted any business in Georgia. See Patterson v. Cmty. Health Sys., Inc., No. 3:17-CV-76 (CDL), 2018 WL 1414848, at *1 n.2 (M.D. Ga. Mar. 21, 2018) ("In light of the [c]ourt's ultimate conclusion that [p]laintiff failed to show that either [defendant] transacted any business in Georgia, it follows that [p]laintiff has also failed to show that those entities have engaged in the type of activity required by subsection (3)."). "Because [plaintiff] failed to demonstrate jurisdiction under Georgia's long-arm statute, [this Court] need not decide whether jurisdiction [is]

20

proper under the Due Process Clause" as to these three defendants. Henriquez v. El Pais Q'Hubocali.com, 500 F. App'x 824, 829 (11th Cir. 2012); see also Sullivan, 340 Ga. App. at 286, 797 S.E.2d at 502 (indicating that the third prong (a due process inquiry) of Georgia's three-party test in considering whether courts may exercise personal jurisdiction is only analyzed after the first two prongs determine that defendant has established minimum contacts with the forum state).

The analysis is different as to Defendant Kedrion S.P.A. ("Kedrion"). In the Complaint, Plaintiff states that in 2008, Plaintiff entered into a Non-Disclosure agreement with Kedrion's Managing Director, Paolo Marcucci. Doc. No. [1], ¶ 30. Defendant Kedrion states that Plaintiff's allegation that its Managing Director entered into a Non-Disclosure agreement with Plaintiff is insufficient to support a finding of personal jurisdiction. Doc. No. [22-1], p. 6. Defendant points to non-Georgia legal authority to support this statement; however, this Court must apply Georgia law for purposes of Georgia's Long-Arm statute and "it has been held [in Georgia jurisprudence] that the execution of a contract by an individual personally present within the territorial limits of the state is sufficient to constitute 'transacting business' within the meaning of the statute." Booksing v.

21

Holley, 210 Ga. App. 869, 871, 437 S.E.2d 857, 860 (1993); see also Crossing Park Properties, LLC v. JDI Fort Lauderdale, LLC, 316 Ga. App. 471, 477, 729 S.E.2d 605, 610 (2012) (finding personal jurisdiction under subsection (1) of Georgia Long-Arm statute when there was negotiation and sending of loan documents to Georgia for execution).

Georgia Courts also apply a three-part test in considering whether courts may exercise personal jurisdiction over a nonresident on the basis of the transaction of business: "[j]urisdiction exists on the basis of transacting business in this state if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice." Amerireach.com, LLC v. Walker, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (2011); see also Sullivan v. Bunnell, 340 Ga. App. 283, 286, 797 S.E.2d 499, 502 (2017). Here, the cause of action does not arise from and does not appear to be connected with the Non-Disclosure Agreement, as the cause of action is based on Defendant Kedrion's actions in not doing business with Plaintiff and a Non-Disclosure Agreement is in support of doing business with Plaintiff.

22

Even if prong (1) of the Georgia Long-Arm statute is deemed satisfied, the Court does not find from the evidence before it that Defendant Kedrion possesses sufficient minimum contacts with the State of Georgia so that maintenance of this suit will not offend traditional notions of fair play and substantial justice. Abramson v. Walt Disney Co., 132 F. App'x 273, 276 (11th Cir. 2005).  This is because the only evidence of Defendant Kedrion's contact with the state is the contract with Plaintiff (for which there are no facts that show that the contract was envisioned to be continuing and wide-reaching contacts with the state of Georgia), and "a defendant's relationship with a plaintiff . . . , standing alone, is an insufficient basis for jurisdiction."  Walden v. Fiore, 571 U.S. 277, 286 (2014).[14]

---

[14] Plaintiff has also not attempted to assert that each defendant is not subject to jurisdiction under any state courts of general jurisdiction.  Therefore, the Court has not applied Federal Rule of Civil Procedure 4(k)(2).  Cf. Wolf v. Celebrity Cruises, Inc., 683 F. App'x 786, 793 (11th Cir. 2017) and Schulman v. Inst. for Shipboard Educ., 624 F. App'x 1002, 1005–06 (11th Cir. 2015).

23

## CONCLUSION

The Motions to Dismiss filed by Defendants CSL Limited, Kedrion S.p.A.,
Biotest AG, and Grifols International, S.A. (Doc. Nos. [20], [22], [31], and [34]) are
**GRANTED**. Defendants CSL Limited, Kedrion S.p.A., Biotest AG, and Grifols
International, S.A. are **DISMISSED WITHOUT PREJUDICE** for lack of personal
jurisdiction. As stated above, a dismissal based on the insufficient service of
process ground of the Defendants' motions is premature and moot (based on the
personal jurisdiction ruling, above); however, in the interest of caution, service
of process as to Defendants CSL Limited, Kedrion S.p.A., Biotest AG, and Grifols
International, S.A. is **QUASHED**.

**IT IS SO ORDERED** this 25th day of February, 2019.


s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

24

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN | ) | |
| THERAPIES ANITRUST LITIGATION | ) | Case No. 09 C 7666 |
| | ) | |
| | ) | MDL No. 2109 |
| | ) | |
| THIS ORDER RELATES TO ALL ACTIONS | ) | Judge Joan B. Gottschall |
| | ) | |

## **MEMORANDUM OPINION & ORDER**

The United States Judicial Panel on Multidistrict Litigation ordered the consolidation of

these actions pursuant to 28 U.S.C. § 1407 for the purpose of supervising pretrial proceedings.

(Doc. 1.) This MDL now consists of seventeen class actions brought on behalf of purchasers of

plasma-derivative protein therapies against defendants CSL Limited, CSL Behring LLC, CSL

Plasma (collectively, "CSL"), Baxter International Inc. ("Baxter"), and Plasma Protein

Therapeutics Association ("PPTA"). Plaintiffs allege that CSL and Baxter, the two largest

domestic producers of plasma-derivative therapies, conspired along with PPTA, a trade

association, to restrict supplies of the therapies, thus keeping prices high, in violation of the

Sherman Act, 15 U.S.C. § 1. The court appointed a plaintiffs' steering committee to conduct and

coordinate the discovery stage of litigation, and, on June 4, 2010, plaintiffs filed a Consolidated

Amended Complaint ("CAC"). (Doc. 222.) All defendants have moved to dismiss for failure to

state a claim under the standard in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).

(Doc. 265.) PPTA has filed a separate motion arguing additional grounds for dismissal (Doc.

255), and CSL Limited seeks dismissal based on a lack of personal jurisdiction (Doc. 261).

## I.    BACKGROUND

CSL and Baxter are the largest of only five producers of plasma-derivative protein therapies in the United States.  (CAC ¶¶ 88, 219.)  Plasma therapies are used by hospitals and other healthcare providers in the treatment of certain "serious illnesses including immune deficiency diseases, coagulation disorders, and respiratory diseases."  (*Id.* ¶¶ 2, 50.)  Plaintiffs allege that a series of significant changes in the market for plasma therapy products led to the formation of the conspiracy between CSL, Baxter, and PPTA beginning at least as early as July 1, 2003 and continuing to the present.  During that period, prices of plasma therapies "have risen dramatically," and "Defendants have enjoyed large profit margins."  (*Id.* ¶ 27.)

The lawsuits in this case were triggered by a Federal Trade Commission ("FTC") complaint that was filed in the United States District Court for the District of Columbia seeking to block a planned merger between CSL and one of its competitors.  *See FTC v. CSL Ltd. et al.*, 09-cv-1000, Doc. 54 (D.D.C. Nov. 11, 2009).  The FTC's complaint contained many of the same facts as the CAC and suggested that the planned merger would further consolidate an already highly concentrated market.  CSL eventually called off the merger, and the FTC dismissed its complaint.  However, plaintiffs seized on the FTC's complaint, and they now allege that the merger was part of the broader conspiracy to ensure high prices and profits in the plasma therapies market. For the purposes of this motion, the court takes as true the following facts alleged in the CAC.[1]

---

[1]    The court will summarize only the most significant allegations because the complaint fills nearly eighty pages. One of the side effects of the Supreme Court's decision in *Twombly* is that antitrust complaints have grown in volume as plaintiffs attempt to provide enough factual detail to survive a motion to dismiss. Herbert Hovenkamp, *The Pleading Problem in Antitrust Cases and Beyond*, 95 Iowa L. Rev. Bulletin 55, 56-57 (2010) ("*Twombly*'s approach leads to a great deal of confusion and—in antitrust at least—has produced prolix complaints sometimes running to more than one-hundred pages."). However, it is important to recognize that *Twombly* does not call for detailed factual allegations. It only requires enough facts to show that an alleged conspiracy is plausible. 550 U.S. at 555.

## A.    Characteristics of the Plasma Therapies Market

The manufacturing process for plasma therapies is a multi-step process that can take up to a year to complete. First, the blood plasma must be collected from donors. Then the plasma must be tested, and the proteins are separated out in a process called "fractionation." Finally, the proteins are finished and checked for quality. (CAC ¶ 48.) The manufacture of plasma therapies is tightly regulated by the United States Food and Drug Administration ("FDA") and state regulators. (*Id.* ¶ 49.) Facilities for collection and processing of blood plasma must be approved by the FDA, and the approval process can take more than two years to complete. (*Id.* ¶¶ 59-60.) Because plasma therapies are subject to FDA approval processes, only plasma collected and processed domestically can be sold in the United States. (*Id.* ¶ 59.)

Plasma therapies can be very expensive. Annual cost for treatment can exceed \$90,000 per patient. But the therapies are life-saving, and no adequate substitutes exist. (*Id.* ¶¶ 50-51, 55, 58, 216-17.) Plasma therapies are a commodity-like product with no significant differences among suppliers. (*Id.* ¶¶ 213-14.) The CAC focuses on two of the "most prominent" plasma therapies, immune globulin ("Ig") and albumin. (*Id.* ¶ 52.) Ig is prescribed to treat a wide variety of diseases. (*Id.* ¶ 53.) Albumin is used primarily in surgical and trauma settings "to expand blood volume and to prime heart valves during surgery." (*Id.* ¶¶ 56-57.)

## B.    Pre-Conspiracy Developments

Although the plaintiffs allege that the conspiracy began in 2003, the CAC lays out some of the important history of the plasma therapies industry. Following a recall of albumin in 1997, the FDA closed a plant located in Kankakee, Illinois.[2] In 1999, a plant in California also closed

---

[2]    At the time, the plant was owned by a company called Centeon. Today, it is owned by CSL Behring. (CAC ¶ 62.)

3

temporarily.[3] The closure of these two facilities spurred a national shortage of plasma therapies. (*Id.* ¶ 62.) Concern over the health implications of these developments led to national media coverage, congressional hearings, and increased FDA regulation. (*Id.* ¶¶ 63-64.)

As part of its response to the crisis, the FDA established a requirement for manufacturers to monitor distribution levels of plasma therapies and to report on those levels twice per year. (*Id.* ¶ 65.) The International Plasma Products Industry Association ("IPPIA"), a predecessor to PPTA, organized the industry to take voluntary action, beyond that required by the FDA. Manufacturers promised to make monthly reports about both distribution and inventory of plasma therapies. (*Id.* ¶ 66.)

After the closed plants came back on line, the industry was faced with a reversal of market conditions. Between 2000 and 2003, there was an overabundant supply of plasma therapies. Prices dropped, and producers experienced "a 30% reduction in gross operating margins." (*Id.* ¶ 79.) At the same time, the industry trade association, now known as PPTA after IPPIA merged with another trade group, launched a new program in September 2002 "to monitor total industry output" and "to warn industry participants when inventory levels of Plasma-Derivative Protein Therapies reached certain levels." (*Id.* ¶ 85.)

## C. Consolidation of Plasma Therapies Industry

The efforts at greater industry coordination on monitoring of supply coincided with a period of consolidation among producers. The industry shrunk from thirteen domestic producers in 1990, to nine in 2003, and down to only five by 2005. (*Id.* ¶ 88.) Today, CSL and Baxter together control approximately 60% of the market for plasma therapies. The rest of the market is divided among three other competitors: Talecris Biotherapeutics Holdings Corporation

---

[3]    At the time, the plant was owned by Alpha Therapeutic Corporation, and it is now owned by Baxter. (CAC ¶ 62.)

4

("Talecris") which controls 23% of the market, Grifols USA ("Grifols") which controls 7%, and Octapharma USA, Inc. ("Octapharma") which controls 5%. (*Id.* ¶ 219.) With respect to Ig and albumin, CSL and Baxter control even larger market shares. (*Id.* ¶¶ 219-21.)

The industry also transformed itself in the direction of more vertical integration. (*Id.* ¶¶ 88-97.) The vast majority of plasma collection centers were privately owned in 2000, but, over the next few years, Baxter, CSL, and other plasma therapy producers acquired many of the independent plasma collectors and facilities. By 2008, 80% of the plasma collection centers were owned by the five producers. (*Id.* ¶ 942.) The changes in the industry have left CSL, Baxter, and Talecris as the major competitors. Grifols and Octapharma remain small and without the capacity for significant expansion. (*Id.* ¶ 90.)

## D.    Conspiracy to Limit Supply of Plasma Therapies

As the plasma therapies industry consolidated, defendants continued to cut supplies, even as demand was increasing. (*Id.* ¶ 98.) This business strategy led to increases in price and a shortage of therapies, causing patients to suffer and, in some cases, die. (*Id.* ¶¶ 98, 157-71.) Plaintiffs point to a series of production cuts, strategic acquisitions, and plant closures by CSL and Baxter leading to reduced supply. In July 2003, Baxter announced plans to reduce its annual plasma production by 600,000 liters and to close twenty-six plasma collection centers and a Michigan fractionation facility. (*Id.* ¶ 105.) Then in April 2004, after acquiring rival Aventis Behring, CSL announced its own plans to reduce plasma production at one of the newly acquired plants. (*Id.* ¶ 107.) Around the same time, Baxter announced an additional reduction in annual plasma production of about 400,000 liters. (*Id.* ¶ 111.) In November 2004, Baxter's CFO John Greisch made note of the fact that CSL had reduced its plasma production by about 1 million liters, approximately the same total amount of reduction as Baxter. (*Id.* ¶ 142.) And in 2005,

Baxter closed some of the plasma collection facilities that it had acquired from the American Red Cross. (*Id.* ¶ 111.) From 2005 until the present, plaintiffs allege that CSL and Baxter have maintained a strategy of slow growth to keep supplies low and prices high. (*Id.* ¶¶ 147-50.)

CSL and Baxter regularly met to discuss the pricing and supply of plasma therapies. Executives from both competitors were involved in managing PPTA, and trade association meetings served as the venue for the defendants to confer about business strategy. (*Id.* ¶¶ 115-16.) The minutes of official meetings were "scrubbed" to eliminate incriminating information, and executives also met after the official conferences "at bars for drinks or at restaurants for dinner away from the watchful eyes of association attorneys and other outsiders, and continued to discuss supply levels and pricing in furtherance of the conspiracy." (*Id.* ¶¶ 128, 130.)

In order to police the conspiracy, plaintiffs allege that defendants relied on the data collected by PPTA regarding supply and inventory. (*Id.* ¶¶ 182-84.) And plaintiffs contend that executives of CSL and Baxter engaged in a system of "signaling" through public statements, in order to assure one another that each competitor was maintaining its end of the arrangement. (*Id.* ¶¶ 136-52.) Plaintiffs point to a number of statements made during investor calls, at industry conferences, or in other public fora that demonstrate that CSL and Baxter planned to stick to a strategy of keeping supplies low. (*Id.*)

Defendants attempted to hide the conspiracy by falsely reporting supply data to the government and denying the existence of shortages in the market. They hoped to avoid another government investigation similar to the one which led to intense scrutiny and regulation in the late 1990's. (*Id.* ¶¶ 172-81.)

When defendants feared expansion by Talecris, an increasingly major player in the plasma therapies market, CSL offered to purchase Talecris at a premium price. Baxter expressed

6

its strong support for the proposed merger. (*Id.* ¶¶ 192-93.) The deal fell apart, however, when the FTC filed suit.[4]

## II. ANALYSIS

### A. *Twombly* Motion

Section 1 of the Sherman Act prohibits any "contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The provision reaches only conduct which results from an agreement among firms and not independent action which happens to have an anti-competitive effect. *Twombly*, 550 U.S. at 553-54; *In re Text Messaging Antitrust Litig.*, ---F.3d---, 2010 WL 5367383, at *4 (7th Cir. 2010). Defendants contend that the factual allegations in the complaint do not plausibly suggest such an agreement. Thus defendants move to dismiss the complaint for failure to meet the pleading standard articulated in *Twombly*.

1.    *Twombly* Standard

The Supreme Court, in *Twombly*, held that a plaintiff alleging a § 1 conspiracy must draft a complaint which includes "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The defendants in *Twombly* were the nation's regional telephone operators. The 1984 break up of American Telephone & Telegraph Company led to the creation of regional monopolies for local telephone service, known as Incumbent Local Exchange Carriers ("ILECs"). But the Telecommunications Act of 1996 sought to inject competition into the local service market by requiring ILECs to open their networks to competitors and by permitting ILECs to offer service throughout the country. The complaint made two primary factual allegations: (1) that the ILECs had each simultaneously acted to block new competitors in

---

[4]    An FTC press release from the time of the lawsuit stated that plasma therapies markets "are already exhibiting troubling signs of coordinated behavior." And, according to plaintiffs' complaint, "The FTC has recognized that some of the language from the files of CSL and Baxter would cause them 'embarrassment' and 'could expose [CSL] to possible treble damages actions.'" (*Id.* ¶¶ 205, 210.)

their respective regions, and (2) that the ILECs refrained from competing in each others' regions. The complaint asserted that this parallel conduct resulted from a conspiracy among the ILECs. *Id.* at 549-51.

The Court held that conclusory assertions of conspiracy plus descriptions of parallel behavior are not sufficient to state a claim under § 1 of the Sherman Act where the alleged facts do not suggest that the defendants were acting pursuant to an agreement. Firms within a single industry often act in similar ways even though no coordination has taken place. *Id.* at 554. The parallel behavior could simply be a uniform response to a common stimulus. To borrow an example used by the Seventh Circuit, the simultaneous establishment of thousands of lemonade stands on a hot summer day does not suggest the existence of an agreement among all enterprising children. *Text Messaging*, 2010 WL 5367383, at *4. Similarly, the fact that the ILECs set up roadblocks to the entry of competitors in their regions does not suggest conspiracy. Each individual firm had an incentive to thwart competitors and would have been expected to act accordingly regardless of how the other ILECs behaved. *Twombly*, 550 U.S. at 566.

In a concentrated market, parallel conduct also may result from interdependent behavior, so-called "conscious parallelism." Firms observe or anticipate their competitors' pricing decisions and take that behavior into account in making business decisions.[5] The price of airline tickets is often consistent across competitors, but, from that fact alone, one cannot assume collusion. The airlines could achieve uniformity by observing competitors' rates, which are readily available, and then quickly moving to match prices. The failure of the ILECs in *Twombly*

---

[5]     In a perfectly competitive market with many sellers, the fact that one competitor reduces its price will have only a tiny effect on the profits of the other competitors because each seller controls only a fraction of the supply. The other competitors will not be forced to change their own pricing in response. In a concentrated market, however, each firm controls a significant share of the supply, and a price cut by one firm could significantly cut into the market share of other competitors. The other firms in the industry will have a strong incentive to match any price cut. Thus the firms in the concentrated market are said to be interdependent. Richard A. Posner, Antitrust Law 56 (2d ed. 2001).

8

to enter each other's regions can also be explained as interdependent behavior. Even though each firm was capable of competing in other regions, "a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 568. Parallel behavior, like that alleged in *Twombly*, cannot alone support a conspiracy claim because some additional fact must be pled which allows an inference of agreement to be drawn.

The Court in *Twombly* contrasted the standard to be applied in assessing a complaint at the motion to dismiss stage with the standard applied in evaluating a complete record later on in the litigation. In the context of a motion for summary judgment or for a directed verdict, a plaintiff asserting a § 1 claim must also show more than parallel behavior. However, the evidence "must tend to rule out the possibility that the defendants were acting independently." *Id.*at 554 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)). Of course, any direct evidence of agreement—such as an admission by an insider—will permit a plaintiff to survive summary judgment. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). More often, plaintiffs must rely on circumstantial evidence to demonstrate that the observed behavior resulted from a meeting of the minds rather than independent decisions.

A court faced with a dispositive motion will examine the evidence as follows. First, the court will look for evidence of interdependence or, put another way, that the defendants have an economic motive to behave in concert. *Matsushita*, 475 U.S. at 596-97. Second, the court looks to all the evidence suggesting agreement, or "plus factors," which can be in the form of economic or non-economic evidence. *In re High Fructose Corn Syrup*, 295 F.3d at 655; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999). The court then examines the

9

competing explanations for the evidence offered by the plaintiffs and defendants. If the inference of an agreement seems equally likely to be true as the inference that no agreement exists, then the plaintiff cannot defeat a motion for summary judgment. *Matsushita*, 475 U.S. at 596-97 ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 49 (7th Cir. 1992).

The court engages in a similar analysis in evaluating an antitrust claim at the motion to dismiss stage. The court looks at all the facts pled in the complaint—focusing on any factual allegations suggesting interdependence and the existence of an agreement—and compares the competing explanations offered by plaintiffs and defendants. *See Twombly*, 550 U.S. at 567-68 (stating that an inference that ILEC's conspired to divide the market for phone service was implausible in light of the obvious alternative explanation and lack of any factual allegations suggesting agreement). But *Twombly* identified a much less onerous standard to be applied at the motion to dismiss stage. *Twombly* does not require that the inferences supporting the plaintiffs' explanation be stronger than those supporting the defendants' explanation. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also Text Messaging*, 2010 WL 5367383 at *6 ("[T]he complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote."). The inference that plaintiffs ask the court to draw from the factual allegations need only be "plausible" in light of alternative lawful explanations for the conduct.

10

The Court did not establish a heightened pleading requirement for antitrust cases. *Twombly*, 550 U.S. at 569 n.14. Rule 8 applies in this context, and it requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The well-pled facts of the complaint must be taken as true and construed in the light most favorable to plaintiffs; all possible inferences should be drawn in the plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

2.      Application of *Twombly* Standard to Plaintiffs' Complaint

Defendants argue that the complaint in this case suffers from the same deficiencies as the complaint in *Twombly*. They contend that plaintiffs have failed adequately to allege any parallel conduct by CSL and Baxter demonstrating interdependence; that plaintiffs have not alleged any "plus factors" which tend to show that defendants acted pursuant to an agreement; and that the alleged conspiracy is not plausible in light of the competing explanation that defendants were merely acting according to their independent self-interest.[6]

According to defendants, "only parallel conduct that would be inexplicable absent an agreement supports an inference of a conspiracy under *Twombly*." (Defs.' Mem. in Support of Mot. to Dismiss at 10.) Defendants point to two recent cases in this judicial district where antitrust plaintiffs alleged that multiple firms had undertaken dramatic and near-simultaneous supply cuts. In *Standard Iron Works v. ArcelorMittal*, plaintiffs alleged "concerted and unprecedented production curtailments that occurred on the heels of" industry meetings. 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009). And, similarly, in *In re Potash Antitrust Litigation*, plaintiffs

---

[6]      The court follows the parties' lead in focusing on whether plaintiffs have adequately pled circumstantial evidence of a conspiracy. The plaintiffs suggest that the complaint also contains allegations of direct communications between defendants, which distinguishes the allegations from those in *Twombly*, which alleged conspiracy only in a conclusory manner. (Pls.' Resp. to Defs.' Mot. at 15 n.16.) But the argument appears only in a footnote and is not well developed.

11

alleged that defendants had slashed production and shut down a number of mines "shortly following" industry meetings. 667 F. Supp. 907, 935 (N.D. Ill. 2009).

The allegations in *Standard Iron Works* and *Potash* contrast with this case in that CSL and Baxter allegedly reduced their capacity over a much longer period of time. Both CSL and Baxter are alleged to have cut production by 1 million liters and to have done so over the course of a year. The closure of plasma collection and production facilities occurred gradually, as the firms were acquiring competitors. In subsequent years, as shortages of these products caused a public health crisis, Baxter and CSL continued to pursue a strategy of growing supplies slowly.

The supply cutbacks alleged in *Standard Iron Works* and *Potash* gave rise to an inference that the defendants in those cases were coordinating because the reductions were dramatic, nearly simultaneous, and closely following communications among competitors.[7] The supply cutbacks in this case are alleged to have occurred more gradually and thus could have resulted from one firm observing its competitor's decisions and then independently deciding to follow along.[8] But *Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses. It would be difficult for a court to conclude that a conspiracy had been plausibly alleged without facts demonstrating "that the defendants had a motive to conspire or, which is the same thing, that their behavior is

---

[7]      Similarly, in *Twombly*, the Court noted that an inference of conspiracy could be drawn from allegations of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernable reason." 550 U.S. at 556 n.4. The Court cited to an influential treatise which terms this type of behavior "incredible simultaneous parallelism." 6 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1425c (3d ed. 2010). The paradigmatic example of simultaneous parallelism given by the treatise is of two firms making identical secret bids on some non-standardized product. Without previous coordination, such a coincidence would seem to be totally improbable. *Id.* at 185. The Seventh Circuit recently affirmed another decision from this judicial district denying a motion to dismiss where it was alleged that "[t]he change in the industry's pricing structure was so rapid . . . that it could not have been accomplished without agreement on the details of the new structure, the timing of its adoption, and the specific uniform price increase that would ensue on its adoption." *Text Messaging*, 2010 WL 5367383, at *5.

[8]      The conduct by Baxter and CSL would be described as "sequential parallelism" because each firm would have had time to observe and evaluate its competitor's actions before making its own production decisions. 6 Areeda & Hovenkamp ¶ 1425d, at 188.

12

interdependent." 6 Areeda & Hovenkamp ¶ 1425b, at 184. But interdependence can be inferred from parallel conduct that is sequential rather than simultaneous. *Id.* ¶ 1425d. The complaint in this case plausibly alleges interdependence because, despite rising demand, defendants allegedly reduced their production capacity in order to keep profits high. In a perfectly competitive market, supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower. But in a concentrated market, like the one for plasma therapies, CSL and Baxter have a motive to avoid undercutting one another on price. Of course, as stated earlier, interdependence alone does not suggest a conspiracy, but the complaint may rely on other "plus factors" in order to suggest that consciously parallel behavior is the result of an illegal agreement.

Plaintiffs point to a number of factual allegations which, they argue, support an inference that the parallel conduct in this case resulted from an agreement between CSL and Baxter. Plaintiffs focus on five categories as critical "plus factors" in this case: (1) defendants allegedly took actions "which would have been against their independent economic self-interest, (2) defendants made public statements about supply strategy which were intended as "signals" to competitors that the conspiracy was proceeding, (3) defendants conducted private meetings to discuss price and supply of plasma therapies, (4) defendants submitted false reports to the government about plasma supplies in order to hide the conspiracy, and (5) the structure of the plasma therapies market is conducive to agreement. Looking at all the factual allegations in the complaint, the court concludes that plaintiffs have plausibly alleged a conspiracy.

Some of plaintiffs' suggested "plus factors" are less convincing than others. For example, many of the public statements, which plaintiffs contend are part of a "signaling" strategy meant to keep the conspiracy going, are very general statements to investors or

regulators about the trajectory of the plasma therapies industry. (*See, e.g.,* Compl. ¶¶ 146 (statement by Baxter CFO at industry conference that company is "in a very good position to see stable growth in this business going forward over the next three to five years"), 147 (statement by CSL Limited CEO that, "What we see now is, I think, the industry now heading to a much more predictable phase of stability . . . .").) It is difficult to imagine how these generic statements render the conspiracy allegation more plausible. Other allegations, such as the fact that CSL and Baxter executives gathered during PPTA meetings and afterward at bars and restaurants to discuss pricing and supply, might not, on their own, be particularly suggestive. However, the Seventh Circuit acknowledged in *Text Messaging* that such behavior can "facilitate" coordination "that would be difficult for the authorities to detect." 2010 WL 5367383, at *5.

It is also critical to repeat that an allegation that firms raise price or decrease supply at a time when demand is increasing would not necessarily suggest the firms are acting pursuant to an agreement. Such behavior need not be, as plaintiffs argue, contrary to independent self-interest. *Baby Food*, 166 F.3d at 122 ("The concept of 'action against self-interest' is ambiguous and one of its meanings could merely constitute a restatement of interdependence."). Interdependent firms know that their competitors have an incentive to match price, and an attempt to gain market share by selling low may simply lead to a price war. But the structure of an industry can suggest whether observed parallel behavior is likely to be the result of agreement or mere interdependence. *Text Messaging*, 2010 WL 5367383, at *4 ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion."). Where prices or supplies can be quickly adjusted (as in the airline example above), firms face little risk in waiting to see how competitors price their products.

In this case, plaintiffs have alleged that expanding supply of plasma therapies must be planned well in advance because plasma therapies require months to manufacture. And expanding production capacity requires approval of regulators and potentially years of waiting. Despite these constraints, CSL and Baxter made decisions to cut back production and reduce capacity. These business decisions would be impossible to reverse quickly. As demand increased, the defendants would have been left without the ability to bring supply in line with orders. This sort of parallel behavior has been described as "perilous leading" because, absent an agreement, the first firm to move takes a significant risk that competitors won't follow. 6 Areeda & Hovenkamp ¶ 1425d; *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990) ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."). If Baxter had cut its production, but CSL refused to follow, Baxter might not have realized its error until months later when CSL would have the ability to capture a greater share of the market. Or if Baxter closed plasma collection facilities, but CSL had not behaved similarly, Baxter might have found itself forced to make new, expensive investments or face the prospect of losing its ability to compete.

In addition, the other allegations of the complaint show that the plasma therapeutics industry was ripe for collusion[9] and that defendants had ample opportunity to carry out their scheme. The industry was highly consolidated, with only a handful of firms, making coordination easier. The product, plasma therapies, is uniform across manufacturers, and the demand for the product is highly inelastic because there are no good substitutes. Fixed costs in

---

[9]     In his treatise on antitrust law, Judge Richard Posner lays out a number of factors on which enforcers of the law should focus in seeking out industries where collusion is likely to occur. Among others, he lists the following factors which are relevant in this case: (1) a market concentrated on the selling side and unconcentrated on the buying side, (2) inelastic demand at the competitive price, (3) entry into the market takes a long time, (4) standardized product, and (5) high ratio of fixed to variable costs. Posner, *supra*, at 69-79.

the industry are high, and the big players are vertically integrated. As a result, new or smaller competitors have very limited ability to increase market share. Plaintiffs also allege that defendants met furtively during and after industry meetings to discuss price and supply, and PPTA worked with defendants to create a system for monitoring production in the industry. Thus, defendants had the opportunity to meet and monitor the ongoing agreement.

Defendants make a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest. After the supply of plasma therapies expanded early in the decade, leading to steep declines in profitability, CSL and Baxter naturally had an incentive to reduce capacity and then pursue a strategy of measured growth. CSL and Baxter also had to contend with Talecris, a competitor who, according to the complaint, was expanding aggressively and already controlled a significant share of the market. But despite any doubts about plaintiffs' case, the defendants propose a standard for reviewing the complaint which does not comport with *Twombly* or Rule 8. It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion. Here, the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations.[10] The complaint in this case meets that lower standard. The defendants' motion is denied.

## B. PPTA's Motion to Dismiss

PPTA moves separately to dismiss arguing that, as a trade association and not a market participant, the complaint cannot state a claim against it. PPTA makes a number of contentions:

---

[10]     The *Twombly* Court expressed its concern that antitrust discovery could be expensive and that plaintiffs who put forth implausible allegations should not be permitted to abuse the system. 550 U.S. at 546. But the Supreme Court has also recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data.

16

that trade association activities are presumptively lawful and that its activities are protected by the *Noerr-Pennington* doctrine and the doctrine of implied repeal.

In light of the court's disposition of the *Twombly* motion, PPTA's motion is easily dispatched without delving much into its legal arguments. The court has already concluded that plaintiffs have alleged a plausible conspiracy. The court must also accept as true the well pled allegations that PPTA helped defendants conceal the conspiracy by falsely denying the existence of supply shortages and over-reporting the actual supply to government officials. (Compl. ¶ 173 ("Defendants, via the PPTA, falsely denied and concealed supply shortages and significantly over-reported the actual supply of Plasma-Derivative Protein Therapies in the industry . . . .").) Given this allegation, the court cannot see how it can avoid the conclusion that plaintiffs have adequately pled PPTA's participation in the conspiracy.

PPTA makes two unconvincing arguments to defeat this allegation. First, PPTA contends that plaintiffs have alleged only that the deception was perpetrated "via" PPTA, rather than "by" PPTA, thus demonstrating that PPTA was not responsible for the falsified supply numbers. However, in considering a motion to dismiss, the court must make all inferences in favor of plaintiffs, and the court declines to give the allegation the narrow reading urged by PPTA. Second, PPTA cites *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), for the proposition that a deception used in the course of lobbying a legislative body is protected from antitrust liability by *Noerr-Pennington*. However, that doctrine protects the First Amendment rights of individuals who lobby the government for legislation or regulation which would have an anticompetitive effect. *Id.* at 379-80. PPTA is not alleged to have sought anticompetitive regulation; rather, it is accused of assisting the other defendants in concealing their unlawful activities.

All the other allegations that PPTA vigorously contests are irrelevant at this stage of the litigation. Plaintiffs have plausibly alleged an antitrust conspiracy and that PPTA participated in effectuating the conspiracy. PPTA's motion to dismiss is denied.

## C.    CSL Limited's Motion to Dismiss for Lack of Personal Jurisdiction

CSL Limited's motion to dismiss for lack of personal jurisdiction may also be quickly disposed of. CSL Limited is an Australian company and the parent of CSL Behring and CSL Plasma Inc. According to the motion and an attached affidavit, CSL's plasma therapies business in the United States is conducted entirely by the two subsidiaries, and CSL Limited should be dismissed from the action.

The parties agree that the relevant forum in this case is the entire United States, rather than just the State of Illinois. Plaintiffs bear the burden of making a prima facie showing that jurisdiction is appropriate. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783. A court may exercise in personam jurisdiction over a nonresident corporate defendant when the plaintiff can establish either general or specific jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). General jurisdiction requires that the corporation's contacts with the forum be "continuous and systematic." *Id.* at 416. Specific jurisdiction requires that plaintiffs' injuries "arise out of or relate to" activities by the defendant which are "purposefully directed" at the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Plaintiffs argue that the allegations of the complaint demonstrate that CSL Limited's contacts with the United States permit the exercise of jurisdiction under either theory.

18

The court need not address all the parties' arguments because it appears that the exercise of specific jurisdiction over CSL Limited is appropriate in this case. Plaintiffs allege that CSL Limited acquired rival Aventis Behring for the purpose of facilitating reduced production of plasma therapies in the United States. (Compl. ¶¶ 106-108.) Later, CSL Limited allegedly sought to acquire Talecris in order to achieve the same goal. (Compl. ¶ 192.) Even accepting CSL Limited's affidavit that it did not participate in the manufacture of plasma therapies, the allegations in the complaint suggest that CSL Limited participated in the antitrust conspiracy which was directed at controlling the supply of plasma therapies in the U.S. market. Thus, according to the complaint, CSL Limited's activities were directed at the United States, and plaintiffs' injuries arose out of those activities. Accordingly, CSL Limited's motion is denied.

### III. CONCLUSION

Defendants' motion to dismiss for failure to state a claim is denied. PPTA's separate motion to dismiss is denied. CSL Limited's motion to dismiss for lack of personal jurisdiction is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 9, 2011

19

1010153

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**    **Jon Leibowitz, Chairman**
                                    **William E. Kovacic**
                                    **J. Thomas Rosch**
                                    **Edith Ramirez**
                                    **Julie Brill**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| **Grifols, S.A.,** | )    **Docket No. C-4322** |
| **a corporation** | ) |
| | ) |
| **and** | ) |
| | ) |
| **Talecris Biotherapeutics Holdings Corp.,** | ) |
| **a corporation** | ) |

## COMPLAINT

      Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by said Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondent Grifols, S.A. ("Grifols"), a corporation subject to the jurisdiction of the Commission, has agreed to acquire Respondent Talecris Biotherapeutics Holdings Corp. ("Talecris"), a corporation subject to the jurisdiction of the Commission, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

### I. RESPONDENTS

1.      Respondent Grifols is a public company, headquartered in Barcelona, Spain. With its primary production facilities in Barcelona and Los Angeles, California, Grifols develops, manufacturers, and sells human blood plasma-derived products. Grifols also owns a network of U.S. plasma collection centers to supply its production facilities. Grifols employs approximately 6,000 people worldwide and had global 2009 revenues of $1.3 billion, roughly one-third of which came from sales in the United States.

2.   Respondent Talecris is a public company – owned in part by the private investment firm Cerberus Capital Management, L.P. – that specializes in the development, manufacture, and sale of human blood plasma-derived products.  Talecris is headquartered in Research Triangle Park, North Carolina, with additional regional headquarters in Canada and Germany.  Talecris has production facilities in Clayton, North Carolina, and Melville, New York, and like Grifols, Talecris owns a network of U.S. plasma collection centers to supply those facilities.  Talecris employs approximately 5,000 people worldwide and had global 2009 revenues of approximately $1.5 billion, roughly two-thirds of which came from sales in the United States.

3.   The plasma-derived products manufactured and sold by Respondents are life-sustaining and life-enhancing biologics indicated for, among other things, the treatment of primary immune deficiency diseases, neurological conditions, severe burns, liver failure, and blood coagulation disorders.

## II.  THE ACQUISITION

4.   Pursuant to an Agreement and Plan of Merger dated June 6, 2010, Grifols agreed to acquire Talecris for $3.4 billion in cash and stock (the "Acquisition").  The Acquisition would combine two of the largest manufacturers of life-sustaining plasma-derived products.

## III.  JURISDICTION

5.   Respondents, and each of their relevant operating subsidiaries and parent entities are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  The Acquisition constitutes an acquisition under Section 7 of the Clayton Act.

## IV.  THE RELEVANT PRODUCTS

6.   The relevant product markets in which to analyze the Acquisition are:  (i) Ig, (ii) albumin, and (iii) plasma-derived Factor VIII ("pdFVIII").

### A.  Ig

7.   Ig is a widely used drug that can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG").  IVIG, the more predominant form, has numerous indications approved by the U.S. Food and Drug Administration ("FDA"), and as many as 150 off-label uses.  The most common uses involve the treatment of Primary Immunodeficiency Diseases and neurological conditions – *e.g.*, Guillain-Barré Syndrome and Chronic Inflammatory Demyelinating Polyneuropathy.

2

8. There are no substitutes for Ig for certain indications.  For other indications, physicians and hospitals regard Ig as far superior to all potential substitutes.

9. Ig constitutes a relevant product market in which to analyze the Acquisition's effects.

## B. Albumin

10. Albumin is used as a blood volume expander and to prime heart valves during surgery, treat burn victims, and replace proteins in treating liver failure.

11. There are no good substitutes for albumin.  Physicians and hospitals regard albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

12. Albumin constitutes a relevant product market in which to analyze the Acquisition's effects.

## C. Plasma-Derived Factor VIII

13. pdFVIII is an essential protein responsible for blood coagulation (*i.e.*, clotting), and products containing pdFVIII are FDA-approved to treat individuals with either Hemophilia A or von Willebrand Disease, or in some instances, both.

14. Recombinant Factor VIII ("rFVIII") is made from non-human sources and can also be used to treat Hemophilia A.  Due to perceived differences in safety, rFVIII is the standard of care for previously untreated Hemophilia A patients.

15. For certain treatments, neither rFVIII nor any other product is a clinical substitute for pdFVIII.  For example, rFVIII products do not contain von Willebrand Factor and therefore cannot be used to treat von Willebrand disease.  Purchasers and patients would not switch from pdFVIII to rFVIII in response to a small but significant and non-transitory increase in price of pdFVIII.

16. pdFVIII constitutes a relevant product market in which to analyze the Acquisition's effects.

3

## V. THE RELEVANT GEOGRAPHIC MARKET

17.    The United States is the relevant geographic market in which to analyze the Acquisition's effects.  To compete in the relevant product markets in the United States, a firm must establish a local sales force, service infrastructure, and reputation among purchasers.

18.    Like pharmaceutical products, Ig, albumin, and pdFVIII must be FDA-approved for sale in the United States.  To obtain approval, the products must be made from plasma collected in the United States at FDA-approved collection centers.  These products must also be manufactured at FDA-approved facilities.

19.    Performing the necessary clinical trials and navigating the FDA approval process for plasma and plasma-derived products takes well in excess of two years.  Thus, Ig, albumin, and pdFVIII currently sold outside of the United States are not viable competitive alternatives for U.S. customers, who cannot and do not turn to these products even in the event of a price increase for products currently available in the United States.

## VI.  MARKET STRUCTURE

20.    Under the 2010 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") and relevant case law, the Acquisition is presumptively unlawful in the Ig and albumin markets.  Under the Herfindahl-Hirschman Index ("HHI"), which is the standard measure of market concentration under the Merger Guidelines, an acquisition is presumed to enhance market power if it increases the HHI by more than 200 points and results in a post-acquisition HHI that exceeds 2,500 points. The Acquisition creates market concentration levels well in excess of these thresholds for Ig and albumin.

    a.    Based on 2009 sales volume, the combined firm would have approximately 31.2% of the Ig market and face meaningful competition from only two firms: Baxter International, Inc. ("Baxter") and CSL Limited ("CSL").  As of 2009, Baxter and CSL commanded approximately 35% and 25% of the Ig market, respectively, meaning the three largest suppliers would control more than 91% of the market after the Acquisition.  According to 2009 sales volume, the Acquisition would increase the HHI in the Ig market by 383 points, from 2,518 to 2,901.

    b.    In September 2010, another Ig supplier, Octapharma AG ("Octapharma"), withdrew its Ig product from the U.S. market because of concerns about serious adverse events.  Before the withdrawal, Octapharma accounted for approximately 8.8% of the Ig market.  Now, Octapharma is not selling any Ig in the United States, and its future competitive significance is uncertain.

4

    c.    In addition, the Acquisition would also increase concentration in the albumin market by 333 points, from 2,743 to 3,076, leaving only four meaningful competitors.

21.    Under the Merger Guidelines, acquisitions that increase the HHI by between 100 and 200 points and result in a post-acquisition HHI that exceeds 2,500 points raise potentially significant competitive concerns and often warrant scrutiny. Here, the Acquisition would increase the HHI in the pdFVIII market by 166 points, from 3,491 to 3,657, leaving only three meaningful competitors controlling nearly 100% of the market.

## VII. ENTRY CONDITIONS

22.    Entry into the relevant markets would not be timely, likely, or sufficient to prevent or defeat the Acquisition's likely anticompetitive effects.

23.    The manufacturing process for plasma-derived products is complex and highly regulated and involves technical know-how and proprietary processes involving (i) plasma collection, (ii) plasma testing, (iii) fractionation (*i.e.*, precipitation of solids by manipulation of solution pH, temperature, etc.), (iv) finishing or purification, (v) quality control, and (vi) lot release.

24.    Currently, the U.S. markets for Ig, albumin, and pdFVIII are controlled by a handful of vertically integrated manufacturers, each of which has its own plasma collection, fractionation, and purification facilities. To be successful, a new entrant must develop and produce a product that is at least on par with the incumbent products in terms of safety, efficacy, and reliability. A new entrant – including existing manufacturers outside the United States – also must establish a U.S. sales force, plasma supply, support, manufacturing capability, and a reputation for safety, efficacy, and reliability.

25.    Building the necessary facilities and infrastructure to manufacture Ig, albumin, and pdFVIII takes years and costs tens of millions of dollars. In particular, entry into the relevant product markets *de novo* requires a massive commitment of time and resources.

## VIII. INDUSTRY BACKGROUND AND THE ACQUISITION'S EFFECTS

26.    Historically, the plasma-derived products industry has operated as a tight oligopoly, characterized by a high level of transparency and coordination. Absent relief, Grifols' acquisition of Talecris would eliminate a significant threat to that dynamic.

    a.    A decade ago, there was robust competition in the plasma-derived products industry. After supply increases in the early 2000s led to lower prices, producers "rationalized" production and plasma collection capacity and began to vertically integrate, placing plasma collection almost entirely in the control of the few remaining firms in the market. Manufacturers also underwent horizontal

consolidation, leading to an industry dominated by three large firms – Baxter, CSL, and Talecris – and two smaller ones – Grifols and Octapharma. In the years that followed, the market saw supply shortages and dramatic year-over-year price increases.

b. Signaling among suppliers – *i.e.*, intentional sharing of competitive information for purposes of securing accommodating reactions from other firms – allows them to gain real time insight into each other's strategies and plans. Sensitive competitive information is widely available from a vast array of reports, market analyses, discussions with downstream purchasers, and the suppliers themselves, as firms collect and catalog an extraordinary wealth of timely "competitive intelligence."

c. The industry's primary trade group, the Plasma Protein Therapeutics Association ("PPTA"), facilitates this free exchange of competitive intelligence. The PPTA regularly publicizes aggregated plasma collection, inventory, and throughput data for IVIG, albumin, and pdFVIII, among other products.

d. Manufacturers routinely use PPTA data and other competitive intelligence to calibrate their own collections, output, and pricing decisions and avoid "irrational" behavior, such as oversupplying the market or starting a price war. When this information is combined with the long production cycle for plasma-derived products, suppliers have little opportunity to "cheat" by increasing output, without being detected and potentially punished by other suppliers well in advance of realizing any benefits from such cheating.

27. The Acquisition would substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, in the following ways, among others:

a. eliminating actual, direct, and substantial competition between Respondents for the sale of Ig, albumin, and pdFVIII in the United States;

b. enabling the combined firm and other firms selling Ig, albumin, and pdFVIII to engage more successfully and completely in coordinated interaction that harms consumers;

c. increasing the likelihood that U.S. consumers would be forced to pay higher prices for Ig, albumin, and pdFVIII; and

d. increasing the likelihood that consumers would experience lower levels of innovation and service in the U.S. markets for Ig, albumin, and pdFVIII.

## IX. VIOLATIONS CHARGED

28.   The allegations of Paragraphs 1 through 27 above are incorporated by reference as though fully set forth here.

29.   The Acquisition constitutes a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

30.   The Acquisition, if consummated, would constitute a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this Complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this thirty-first day of May, 2011.

By the Commission, Commissioner Kovacic recused.


Donald S. Clark
Secretary

SEAL:

7

**0810255**

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     Jon Leibowitz, Chairman
                       Pamela Jones Harbour
                       William E. Kovacic
                       J. Thomas Rosch

| | |
|---|---|
| **In the Matter of** )<br><br>**CSL Limited,** )<br>  **a corporation** )<br><br>      **and** )<br><br>**Cerberus-Plasma Holdings, LLC,** )<br>  **a limited liability company.** )<br>) | **Docket No. 9337**<br><br>**REDACTED PUBLIC VERSION** |

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that Respondents CSL Limited ("CSL") and Cerberus-Plasma Holdings, LLC ("Cerberus") have entered into a merger agreement in violation of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, and which merger, if consummated, would violate Section 5 of the FTC Act, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint, stating its charges as follows:

### I.

### NATURE OF THE CASE

1.  CSL's proposed $3.1 billion acquisition of Talecris Biotherapeutics Holdings Corporation ("Talecris") from Cerberus (the "Merger") threatens to substantially lessen competition in the markets for several life-sustaining plasma-derivative protein therapies. The effect will be further tightening of supply relative to demand and steeper price increases – potentially leaving critically ill patients without the treatments they need most.

2.   The Merger would reduce the number of competitors for certain plasma products from three to two and, for other plasma products, from five to four.  Following the Merger, CSL would have just one significant competitor -- Baxter International ("Baxter").  The other two industry firms, Grifols, S.A. ("Grifols") and Octapharma AG ("Octapharma"), are much smaller, with market shares in the single digits, and limited ability to expand their presence in the United States.

3.   Combined, CSL/Talecris would command nearly one-half of the U.S. sales of immune globulin ("Ig"[1]), albumin, and Rho-D (each), and over 80% of alpha-1 antitrypsin ("alpha-1") sales.  Concentration levels in each of these relevant markets far exceed the thresholds provided in the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), giving rise to a strong presumption that the transaction will harm competition.

4.   The industry already operates as a tight oligopoly, with a high level of information sharing and interdependence among firms.  Suppliers have learned they can maximize profits if each firm does its part to maintain overall industry ███████ holding back on expanding output to avoid driving prices lower.  Firms closely monitor each other, collecting and cataloging an extraordinary wealth of timely competitive information, to ensure that all are engaging in desired ████████ and ████████ behavior. ████████████████████████

5.   By acquiring Talecris, CSL would eliminate the only significant threat to this durable and highly profitable oligopoly. ████████████████████████

     The resulting increase in availability of plasma-derivative therapies would have real benefits for patients, but would negatively impact industry profit margins as increased supply would result in lower prices.

6.   ████████████████████████████████████████ provided motivation for the Merger and the significant premium that CSL agreed to pay.

7.   Without the aggressively expanding Talecris, CSL and Baxter, the only two remaining significant firms in the plasma industry, could more successfully and completely suppress industry output relative to demand. ████████████████████████ Baxter has publicly expressed its

---

[1]  Immune globulin for intravenous administration commonly is referred to as "IVIG" or "IGIV."

concurring view that CSL's proposed acquisition of Talecris would be "a positive stabilizing move within the industry."

8.  Other firms would be unable to replace the competition eliminated by the Merger. Barriers to entry are ███████████████████████ Efficiencies likewise are insufficient to offset the Merger's anticompetitive effects.

## II.

## RESPONDENTS

### A.

### CSL Limited

9.  Respondent CSL is a company incorporated and domiciled in Australia, with its office and principal place of business located at 45 Poplar Road, Parkville, Victoria, 3052, Australia.

10. The second-largest supplier of plasma-derivative protein therapies in the world, CSL produces and sells biotherapies indicated for the treatment of several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease. CSL is a vertically integrated company, owning and operating more than 70 plasma collection facilities in the United States and Germany and three manufacturing centers in Switzerland, Germany, and Illinois. CSL's worldwide sales for its 2008 fiscal year were approximately $2.5 billion.

11. CSL's wholly-owned U.S. subsidiary, CSL Behring, is headquartered at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901.

12. CSL is, and at all relevant times has been, engaged in "commerce" as defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and is an entity whose business is in or affects "commerce" as defined in Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 44.

### B.

### Cerberus-Plasma Holdings, LLC

13. Respondent Cerberus is a limited liability company existing and doing business under and by virtue of the laws of the state of Delaware, with its office and principal place of business located at 299 Park Avenue, 22nd Floor, New York, New York 10171. Cerberus is the majority owner and ultimate parent entity of Talecris.

3

14.   Talecris, a wholly-owned subsidiary of Cerberus, is headquartered at 4101 Research
      Commons, 79 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709.
      Talecris is the third-largest producer of plasma-derivative protein therapies in the world.
      Talecris began operations in the United States in 2005, when it acquired Bayer's
      worldwide plasma business.  Like CSL, Talecris is a vertically integrated company,
      owning a number of plasma collection centers in the United States, as well as
      manufacturing facilities in Clayton, North Carolina, and Melville, New York.  Talecris'
      worldwide revenues were $1.2 billion in 2007.

15.   Cerberus is, and at all relevant times has been, engaged in "commerce" as defined in
      Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and is an entity whose
      business is in or affects "commerce" as defined in Section 4 of the Federal Trade
      Commission Act, as amended, 15 U.S.C. § 44.

### III.

### THE MERGER

16.   Pursuant to an Agreement and Plan of Merger dated August 12, 2008, CSL proposes to
      acquire all of the outstanding voting securities of Talecris in a transaction valued at
      approximately $3.1 billion.

17.   ████████████████████████████████████████████████████████
      ████████████████████████████████████████████████████████
      ███████████████████████████ he agreement reached between the parties includes a
      $75 million breakup fee and a deal under which CSL will supply Talecris with plasma for
      a period of five years even if the transaction is not consummated.

### IV.

### THE PLASMA-DERIVATIVE PROTEIN PRODUCTS INDUSTRY

### A.

### General Market Characteristics

18.   The manufacturing process for plasma-derivative protein products involves (1) plasma
      collection, (2) plasma testing, (3) fractionation (*i.e.*, precipitation of solids by
      manipulation of solution pH, temperature, etc.), (4) finishing or purification, (5) quality
      control, and (6) lot release.  The time required to complete the full manufacturing process
      ranges from seven months to one year.

19.   The manufacturing process is highly regulated because plasma products run the risk of
      containing and transmitting infections.  Regulators include the U.S. Food and Drug

Administration ("FDA"), state regulatory agencies, and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

20.    Plasma-derivative protein therapies are essential for treating a number of serious illnesses. The annual cost for these treatments can exceed $90,000 per patient in some cases.

21.    Purchasers (usually hospitals through contracts negotiated by Group Purchasing Organizations ("GPOs")) of plasma-derivative protein products will pay very high prices if necessary to make treatment available to critically ill patients. As a result, small changes in production levels cause dramatic swings in prices for products, and producers stand to increase profits greatly by controlling output relative to demand.

22.    Within each relevant market, the product offerings of the competing plasma firms are largely homogenous. Pricing and other product variables on which firms compete are standardized, enhancing the high degree of transparency in the industry.

**B.**

**Fewer Competitors, Tightening Supply, and Higher Prices**

23.    Aggressive competition among sellers in an open marketplace gives consumers the benefits of lower prices, higher quality products and services, more choices, and greater innovation.

24.    In 1990, there were 13 producers of plasma-derivative products; in 2003, there were nine. Today there are only five: CSL, Talecris, Baxter, Grifols, and Octapharma.

25.    Several firms recently merged or were acquired, and a major non-profit entity, the American Red Cross, exited the industry. Independent plasma collectors also have been acquired by the large fractionators.

26.



5

[redacted]

27. Indeed, over time, as consolidation has occurred in the plasma industry, prices have increased. GPOs, hospitals, physicians – and ultimately patients – have experienced tightening supplies and rising prices in recent years.

28. These price increases have been caused by the consolidation of competitors and the resulting increases in concentration. The remaining participants have recognized that they are operating in an oligopoly in which they are better off avoiding competition, restricting supply, and raising prices.

29. In a recent investor call, Baxter explained how competitors have "lived through the events of the early 2000s," referring to a period of ample supply and lower prices, and have now returned to a time of "very good stock prices and very good returns for shareholders."

30. [redacted]

31. GPOs, hospitals, and physicians are concerned about tight supplies and rising prices, and the effect that the Merger will have on an already strained marketplace.

32. Others also have recognized the movement towards an oligopoly and higher prices. In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were having problems obtaining Ig. HHS concluded in its key findings that Ig "manufacturing is a tight oligopoly in which the leading three manufacturers . . . have a combined market share of around 85%." HHS went on to find:

> Manufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations. In economic terms, current IGIV supplies are being rationed.

. . . .

> The existence of a secondary market with high IGIV prices combined with a manufacturer instituted allocation system for IGIV are symptomatic of a market in which demand exceeds supply.

33.     In particular, the industry recognizes that controlling capacity is critical to preventing price competition and that consolidation has been an effective way to eliminate or control capacity.

34.     In fact, firms in the plasma industry have used consolidation as a tool to eliminate excess capacity and reduce supply, rather than to produce benefits for consumers.  CSL and Baxter each have reduced capacity following past acquisitions. █████████

35.     CSL and Baxter, in particular, have focused on preventing oversupply of IVIG and plasma. █████████

36.     The firms are keenly aware that restrained output is profitable only if all firms cooperate. █████████ Similarly, Baxter recognizes that as long as competitors are not "irrational" and do not "trash price and take share," Baxter can increase supply steadily in line with market demand to keep prices high.

37.     Competitive information is widely available from industry sources and the competitors themselves, and firms closely monitor each others' activities with respect to plasma collection, manufacturing, and output.

38.     Baxter and CSL have developed sophisticated oligopoly models to estimate and predict changes in supply and demand. █████████

39.     Firms also engage in signaling – *i.e.*, intentional sharing of competitive information for purposes of securing accommodating reactions from other firms.  Baxter's CFO acknowledged this in a recent investor call, stating: "Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would.  It wouldn't make sense and *from everything we read and all the signals we get, there is nothing that says anyone would do that.  I think people are very consistent in the messages they deliver*, which are pretty consistent with what we have told you today."  (Emphasis added.)

7

40. Talecris is the one firm in the industry that can thwart the prevailing restrained, oligopolistic approach.



41. In contrast, the remaining competitors in the industry, Grifols and Octapharma, are too small to have a significant market impact.

42.

43.

this Merger will substantially lessen competition in an already oligopolistic industry. The remaining sellers – CSL and Baxter chief among them – will continue to tighten supply relative to demand, forcing critically ill patients to struggle to obtain, and pay even more for, life-saving and life-sustaining therapies.

## V.

## THE RELEVANT PRODUCT MARKETS

44. The relevant product markets in which to analyze the Merger are (1) Ig, (2) albumin, (3) alpha-1, and (4) Rho-D.

### A.

### Ig

45. Ig is a widely used drug that can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG"). IVIG, the more predominant form, has over 20 FDA-approved indications, and as many as 150 off-label uses. The most common uses involve the treatment of Primary Immunodeficiency Diseases ("PID") and neurological conditions – e.g., Guillain-Barré Syndrome ("GBS") and chronic inflammatory demyelinating polyneuropathy ("CIDP").

46.     Ig constitutes a relevant product market in which to analyze the effects of CSL's proposed acquisition of Talecris.

47.     There are no good substitutes for Ig.

## B.

## Albumin

48.     Albumin is used as a blood volume expander and to prime heart valves during surgery.

49.     Albumin constitutes a relevant product market in which to analyze the effects of CSL's proposed acquisition of Talecris.

50.     There are no good substitutes for albumin.  Physicians and hospitals regard albumin as far superior from a clinical standpoint to any potential alternatives, such as hetastarch and saline products.

## C.

## Alpha-1

51.     Alpha-1 is FDA-indicated to treat individuals with alpha-1 antitrypsin deficiency-related lung disease.

52.     Alpha-1 constitutes a relevant product market in which to analyze the effects of CSL's proposed acquisition of Talecris.

53.     There are no good substitutes for alpha-1.

## D.

## Rho-D

54.     Rho-D is the preparation of Rho-D/Anti-Rh IgG antibodies used to prevent hemolytic disease of the newborn ("HDN").  HDN develops when a mother who is Rh-negative conceives a fetus that is Rh-positive, which without treatment results in serious health consequences for the fetus.  When administered to Rh-negative mothers, Rho-D can bind to and destroy the fetal Rh-positive red blood cells.

55.     Rho-D constitutes a relevant product market in which to analyze the effects of CSL's proposed acquisition of Talecris.

56.     There are no good substitutes for Rho-D.

9

# VI.

## THE RELEVANT GEOGRAPHIC MARKET

57.    The relevant geographic market in which to analyze the effects of the proposed transaction is the United States.

58.    Like pharmaceutical products, each of the relevant plasma-derivative protein products must be approved for sale in the United States by the FDA.   To obtain approval, the products must be made from plasma collected in the United States at collection centers approved by the FDA.  Plasma-derivative protein products must also be manufactured at plants approved by the FDA.

59.    Performing the necessary clinical trials and navigating the FDA approval process for plasma and plasma-derivatives takes well in excess of two years.  Thus, plasma-derivative protein products sold outside of the United States are not viable competitive alternatives for U.S. customers, who cannot turn to these products even in the event of a price increase for products currently available in the United States.

# VII.

## MARKET STRUCTURE AND THE MERGER GUIDELINES PRESUMPTION

60.    Under both case law and the government's Merger Guidelines, the Merger is presumptively unlawful in each of the relevant markets.  The post-merger market share of the merged firm would range from 42% to 82%, depending on the market.  The Merger Guidelines measure concentration using the Herfindahl-Hirschman Index ("HHI").  Under that test, a merger is presumed likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100.  Here, the post-merger HHIs range from 3,557 to 7,152, and the HHI increase is between 646 and 1,787, depending on the market.

61.    Appendices A, B, C, and D set forth product-specific market concentration calculations for Ig, albumin, Rho-D, and alpha-1, respectively.

## VIII.

## ANTICOMPETITIVE EFFECTS

### A.

### Ig and Albumin

62.  As described *supra* in Part IV, these markets are not competitive today.

63.  

64.  CSL's proposed acquisition of Talecris would substantially lessen competition by enabling CSL, Baxter, and the other firms selling Ig and albumin to engage more successfully and more completely in coordinated interaction that harms consumers.

65.  The Merger would decrease the number of firms with control over supply of the relevant products, and it would significantly increase industry concentration. As the number of firms decreases and concentration increases, the difficulties and costs of reaching and enforcing an understanding with respect to the control of supply are reduced – as demonstrated by prior consolidations in the industry. Factors such as market transparency, firm and product homogeneity, and available means for punishing deviations from agreed terms will facilitate coordination going forward.

66.  The elimination of Talecris – itself a unique competitive constraint in the relevant markets – would be particularly detrimental to competition.

### B.

### Alpha-1

67.  The Merger would reduce the number of alpha-1 suppliers from three to two and substantially increase market concentration.

68.  CSL's acquisition of Talecris would eliminate the vigorous competition that has existed in the alpha-1 market for the last five years as                                 Alpha-1 patients and doctors benefitted significantly from this non-price and price competition through better education and diagnosis programs, new product introductions and improvements, and lower prices.

69.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮ Post-merger, the combined company would control over 80% of
        alpha-1 sales, and the existing vigorous competition for patients would end.

70.     The two remaining competitors in this market post-merger – CSL and Baxter – would be
        able to coordinate more successfully and completely on price. With very timely, accurate
        pricing information as exists in this industry, this Merger to duopoly would make price
        coordination easier and facilitate prompt detection of deviations from the terms of
        coordination.

                                            C.

                                          Rho-D

71.     Like the alpha-1 market, the market for Rho-D drugs is highly concentrated today with
        only three competitors. The market will be significantly more concentrated, and less
        competitive, with the elimination of Talecris as an independent competitor.

72.     Since their entry into this market in 2004, CSL and Talecris have competed aggressively
        against one another, as the only two (relatively) low-price suppliers of Rho-D. The only
        other Rho-D supplier, Ortho-Clinical Diagnostics ("Ortho"), has stayed out of the fray,
        maintaining its position as a premium, higher-priced supplier. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ atients and doctors have
        benefitted significantly from this head-to-head competition.

73.     Following the Merger, the combined company would control over 40% of the Rho-D
        sales. With this significantly higher share of the market, and no remaining low-priced
        alternatives, CSL/Talecris would be less likely to engage in competitive pricing, thereby
        risking more aggressive competition from the sole remaining supplier, Ortho. In
        addition, this Merger to duopoly would make price coordination easier and facilitate
        prompt detection of deviations from the terms of coordination.

IX.

                                    ENTRY BARRIERS

74.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                                           12

75.   No firm has entered *de novo* in recent history.  Current prospective entrants have scant chances of making a significant market impact in a timely manner.

76.   Each step of the manufacturing process involves significant up-front, sunk costs, onerous and lengthy regulatory approvals, and specialized technical expertise.

77.   Entry into the plasma-derivative protein product markets also requires a significant amount of intellectual property, including trade secrets relating to purification and safety, and substantial product research and development.

78.   In addition, regulatory hurdles impose significant costs to new entry and extend the time it would take to enter the U.S. market with a plasma-derivative protein product, let alone to achieve a significant market impact.

79.   Thus, new entry will not be timely, likely, or sufficient to defeat the anticompetitive effects stemming from the Merger.

80.   Outside of the Big Three (Baxter, CSL, Talecris), only Grifols and Octapharma have an existing presence in the U.S. Ig or albumin markets.  Similar barriers preclude these firms from significantly expanding production in a timely manner to counteract anticompetitive quantity restrictions and price increases.

## X.

## EFFICIENCIES

81.   Extraordinarily great merger-specific efficiencies would be necessary to justify the Merger in light of its vast potential to harm competition.  Such efficiencies are lacking here.

82.   The Merger is not necessary to permit the parties to achieve substantial efficiencies from manufacturing complementarities and supply cost reductions.

83.   Similarly, CSL and Talecris need not merge in order for Talecris to reduce its plasma collection costs, which currently are higher than the industry norm.  As Talecris continues to build up its collection platform, and its centers mature, it likely will become more efficient on its own.

13

# XI.

## VIOLATIONS

### COUNT I - ILLEGAL MERGER

84. The allegations of Paragraphs 1 through 83 above are incorporated by reference as though fully set forth.

85. The Merger, if consummated, would substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.

### COUNT II - ILLEGAL MERGER AGREEMENT

86. The allegations of Paragraphs 1 through 83 above are incorporated by reference as though fully set forth.

87. Respondents CSL and Cerberus, through the merger agreement described in paragraphs 16-17 above, have engaged in unfair methods of competition in or affecting commerce in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

### NOTICE

Notice is hereby given to the Respondents that the twenty-seventh day of October, 2009, at 10:00 a.m. is hereby fixed as the time, and Federal Trade Commission offices, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission and Clayton Acts to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding.

14

In such answer, you may, however, reserve the right to submit proposed findings and conclusions under § 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge will schedule an initial pre-hearing scheduling conference to be held not later than ten (10) days after the answer is filed by the last answering respondent. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (and in any event no later than five (5) days after the answer is filed by the last answering respondent). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving a respondent's answer, to make certain initial disclosures without awaiting a discovery request.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Merger challenged in this proceeding violates Section 7 of the Clayton Act, as amended, or Section 5 of the Federal Trade Commission Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. If the Merger is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant markets, with the ability to offer such products and services as CSL and Cerberus were offering and planning to offer prior to the Merger.

2. A prohibition against any transaction between CSL and Cerberus that combines their businesses in the relevant markets, except as may be approved by the Commission.

3. A requirement that, for a period of time, CSL and Cerberus provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses in the relevant markets with any other company operating in the relevant markets.

4. A requirement to file periodic compliance reports with the Commission.

15

5.      Any other relief appropriate to correct or remedy the anticompetitive effects of the transaction or to ensure the creation of one or more viable, competitive independent entities to compete against CSL/Cerberus in the relevant markets.

IN WITNESS WHEREOF, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this twenty-seventh day of May, 2009.

By the Commission, Commissioner Harbour and Commissioner Kovacic recused.


                         Donald S. Clark
                         Secretary

SEAL

16

181 0081

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      **Joseph J. Simons, Chairman**
                        **Maureen K. Ohlhausen**
                        **Noah Joshua Phillips**
                        **Rohit Chopra**
                        **Rebecca Kelly Slaughter**

|  |  |
|---|---|
| **IN THE MATTER OF** ) | |
| ) | |
| **GRIFOLS, S.A.,** ) | |
|     **a corporation;** ) | |
| ) | **Docket No. C-4654** |
| **and** ) | |
| ) | |
| **GRIFOLS SHARED SERVICES NORTH AMERICA, INC.,** ) | |
|     **a corporation.** ) | |

## COMPLAINT

Pursuant to the Clayton Act and the Federal Trade Commission Act ("FTC Act"), and its authority thereunder, the Federal Trade Commission ("Commission"), having reason to believe that Respondent Grifols, S.A. ("Grifols"), a corporation subject to the jurisdiction of the Commission, has entered into an acquisition with Biotest US Corporation ("Biotest US"), a corporation subject to the jurisdiction of the Commission, in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, that such acquisition, if consummated, would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

## I.  RESPONDENTS

1.     Respondent Grifols, is a corporation organized, existing, and doing business under and by virtue of the laws of the Kingdom of Spain with its executive offices and principal place of business located at Avinguda de la Generalitat, 152-158, Parc de Negocis Can Sant Joan, Barcelona, Spain 08174.  Its United States address for service of process and the Complaint, the Decision and Order, and the Order to Maintain Assets, as follows: General Counsel, c/o Grifols Shared Services North America, Inc., 2410 Lillyvale

1

181 0081

Avenue, Los Angeles, California 90032.  In 2016, Grifols had net revenues of approximately $4.3 billion, of which 56 percent was generated from its North American operations.

2.      Respondent Grifols Shared Services North America, Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Virginia with its executive offices and principal place of business located at 2410 Lillyvale Avenue, Los Angeles, California 90032.

3.      Each Respondent is, and at all times relevant herein has been, engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act as amended, 15 U.S.C. § 12, and engages in business that is in or affects commerce, as "commerce" is defined in Section 4 of the FTC Act, as amended, 15 U.S.C. § 44.

## II.  PARTIES

4.      Biotest US, is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its executive offices and principal place of business located at 901 Yamato Road, Suite 101, Boca Raton, Florida 33431.  Through its subsidiary, Biotest Pharmaceutical Corporation, Biotest US owns a network of 22 U.S. plasma collection centers.  Prior to July 20, 2018 it also owned 41 percent of the stock of ADMA Biologics, Inc. ("ADMA").  ADMA develops, manufactures and sells human blood plasma-derived products in the United States.  In 2017, Biotest US generated approximately $187 million in revenues.

5.      The Biotest Divestiture Trust, is a statutory trust organized under the laws of the State of Maryland and pursuant to the terms of a declaration of trust, dated January 17, 2018, and an Amended and Restated Declaration of Trust, dated July 8, 2018, by and among Biotest AG (an Aktiengesellschaft organized under the laws of the Federal Republic of Germany), as grantor, and Eric Rosenbach, a U.S. citizen.  The mailing address of The Biotest Divestiture Trust is c/o Eric Rosenbach, Trustee, 402 Norfolk Street, Cambridge, Massachusetts 02139.

## III.  THE PROPOSED ACQUISITION

6.      Pursuant to agreements dated December 22, 2017, Grifols agreed to acquire all of the outstanding voting securities of Biotest US from The Biotest Divestiture Trust, which included the outstanding securities of ADMA owned by Biotest US ("acquisition agreement").  Grifols and Biotest US subsequently modified the acquisition agreement ("modified acquisition") to exclude the outstanding securities of ADMA and revalued the

181 0081

acquisition. The acquisition agreement and the modified acquisition (collectively, "the Acquisition") are subject to Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## IV.  THE RELEVANT MARKETS

7.    The relevant lines of commerce in which to analyze the effects of the Acquisition are:

    a.  the development, license, manufacture, marketing, distribution, and sale of hepatitis B immune globulin; and

    b.  the collection of human source plasma.

8.    Hepatitis B immune globulin is a plasma-derived injectable medicine used to provide patients with hepatitis B antibodies to prevent hepatitis B infections.

9.    Human source plasma is a critical input for a variety of medical products that are used to treat diseases and conditions in a variety of therapeutic areas, including pulmonology, hematology, immunology, infectious disease and trauma.  Human source plasma is collected from donors at plasma collection centers.

10.   The relevant geographic area in which to assess the competitive effects of the Acquisition on the hepatitis B immune globulin market is the United States.

11.   The relevant geographic areas in which to assess the competitive effects of the Acquisition on the collection of human plasma market are Lincoln, Nebraska; Augusta, Georgia; and Youngstown, Ohio.

## V.  THE STRUCTURE OF THE MARKETS

12.   Only three companies—Grifols, ADMA and Saol—sell hepatitis B immune globulin in the United States.  ADMA has the largest share, followed by Saol and then Grifols. Biotest US owned 41 percent of the outstanding shares of ADMA.  Without the modification of the acquisition agreement, the Acquisition would have resulted in Respondent Grifols owning 41 percent of the stock of its most significant competitor.

13.   Respondent Grifols and Biotest US are the only two participants in the human source plasma collection market in the three geographic areas identified in Paragraph 11.  The Acquisition would give Respondent Grifols a monopoly in each of the relevant markets.

3

181 0081

## VI.  ENTRY CONDITIONS

14.    Entry into the hepatitis B immune globulin relevant market would not be timely, likely, or sufficient in magnitude, character, and scope to have deterred or counteracted the anticompetitive effects of the acquisition agreement.   Entry would not be timely because of lengthy drug development and FDA approval timelines.   In addition, entry sufficient to deter or counteract the likely competitive harm of the acquisition agreement was unlikely to occur.

15.    Entry into the collection of human source plasma markets is unlikely to be timely and sufficient to deter or counteract the competitive harm likely to result from the Acquisition.   Entry is impeded by the scarcity of qualified donors in the geographic areas identified in Paragraph 11, such that these areas are unlikely to support a new human source plasma collection center.

## VII.  EFFECTS OF THE ACQUISITION

16.    The effects of the Acquisition, if consummated, may be to substantially lessen competition in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, in the following ways, among others:

    a.  by increasing the likelihood that Respondent Grifols would unilaterally exercise market power in the market for hepatitis B immune globulin;

    b.  by eliminating actual, direct, and substantial competition between Grifols and Biotest US in the market for the collection human source plasma;

    c.  by increasing the ability of the merged entity unilaterally to decrease donation fees in the market for the collection of human source plasma; and

    d.  by reducing incentives to improve service or quality in the market for the collection of human source plasma.

## VIII.  VIOLATIONS CHARGED

17.    The Acquisition described in Paragraph 6 constitute a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

4

181 0081

18. The Acquisition described in Paragraph 6, if consummated, would constitute a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**WHEREFORE, THE PREMISES CONSIDERED,** the Federal Trade Commission on this thirty-first day of July, 2018 issues its Complaint against said Respondents.

By the Commission.

Donald S. Clark
Secretary

SEAL:

5

EXHIBIT

2



# GEORGIA
# CORPORATIONS DIVISION

**GEORGIA SECRETARY OF STATE**
## BRAD RAFFENSPERGER

HOME

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | |
|---|---|
| Business Name: | **GRIFOLS SHARED SERVICES NORTH AMERICA, INC.** |
| Business Type: | **Foreign Profit Corporation** |
| Business Purpose: | **NONE** |
| Principal Office Address: | **2410 Lillyvale Ave, Los Angeles, CA, 90032, USA** |
| Jurisdiction: | **Virginia** |

| | |
|---|---|
| Control Number: | **11072632** |
| Business Status: | **Active/Compliance** |
| Date of Formation / Registration Date: | **9/21/2011** |
| Last Annual Registration Year: | **2020** |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Registered Agent Name: | **C T Corporation System** |
| Physical Address: | **289 S Culver St, Lawrenceville, GA, 30046-4805, USA** |
| County: | **Gwinnett** |

### OFFICER INFORMATION

| Name | Title | Business Address |
|---|---|---|
| Chris Healey | CEO | 2410 Lillyvale Ave, Los Angeles, CA, 90032, USA |
| David Pierce | Secretary | 2410 Lillyvale Ave, Los Angeles, CA, 90032, USA |
| Maxime P. de Brouwer | CFO | 2410 Lillyvale Ave, Los Angeles, CA, 90032, USA |

Back

Filing History    Name History    Return to Business Search

grifolsplasma.com

**TALECRIS PLASMA RESOURCES, INC.**
2438 Clark Avenue
Albany, GA 31705
229-420-8456

**TALECRIS PLASMA RESOURCES, INC.**
4335 Victory Drive
Columbus, GA 31903
706-687-1071

**BIOMAT USA, INC.**
630 North Avenue
Macon, GA 31211
478-745-7626

**BIOMAT USA, INC.**
8805 White Bluff Road, Suite G,H, J
Savannah, GA 31406
912-927-4005

**BIOMAT USA, INC.**
233 W Hancock Ave.
Athens, GA 30601
706-354-3898

**BIOMAT USA, INC.**
3190 Atlanta Highway Suite 112-B
Athens, GA 30606
706-715-6628

**BIOMAT USA, INC.**
2704 Peach Orchard Rd.
Augusta, GA 30906
706-798-3061

**BIOMAT USA, INC.**
108 W. Hendry St.
Hinesville, GA 31313
912-255-6150

**BIOMAT USA, INC.**
3000 Windy Hill Rd. SE Suite #220
Marietta, GA 30067
678-504-7333

**BIOMAT USA, INC.**
6290 Jimmy Carter Blvd. #208
Norcross, GA 30071
678-495-5801



**Federal Trade
Commission**

Protecting America's
Consumers 6/1/2011

## FTC Challenges Grifols/Talecris Merger as Anticompetitive

### Settlement Requires Grifols to Divest Assets in the Plasma-Derived Drug Industry

The Federal Trade Commission will require Grifols, S.A, a manufacturer of plasma-derived drugs, to make significant divestitures as part of a settlement allowing Grifols to acquire a leading plasma-derived drug manufacturer, Talecris Biotherapeutics Holdings Corp.

The settlement is the latest FTC action taken to preserve competition and protect U.S. consumers from higher health care costs. It resolves FTC charges that Grifols' proposed acquisition of Talecris would be anticompetitive and would violate federal antitrust laws. As part of the settlement, Grifols will sell the Talecris fractionation facility in Melville, New York, and Grifols' plasma collection centers in Mobile, Alabama, and Winston-Salem, North Carolina, to Kedrion S.p.A Kedrion is a manufacturer of plasma-derived products in Europe and other markets, and will be a new entrant in the U.S. plasma-derived products industry. Grifols also will manufacture three plasma-derived products for Kedrion for several years under a manufacturing agreement.

On June 6, 2010, Grifols agreed to acquire Talecris for approximately $3.4 billion in stock and cash. Grifols, headquartered in Barcelona, Spain, develops and manufactures human blood plasma-derived products, with facilities in Barcelona and Los Angeles. Talecris is based in Research Triangle Park, North Carolina, and also specializes in the development, manufacture, and worldwide sale of blood plasma-derived products.

As alleged in the FTC's complaint, Grifols' proposed acquisition of Talecris would be anticompetitive and violate federal law by lessening competition in the U.S. markets for three blood plasma-derived products:

- Immune globulin (Ig), which is used to treat, among other things, immune deficiencies and neurological disorders;
- Albumin, which is used to expand blood volume, prime heart valves during cardiac surgery, treat burn victims, and replace proteins in patients suffering from liver failure; and
- Plasma-derived Factor VIII (pdFVIII), which is used to treat bleeding disorders, primarily Hemophilia A and von Willebrand disease.

Each of these products must be approved by the Food and Drug Administration for sale in the United States. The FDA requires that they be made only from plasma collected in the United States and made at FDA-approved plants.

According to the FTC, Grifols and Talecris currently have approximately 8.4 percent and 22.8 percent of the U.S. Ig market, respectively, and their merger would leave only three meaningful manufacturers with nearly all U.S. Ig sales. In the market for albumin, the companies have U.S. market shares of approximately 13 percent each, and the acquisition would leave only four significant competitors. In the market for pdFVIII, Grifols and Talecris have 23 percent and 3.6 percent of the U.S. market, and after their merger there would be only three main competitors.

In its complaint, the FTC alleges that the acquisition of Talecris by Grifols would eliminate direct competition for the products in the three plasma-derived markets. With fewer competitors in the market, those remaining could more easily work together through coordinated interaction to reduce supply and raise prices for consumers.

The FTC's proposed settlement order is designed to remedy the alleged anticompetitive impacts of the transaction as proposed. It requires Grifols to: 1) sell the fractionation facility Talecris currently owns in Melville, New York, to Kedrion; 2) sell plasma collection centers to Kedrion; 3) sell Talecris' Koate pdFVIII business, including the Koate brand name in the United States, to Kedrion; and 4) manufacture private-label Ig, private-label albumin, and Koate for seven years for Kedrion to sell in the United States.

The proposed order will expedite the entry of Kedrion as an additional competitor into each of the three blood plasma-derived markets, making a potential industry-wide coordinated plan to raise prices more difficult. Kedrion's entry will limit he ability of the combined Grifols-Talecris to raise prices. As a significant provider of plasma-derived products outside the United States, Kedrion has the resources and ability to become an effective competitor in the U.S. market. The order's terms will ensure that Kedrion will have immediate access to these markets and will be able to supply Ig, albumin, and pdFVIII in the United States, adding to the available supply of these life-saving products.

The Commission vote approving the complaint and proposed consent order was 4-0, with Commissioner William E. Kovacic recused and Commissioner Julie Brill issuing a separate concurring statement. The proposed order will be published in the Federal Register subject to public comment for 30 days, until July 1, 2011, after which the Commission will decide whether to make it final. Comments can be submitted electronically here.

In her concurring statement, Commissioner Brill stated that whether to approve the proposed consent is a "close call." She noted past competition concerns in the industry and their detrimental effects on consumers, including safety-net providers who serve indigent and other at-risk patients. Commissioner Brill further stated: "I expect that the Commission, other federal and state agencies, and affected purchasers will closely monitor these markets" in the future.

**NOTE:** The Commission issues a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The issuance of a complaint is not a finding or ruling that the respondent has violated the law. A consent order is for settlement purposes only and does not constitute an admission of a law violation. When the Commission issues a consent order on a final basis, it carries the force of law with respect to future actions. Each violation of such an order may result in a civil penalty of up to $16,000.

**Copies** of the complaint, consent order, and an analysis to aid public comment are available from the FTC's website at http://www.ftc.gov and also from the FTC's Consumer Response Center, Room 130, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The FTC's Bureau of Competition works with the Bureau of Economics to investigate alleged anticompetitive business practices and, when appropriate, recommends that the Commission take law enforcement action. To inform the Bureau about particular business practices, call 202-326-3300, send an e-mail to antitrust{at}ftc{dot}gov, or write to the Office of Policy and Coordination, Room 394, Bureau of Competition, Federal Trade Commission, 600 Pennsylvania Ave, N.W., Washington, DC 20580. To learn more about the Bureau of Competition, read Competition Counts. Like the FTC on Facebook and follow us on Twitter.

**MEDIA CONTACT:**

Mitchell J. Katz
*Office of Public Affairs*
202-326-2161

**STAFF CONTACT:**

Jeffrey Perry
*FTC Bureau of Competition*
202-326-2331

(FTC File No. 101-0153)
(Grifols-Talecris.final)

---

**E-mail this News Release**
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

| Related Items: |
|---|

| *In the Matter of* **Grifols, S.A., a corporation, and Talecris Biotherapeutics Holdings Corp., a corporation**<br>Docket No. C-4322<br>FTC File No. 101 0153 |
|---|

Last Modified: Wednesday, June 1, 2011

🔒 grifols.com

# GRIFOLS

SEARCH 🔍    EN ∨

COMPANY    COMMITMENT    INNOVATION    TEAM    PRODUCTS AND SERVICES    INVESTORS    CAREERS    ⁙    CONTACT

AUGUST 1, 2018

## Grifols expands its plasma collection network by acquiring 24 Biotest centers in the United States

 

The transaction aligns with Grifols' corporate strategy and enables the company to reinforce its donation-center expansion plan

- Grifols acquires 100% of Biotest U.S. Corporation's shares for USD 286 million after obtaining approval by the Federal Trade Commission (FTC), the U.S. antitrust authority

- The transaction aligns with Grifols' corporate strategy and enables the company to reinforce its donation-center expansion plan, initiated in 2015, to increase and diversify its access to its main raw material used to produce plasma-derived therapies

- Grifols is the worldwide leader in plasma collection, with nearly 250 centers in the United States and Europe following the acquisition of the German firm Haema. Its strategic plan also includes building and managing plasma centers in China

*Barcelona (Spain), August 1, 2018.-* Grifols (MCE: GRF, MCE: GRF.P, NASDAQ: GRFS) has closed a transaction to acquire 24 plasma donation centers in the United States operated by Biotest Pharmaceuticals Corp., a wholly-owned subsidiary of Biotest US Corporation, for USD 286 million (EUR 244 million). Grifols financed the transaction with its own resources, without issuing debt.

Following this acquisition, Grifols will own 249 plasma donation centers to ensure access to its main raw material and increase its supply of plasma proteins used for therapeutic purposes. All of the newly acquired plasma donation centers are licensed by the U.S. Food and Drug Administration (FDA) and European health authorities. In 2017, these acquired plasma donation centers collected approximately 850,000 liters of plasma.

The agreement includes 24 collection centers, 2 plasma centers under construction and a series of other assets, among them, existing working capital amounting to approximately USD 40 million.

The transaction has been approved by all competent regulatory authorities.

By expanding and diversifying its network of donation centers, Grifols reinforces its global leadership position in plasma collection in alignment with its strategic plan. This transaction, coupled with the 2016-2021 capital investment plans for the Bioscience Division (endowed with more than EUR 500 million) will enable Grifols to meet the projected growing demand for plasma-derived medicines.

Grifols currently owns 214 centers in the U.S. and 35 in Europe following the acquisition of Haema, Germany's largest independent network of donation centers. Its overall strategy also includes an agreement to build and manage plasma donation centers in China with Boya Bio-Pharmaceutical, a leading Chinese manufacturer of plasma-derived medicines.

Osborne Clarke, S.L.P. acted as legal advisor for the transaction.



← → C      🔒 crunchbase.com

crunchbase   🔍 Search Crunchbase   Advanced ∨   ⚡ TRY PRO FREE   Resources ∨   Log In

**Grifols Shared Services North America, Inc.**   💬 CONNECT TO CRM   ⊕ SAVE

Summary   Technology   Signals & News

## 🏢 About

Grifols Shared Services North America, Inc. manufactures plasma derivative biopharmaceutical products.

📍 Los Angeles, California, United States

🚩 Private

📊 276,920

## ✂ Recent News & Activity

There is no recent news or activity for this profile.



## 📋 Details ✏

**Industries**
Biotechnology   Manufacturing   Pharmaceutical

**Headquarters Regions**
Greater Los Angeles Area, West Coast, Western US

**Sub-Organization of**
Grifols

**Operating Status**
Active

**Company Type**
For Profit

Grifols Shared Services North America, Inc. manufactures plasma derivative biopharmaceutical products. Shared Services North America, Inc., a wholly owned subsidiary of Grifols, S.A.



Unlock more with Pro

⚙ Search using intuitive filters

⊷ Uncover company growth signals

💬 Export and derive insights

🔔 Get notified with customizable alerts

EXHIBIT

3

← → C                                    🔒 ecorp.sos.ga.gov                                    🎤 ⬆️ 32 •••

 **GEORGIA**
**CORPORATIONS DIVISION**

GEORGIA SECRETARY OF STATE
**BRAD RAFFENSPERGER**

HOME

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | |
| --- | --- |
| Business Name: | **OCTAPHARMA PLASMA, INC.** |
| Business Type: | **Foreign Profit Corporation** |
| Business Purpose: | **NONE** |
| Principal Office Address: | **10644 Westlake Dr, CHARLOTTE, NC, 28273** |
| Jurisdiction: | **Delaware** |

| | |
| --- | --- |
| Control Number: | **08093676** |
| Business Status: | **Active/Compliance** |
| Date of Formation / Registration Date: | **12/15/2008** |
| Last Annual Registration Year: | **2022** |

### REGISTERED AGENT INFORMATION

| | |
| --- | --- |
| Registered Agent Name: | **INCORP SERVICES, INC.** |
| Physical Address: | **9040 Roswell Road, Suite 500, Atlanta, GA, 30350, USA** |
| County: | **Fulton** |

### OFFICER INFORMATION

| Name | Title | Business Address |
| --- | --- | --- |
| BARRY POMEROY | CFO | 10644 Westlake Dr, CHARLOTTE, NC, 28273, USA |
| BARRY POMEROY | Secretary | 10644 Westlake Dr, CHARLOTTE, NC, 28273, USA |
| FREDRIC MARGUERRE PRES. | CEO | SEIDENSTRASSE 2 CH-8853, LACHEN SWITERLAND, NC, 28273, USA |

Back        Filing History    Name History    Return to Business Search

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FURQUAN R. STAFFORD,

     Plaintiff,

v.

GRIFOLS INTERNATIONAL S.A.,
KEDRION S.P.A., OCTAPHARMA AG,
BAXALTA, INC., CSL LIMITED,
BIOTEST AG,

     Defendants.

CIVIL ACTION
NO. 1:18-cv-00321-SCJ

## DECLARATION OF DANIEL WYDER

1.  I am an adult citizen and resident of Switzerland.

2.  I make this declaration in support of Octapharma AG's Motion to Dismiss, and I have personal knowledge of the facts stated herein.

3.  I am Deputy General Counsel of Octapharma AG ("Octapharma").

4.  Octapharma is a Swiss stock corporation founded in 1983.

5.  Octapharma's core business is the development, production, and sale of safe and effective medicines derived from human proteins.

6.  Octapharma's principal place of business is in Lachen, Switzerland.

7.  Octapharma has no physical presence in Georgia.

8.  Octapharma has never owned or leased an office or any other property in Georgia.

1749798.1

Case 1:18-cv-00321-SCJ   Document 53-1   Filed 03/07/19   Page 3 of 4

9. Octapharma has no employees in Georgia.

10. Octapharma does not advertise or solicit business in Georgia.

11. Octapharma is not authorized or registered to nor does it conduct any business in Georgia.

12. Octapharma has never had an agent for service of process in Georgia.

13. Octapharma does not have a bank account in Georgia or otherwise hold any assets in the state.

14. Octapharma has never paid income or property tax to the State of Georgia.

15. Octapharma Plasma, Inc. ("OPI") and Octapharma USA, Inc., are each wholly-owned subsidiaries of Octapharma AG.

16. Though OPI and Octapharma USA, Inc. are authorized to do business in Georgia, those entities are separate and independent from Octapharma AG.

17. OPI and Octapharma USA, Inc. are engaged in different lines of business than Octapharma AG.

18. OPI and Octapharma USA, Inc. keep separate business records than Octapharma AG.

19. OPI and Octapharma USA, Inc., file taxes separately from Octapharma, AG.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1749798.1

Executed on 7 March, 2019.

**octa**pharma®

Octapharma AG, Seidenstrasse 2
CH-8853 Lachen, Switzerland

/s/

Daniel Wyder

Octapharma AG
Seidenstrasse 2
CH-8853 Lachen
Switzerland

1749798.1



**Octapharma Plasma**

CONNECT TO CRM    ⊕ SAVE    ⋮

| Summary | Financials | People | Technology | Signals & News |



## 📋 Details ✏️

**Industries**

Biotechnology    Health Care    Pharmaceutical

**Headquarters Regions**
East Coast, Southern US

**Founded Date**
2008

**Operating Status**
Active

**Company Type**
For Profit

**Contact Email**
careers@octapharmaplasma.com

**Phone Number**
(704)654-4600

Octapharma Plasma, Inc. owns and operates plasma collection centers throughout the United States critical to the development of life-saving patient therapies utilized by thousands of patients all over the world. Octapharma Plasma is a subsidiary of one of the world's largest plasma products manufacturers, Octapharma AG, a Lachen, Switzerland-based company that has been committed to patient care and medical innovation for over 25 years. Octapharma employs over 2,500 people and has biopharmaceutical experience in 70 countries worldwide. Octapharma is the only plasma products manufacturer with two state-of-the-art production sites licensed by the U.S. Food and Drug Administration, allowing the company to ensure unparalleled production flexibility and sustainable supply. Octapharma Plasma, Inc. operates FDA and European Union approved plasma collection centers located throughout the U.S. These centers adhere to strict safety regulations for the protection of the donors and the products collected.

∧ READ LESS



**Unlock more with Pro**

Search using advanced filters

Uncover company growth signals

Export and save insights

Get notified with customizable alerts

**Get the most out of Crunchbase**

⚡ TRY PRO FREE



octapharmaplasma.com

   

Jump to state:


GA

## Georgia

### Athens



Address

1055 Gaines School Rd, Ste 105
Athens, GA 30605

Phone

+1 706 410 1298

More Info

### Atlanta



Address

3363 Buford Highway NE
Atlanta, GA 30329

Phone

+1 404 471 9921

More Info

EXHIBIT 4

    

ecorp.sos.ga.gov



# GEORGIA
## CORPORATIONS DIVISION

### GEORGIA SECRETARY OF STATE
## BRAD RAFFENSPERGER

HOME

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | |
|---|---|
| Business Name: | **KEDRION BIOPHARMA INC.** | Control Number: | **14116136** |
| Business Type: | **Foreign Profit Corporation** | Business Status: | **Active/Compliance** |
| Business Purpose: | **NONE** | | |
| Principal Office Address: | **400 Kelby St., Fort Lee, NJ, 07024, USA** | Date of Formation / Registration Date: | **12/8/2014** |
| Jurisdiction: | **Delaware** | Last Annual Registration Year: | **2020** |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Registered Agent Name: | **CORPORATION SERVICE COMPANY** |
| Physical Address: | **40 TECHNOLOGY PARKWAY SOUTH, SUITE 300, NORCROSS, GA, 30092, USA** |
| County: | **Gwinnett** |

### OFFICER INFORMATION

| Name | Title | Business Address |
|---|---|---|
| Dan Zavodnick | Secretary | 400 Kelby St., Fort Lee, NJ, 07024, USA |
| Paolo Marcucci | CEO | 400 Kelby St., Fort Lee, NJ, 07024, USA |
| Peer Hansen | CFO | 400 Kelby St., Fort Lee, NJ, 07024, USA |

Back    Filing History    Name History    Return to Business Search

Kedrion Biopharma of USD equivalent of Euro 10 million.

Kedrion S.p.A. (**Kedrion**) will hold the remaining stake of 95.5% of Kedrion Biopharma's share capital.

The entry of the new shareholder and the capital increase contributions from SIMEST will allow Kedrion Biopharma to pursue its development strategy on a national and international level and make the company more attractive for new forms of funding.

Kedrion Biopharma is an international company that collects and fractionates blood plasma to produce and distribute plasma-derived therapeutic products for use in treating and preventing serious diseases, disorders and conditions such as hemophilia, primary immune system deficiencies and Rh-sensitization. Kedrion Biopharma, a U.S. subsidiary of Kedrion, is headquartered in Fort Lee, New Jersey. Kedrion launched US operations in 2011, but the company's international roots stretch back several decades in the production of blood and plasma-derived products.

For further information, please contact **Investor@kedrion.com**







# KEDPLASMA
UNITED STATES

a Kedrion Biopharma company

SOCIAL NETWORK ∨     KEDPLASMA US ∨

PLASMA AND DONATION   WHY DONATE PLASMA   DONATING   ANTI-D PROGRAM   ABOUT US   CONTACT   CAREERS

WE ARE IN

## Atlanta-Tucker, GA

5995 Lawrenceville Hwy., Tucker, GA 30084
770-261-8490

Monday - Thursday: 7AM - 7PM

Friday & Saturday: 8AM - 6PM

Sunday: Closed

**KEDPLASMA needs plasma donations from people who have recovered from COVID-19. Compensation is available. Contact center for details.**

CONTACT US ›

Map data ©2020 Google   Terms of Use

EXHIBIT

5

   

🔒 ecorp.sos.ga.gov

 **GEORGIA**
**CORPORATIONS DIVISION**

**GEORGIA SECRETARY OF STATE**
**BRAD RAFFENSPERGER**

HOME

## BUSINESS SEARCH

### BUSINESS INFORMATION

| | |
|---|---|
| Business Name: | **CSL PLASMA INC.** |
| Business Type: | **Foreign Profit Corporation** |
| Business Purpose: | **NONE** |
| Principal Office Address: | **900 Broken Sound Parkway, Ste 400, Boca Raton, FL, 33487, USA** |
| Jurisdiction: | **Delaware** |

| | |
|---|---|
| Control Number: | **13435021** |
| Business Status: | **Active/Compliance** |
| Date of Formation / Registration Date: | **6/24/2013** |
| Last Annual Registration Year: | **2020** |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Registered Agent Name: | **C T CORPORATION SYSTEM** |
| Physical Address: | **289 S Culver St, Lawrenceville, GA, 30046-4805, USA** |
| County: | **Gwinnett** |

### OFFICER INFORMATION

| Name | Title | Business Address |
|---|---|---|
| Greg Boss | Secretary | 900 Broken Sound Parkway, Ste 400, Boca Raton, FL, 33487, USA |
| Mike Deem | CEO | 900 Broken Sound Parkway, Ste 400, Boca Raton, FL, 33487, USA |
| Robert Lawler | CFO | 900 Broken Sound Parkway, Ste 400, Boca Raton, FL, 33487, USA |

Back    Filing History    Name History    Return to Business Search



CSL Behring > Our Company > Our Story

# Our Story

The Commonwealth Serum Laboratories was established in Australia in 1916 to service the health needs of a nation isolated by war. Over the ensuing years CSL provided Australians with rapid access to 20th century medical advances including insulin and penicillin, and vaccines against influenza, polio and other infectious diseases. CSL Limited was incorporated in 1991 and listed on the Australian Securities Exchange (ASX) in 1994.

Since then, CSL has acquired a number of companies. They include: Aventis Behring, which is now known as global biotechnology leader CSL Behring; U.S. plasma collector Nabi, which helped to form the world's premier plasma collection company in CSL Plasma; the Novartis influenza vaccine business, now integrated and known as Seqirus, the world's second largest influenza vaccines company; Calimmune, a leader in gene-modification and cell delivery technology; and Vitaeris, a biopharmaceutical company focused on the development of clazakizumab as a potential treatment option for organ transplant recipients experiencing rejection. Their combined and rich histories make CSL the innovative global leader it is today.

🔒 cslplasma.com

**CSL Plasma**
*Good for You. Great for Life.*

Global Selector ▼     English ▼          COVID-19 Plasma Donations Needed     Contact Us     FAQs

WHY DONATE?     BECOME A DONOR     FIND A DONATION CENTER     REWARDS FOR CURRENT DONORS     ABOUT CSL PLASMA     CAREERS     🔍

## Augusta

**Address**
3457 Peach Orchard Road
Augusta, GA 30906

**Contact Info**
Ph: 706-955-1526
Fax: 706-793-1006
Mon-Fri 7am-7pm; Sat/Sun 7am 4pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Dalton

**Address**
902 Abutment Rd
Dalton, GA 30721

**Contact Info**
Ph: 706-671-6888
M/W/F 10a-6p; T/Th 7a-3p; Sat-Sun 9a-3p

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Decatur

**Address**
1283 Columbia Drive
Decatur, GA 30032

**Contact Info**
Ph: 404-424-8503
Fax: 404-289-6894
Mon-Fri 7am-7:30pm; Sat 7am-5pm; Sun 6am-6pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## East Point

**Address**
1043 Cleveland Ave.
East Point, GA 30344

**Contact Info**
Ph: 404-902-5749
Fax: 404-763-3945
Mon-Fri 6am-7pm; Sat/Sun 7am-5pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Gainesville

**Address**
2293 Browns Bridge Rd
Gainesville, GA 30501

**Contact Info**
Ph: 678-207-4844
Fax: 770-534-8912
Mon-Fri 6am-7pm; Sat 7am-3pm; Sun 7am-6pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

Global Selector ▼   English ▼

COVID-19 Plasma Donations Needed    Contact Us    FAQs

**CSL Plasma**
*Good for You. Great for Life.*

WHY DONATE?    BECOME A DONOR    FIND A DONATION CENTER    REWARDS FOR CURRENT DONORS    ABOUT CSL PLASMA    CAREERS    🔍

## Jonesboro

**Address**
6525 Tara Blvd, Suite B
Jonesboro, GA 30236

**Contact Info**
Ph: 678-487-1035
Fax: 678-479-5579
Sun-Fri 6am-7pm; Sat 6am-5pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Lawrenceville

**Address**
2150 Riverside Parkway
Lawrenceville, GA 30043

**Contact Info**
Ph: (678) 229-1665
Fax: (678) 407-6203
Sun-Fri 6am-7pm; Sat 6am-5pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Macon

**Address**
3353 Mercer University Dr.
Macon, GA 31204

**Contact Info**
Ph: (478) 292-5996
Fax: (478) 742-5941
Mon-Fri 7am-7pm; Sat-Sun 8am-4pm

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Rome

**Address**
15 N. Division St SW
Rome, GA 30165

**Contact Info**
Ph: 706-388-2091
Fax: 706-622-3206
Tues-Fri 7am-7pm; Sat 8am-5pm; Sun/Mon: Closed

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

## Savannah

**Address**
Coming Soon
, GA 31404

**Contact Info**

ⓘ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

🔒 cslplasma.com

## CSL Plasma
*Good for You. Great for Life.*

Global Selector ▼   English ▼

COVID-19 Plasma Donations Needed   Contact Us   FAQs

WHY DONATE?   BECOME A DONOR   FIND A DONATION CENTER   REWARDS FOR CURRENT DONORS   ABOUT CSL PLASMA   CAREERS   🔍

### Smyrna

**Address**
3201 South Cobb Drive, Suite A
Smyrna, GA 30080

**Contact Info**
Ph: 770-504-5101
Fax: 770-436-5835
Mon-Fri 6am-7pm; Sat 6am-3pm; Sun 6am-6pm

ℹ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

### Stone Mountain

**Address**
937 N. Hairston Rd, Suite 1
Stone Mountain, GA 30083

**Contact Info**
Ph: 770-783-2475
Fax: 770-879-0829
Mon-Fri 6am-7pm; Sat 7am-4pm Sun 6am-6pm

ℹ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

### Warner Robins

**Address**
1331 Green St
Warner Robins, GA 31093

**Contact Info**
Ph: 478-236-6271
Fax: 478-399-0192
Mon 8am-4pm; Tues-Fri 8am-6pm; Sat/Sun 8am-3pm

ℹ Donation Center Details & Rewards

🤍 Set this as my preferred center

📍 Map This Location

Contact Us

## CSL Plasma

 

Centers Coming Soon | Privacy Policy | Terms of Use | Cookie Policy | Sitemap

EXHIBIT

6

# Furquan R. Stafford
## Owner & CEO



 404-902-3824

 iamstafford@thereslifeintheblood.com

 2385 Godby Rd. #491468
College Park, Georgia





# Vertical Restraints

- Agreements between firms at different levels of the manufacturing and distribution process.

- Vertical restraints may restrain competition among firms that occupy the same level in chain.

- Vertical restraints that significantly affect competition may be **per se** violations.

 MARANATHA

## Furquan R. Stafford, Sr.

**Subject:**                              FW: Follow-Up: Mr. Tommy Smith (CSL Contact)

**From:** David.Confessore@CSLPLASMA.COM [mailto:David.Confessore@CSLPLASMA.COM]
**Sent:** Friday, December 21, 2012 2:52 PM
**To:** fstaffordsr@cpplasmacenter.org
**Subject:** FW: Follow-Up: Mr. Tommy Smith (CSL Contact)

Mr. Stafford,

Tommy Smith at Novus Architects passed on your message to me. Thank you for your interest in contacting CSL Plasma. I remember that you reached out to us a year or so ago. Unfortunately, our position has not changed since the last contact. CSL Plasma continues to be able to expand its own collections to meet the needs of our parent company, CSL Behring. We are not interested in pursuing any supply contracts with third parties at this point in time.

I wish you luck in your continued endeavors.

Best regards,

David

David H. Confessore
Senior Director, Business Services
**CSL Plasma** *Good for You. Great for Life*
Boca Raton, Florida USA

Phone: +1.561.912.3058
Mobile: +1.305.773.7131
david.confessore@cslplasma.com

---

**From:** Furquan R. Stafford, Sr. [mailto:fstaffordsr@cpplasmacenter.org]
**Sent:** Friday, December 07, 2012 12:58 AM
**To:** Tommy Smith
**Subject:** Follow-Up: Mr. Tommy Smith (CSL Contact)

Hello Tommy:

It's been a minute since the last time we chatted. But I just wanted to bring you up to date with my project. The issue that I have been facing is a plasma contract. The investment group is not going to invest capital without a plasma contract. They have made emphasis on capital during FDA certification and without plasma agreement the project is too risky. The property and future home of C.P. Plasma Center is a Plaza, 73,000 square feet. Everything is in place to move forward and City officials are welcoming the project with open arms.

In previous conversations, you mention your relationship with CSL. My question to you and favor from you is that would you be willing to connect me with the person at CSL that would consider forming a partnership with C.P. Plasma Center? I believe that it is a win win situation for both parties. I'm confident that we can do at least 50,000 liters in our first year. I've worked too hard too long and I just need an "opportunity."

I appreciate your time and attention towards this matter.

**Furquan R. Stafford, Sr.**
**Chairman & CEO**
**C. P. Plasma Center, Inc. (CPPC)**
**College Park, Georgia - U  A**



*"There's Life in the Blood"*



 **Please consider the environment before printing this email.**

-------------------------------------------------------------------------------------------------------------

*This e-mail transmission is protected by the electronic communications privacy act, 18 U.S.C. 2510, et seq. The message and any attachments are confidential and contain proprietary content intended only for the designated recipient(s). Any duplication and/or distribution of this transmission, in any form or part, without the written consent of the sender is hereby prohibited. These confidentiality protections shall apply even if you have received this transmission on error, in which case you must disregard its contents and destroy it, and please notify the sender of the mistake.  C.P. Plasma Center, Inc. (CPPC)*

**Furquan R. Stafford, Sr.**

**Subject:**                    FW: CPPC Plasma Agreement Proposal

**From:** David Bell [mailto:david.bell@grifols.com]
**Sent:** Tuesday, September 20, 2011 12:58 PM
**To:** fstaffordsr@cpplasmacenter.org
**Subject:** CPPC Plasma Agreement Proposal

Mr. Stafford,

Victor Grifols forwarded your proposal to me for a response.  You should be aware that Grifols' goal has been to be vertically integrated with regard to all aspects of our business, including plasma procurement.  Additionally, with our recent acquisition of Talecris, we inherited certain third party plasma supply agreements and as a result, we have a surplus of plasma relative to our capacity for fractionation and purification.  We see this imbalance continuing into the future and thereafter returning to our self-sufficiency for plasma procurement.  As a result, we are not currently soliciting or accepting any third party supply agreements.

We appreciate your interest in the plasma supply business and suggest that you contact other companies who may not have as developed an internal plasma supply system as Grifols.

Best regards.

David Bell
Executive Vice President, U.S. Operations
Grifols
david.bell@grifols.com



feature

# BLOOD MONEY: Furquan Stafford's Journey to Seek Color in the Blood Plasma Industry Continues

### BY DOMINIQUE HUFF

**A**frican Americans have always played a significant role in the foundation of the United States of America. Our community is a significant contributor to the economy on many levels from consumer buying power to business ownership. When one thinks of black entrepreneurship, the blood plasma field probably escapes the mind of most.

The late Dr. Charles R. Drew (1904-1950) was the first African American who developed the procedure for extracting blood plasma. Dr. Drew's system for the storing of blood plasma revolutionized the medical profession. He also established the American Red Cross blood bank, of which he was the first director, and he organized the world's first blood bank drive, called "Blood for Britain."

members were used as testing subjects for many medical procedures.

He also ran a profitable prison blood plasma collection operation. Dr. Stough's plasma studies were experimented on black prisoners, raising concerns of racism. Dr. Stough was expelled several times from hospitals and prisons after his experiment caused the death of black inmates who died from a variety of diseases and netted millions of dollars in profits.

Today, the U.S. Plasma Collection industry has become a multibillion dollar industry globally that relies on the

In 1941, the American Red Cross announced that it would no longer accept blood donated by blacks because "white men in the service would refuse blood plasma if they knew it came from Negro veins." Dr. Drew donated his blood and when it was segregated he resigned from the American Red Cross in protest. The United States military segregated blood supplies until 1949; the American Red Cross did so until 1950.

*Time Magazine* reported in July 1963 that a drug trial program at the Oklahoma State

Penitentiary was being "drastically overhauled." The prison's medical director, Dr. Austin R. Stough was paid an estimated $300,000 annually by pharmaceutical companies to use African American prisoners as guinea pigs. During the era and previously, the African-American community

plasma production in the United States which African Americans donates the bulk of that production. Grifols of Spain; Baxter International of Deerfield, Ill.; Biotest AG of German; CSL of Australia; Kedrion Spa of Italy; and Octapharma of Switzerland are the global manufactures of plasma products. These companies now own most of their own U. S. plasma collection centers instead of buying plasma from independent collectors which raises concerns about the U.S. antitrust laws, moral and ethnic issues.

Meet Furquan R. Stafford, Sr., a budding entrepreneur in the blood plasma business.

While others wait to work; he has worked while he is waiting for his opportunity to enter into the U.S. Plasma Collection industry. Stafford wants to turn his dream into a



reality. Blood in his body and blood on his mind, he is on a mission to become the first African American to own and operate his own plasma center (C.P. Plasma Center, Inc.)— A center built by blacks in the black community for the purpose of processing blood plasma.

The C.P. Plasma Center objective is to explore the field of plasma proteins to manufacture and supply high quality remedial treatment that elevates and extends the lives of patients throughout the world.

The medical procedure at C.P. Plasma Center is called Plasmapheresis. During plasmapheresis, blood is initially taken out of the body through a sterile needle in the arm. Plasma is then removed from the blood by a cell separator (Plasma Collection System II). Plasma is the clear liquid portion of the blood that remains after the removal of red cells, leukocytes and platelets. It is made up of water, salts, enzymes, antibodies, and other proteins. It is the starting material for a wide range of lifesaving medicines. The center wants to assist in combating Sickle Cell, Hemophilia, Alzheimer's disease, Pediatric HIV and ensuring that donors are treated with respect not as commodities.

Stafford hopes to galvanize Black America to pull its resources and influences together to bring awareness about foreign companies building their companies from the blood of African Americans. Not long ago it was separated but today

it has become "BIG" business? Yet not one is owned by an African American!

Noted people such as Congressmen John Lewis and the Rev. Jesse L. Jackson, Sr. have endorsed and wrote letters of support for Stafford's vision and in 2011 Congressman Henry C. "Hank" Johnson, Jr. submitted a Proclamation in the U.S. House Of Representatives honoring Stafford's pioneer work in the U.S. plasma industry. Stafford has caught the attention of various media outlets nationally and in Brazil. Nigeria has also expressed interest in his historic venture.

An issue that Stafford continues to combat is racism and discrimination in the industry, he says. His fight has even gone to Washington, DC with correspondence to various federal agencies and the White House.

"The fact that there is a $12 million deal on the table and the only thing that's in the way of getting this deal done is a contract from one of the global manufactures," Stafford laments. "I believe that [these firms are] discriminating against me. I have provided information indicating that I am qualified and have resources to support the first African American owned plasma center." sclc



*Dominique Huff is the CEO/Founder of the Tenth Amendment Media Group. Dominique worked his way through the journalism sector by being one of the founders of the student newspaper at Camp Creek Middle School, editing several publications including the Signal at Georgia State University. Dominique prides himself in sharing the story of others through broadcasting, publishing and hospitality. He can be contacted at dhuff@tenthamendmentmedia.com.*

Furquan R. Stafford, Sr.

**RUBIN POSTAER & ASSOCIATES**

*Supporting the dreams of all in search of equal employment opportunities, irrespective of race, creed, sex, age, disability, or ethnic background.*

**www. rpa.com**

**Burgess Pigment Co., Inc.**
Beck Boulevard
Sandersville, Georgia

**Moldex Metric, Inc.
Metric Products**
10111 Jefferson Boulevard
Culver City, California

*Supports equal opportunity for all, regardless of race, creed, sex, age, disability, or ethnic background.*

JOHN LEWIS
5TH DISTRICT, GEORGIA

SENIOR CHIEF DEPUTY DEMOCRATIC WHIP

COMMITTEE:
WAYS AND MEANS

SUBCOMMITTEE:
HEALTH

COMMITTEE:
BUDGET

WASHINGTON OFFICE:
343 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1005
(202) 225-3801
FAX: (202) 225-0351

DISTRICT OFFICE:
THE EQUITABLE BUILDING
100 PEACHTREE STREET, N.W.
SUITE # 1920
ATLANTA, GA 30303
(404) 659-0116
FAX: (404) 331-0947

## Congress of the United States
### House of Representatives
### Washington, DC 20515-1005

October 27, 2003

Mr. Jan Bult
President
Plasma Protein Therapeutic Association
147 Old Solomons Island Road, Suite 100
Annapolis, Maryland  21401

Dear Mr. Bult:

Enclosed please find a letter from my constituent, Mr. Furquan Stafford, regarding diversity in the blood plasma industry.

Mr. Stafford's letter states that, while African-Americans provide the vast majority of blood plasma to the plasma protein industry, African-Americans are not well represented among plasma providers and PPTA Source Members.  The letter also questions whether there are any diversity programs or minority initiatives within the blood plasma industry and, if not, whether other steps are being developed to encourage greater minority participation in the industry.

I would appreciate learning more about this matter.  Please provide my office information regarding minority participation in your organization, diversity programs instituted by your members, and any other efforts regarding minorities.  Kindly respond to my District Office in Atlanta.

Thank you for your attention to this matter.

Sincerely,

John Lewis
Member of Congress

JL: gd

VI. Technologies, Inc.      Tel.(516) 752-7314
155 Duryea Road            Fax (516) 752-8754
Melville, New York 11747

# V. I. Technologies, Inc.



155 Duryea Road, Melville, New York 11747
from the desk of-
Kenneth D. Graziano, Ph.D.
(516) 752-7314, ext.109
(516) 752-8754 Fax

May 4, 1998

Furquan R. Stafford
President & CEO
C.P. Plasma Center, Inc.
2200 Godby Road, D10
College Park, GA 30349

Re: Fax of 5/1/98

Dear Mr. Stafford:

Thank you for your interest in being a source plasma supplier to V. I. Technologies, Inc. (Vitex).
At present Vitex has all of our source materials being provided by our customers. Should this
situation change, and we need to obtain additional supplies, we will be in contact with you.

Sincerely,

Kenneth D. Graziano
Vice President
Regulatory Affairs
Responsible Agent
License # 386

Personal1.1IMemoformat

Pharmaceutical
Division

Biological Products

**Richard Thomas**
Vice President &
General Manager
Plasma Operations

May 4, 1998

Furquan R. Stafford
President/CEO
C.P. Plasma Center, Inc.
2200 Godby Rd. D10
College Park, GA  30349

Dear Mr. Stafford:

Thank you for your inquiry.  I regret that, at this time, Bayer is not issuing any new
contracts for source plasma.  Our needs are adequately covered by our current contract
suppliers.

I will keep CPP in mind if our supply situation changes.

Sincerely,

Richard Thomas
Vice President and
General Manager
Plasma Operations

RT/ds

Bayer Corporation
800 Dwight Way
P.O. Box 1986
Berkeley, CA 94701-1986
Phone: 510 705-7705
Fax: 510 705-7704



August 3, 2012

Furquan R. Stafford, Sr.
Chairman & CEO
C.P. Plasma Center, Inc (CPPC)
2755 Ocean Valley Drive
College Park, Georgia 30349


Dear Mr. Stafford,

Thank you for your letter to Bob Parkinson regarding plasma collection services. The availability of source plasma and production capacity for plasma-derived therapies is a priority across our industry and Baxter is actively involved in capacity-building activities. We wish you the best of luck with the establishment of a plasma collection center and we look forward to learning more about it in the future once your center is operational.

Sincerely,

Julie Kim
General Manager, BioTherapeutics

Baxter Healthcare Corporation
One Baxter Parkway, Deerfield, Illinois 60015
T 847 948 2000



# NATIONAL HEADQUARTERS

930 East 50th Street
Chicago, Illinois 60615
Phone: (773) 373-3366 * Fax: (773) 373-3571

November 7, 2012

**National Headquarters
Community Services
International Trade Bureau
LaSalle Street Project**
930 East 50th Street
Chicago, IL 60615
Phone: (773) 373-3366
Fax: (773) 373-3571

**Public Policy Institute &
Telecommunications Project**
727 15th St. NW
Suite 1200
Washington, DC 20005
Phone: (202) 393-7874
Fax: (202) 393-1495

**Wall Street Project**
5 Hanover Square
2nd Floor
New York, NY 10004
Phone: (212) 425-7874
Fax: (212) 968-1412

**Entertainment Project**
1313 8th Street
Suite 232
Los Angeles, CA 90019
Phone: (323) 734-3900
Fax: (323) 734-3913

**Technology Project**
560 20th Street
Oakland, CA 94612
Phone: (510) 869-2202
Fax: (510) 763-2680

**Peachtree Street Project**
Herndon Plaza
100 Auburn Avenue
Suite 101
Atlanta, GA 30303
Phone: (404) 525-5663 or 5668
Fax: (404) 525-5233

**Automotive Project**
First National Building
660 Woodward Avenue
Suite 1433
Detroit, MI 48226
Phone: (313) 963-9005
Fax: (313) 963-9012

**Energy Science Project**
2616 South Loop West
Suite 100 C
Houston, TX 77054
Phone: (713) 432-0209
Fax: (713) 218-7072

Baxter International, Inc.
Mr. Robert L. Parkinson, Jr.
Chairman and Chief Executive Officer
1 Baxter Pkwy
Deerfield, IL 60015

RE: Corporate Inclusion

Dear Mr. Parkinson:

The Rainbow PUSH Coalition (RPC) objectives are to promote inclusion, opportunity, and economic growth by encouraging public and private companies to improve hiring and promotion practices; name more minorities to corporate boards; allocate more business to minority companies; and increase the amount of business minority firms conduct with each other and ensuring that entrepreneurs have an opportunity to compete in the market economy. We challenge corporate America to end its multi-billion dollar trade deficit with minority vendors, consumers, and employees. In the United States there is an economic and health disparity in the U.S. Plasma Collection industry. Blood plasma collection centers have long served as valuable resources for people suffering from medical problems controllable by a drug made from human plasma.

Unfortunately, though African Americans represent a large part of the engine behind this life-enhancing donation process, we are far from represented on the business side in this industry. The United States displays a severe lack of ethnic diversity in the ownership and operations of plasma collection centers. According to Mr. Furquan R. Stafford, Sr., a member of the Trade Bureau at Rainbow PUSH Atlanta and a metro Atlanta-based entrepreneur has brought attention to the RPC that he has not been able to identify a single plasma collection center owned and operated by an African American, despite the fact that the percentage of African Americans who donate plasma is unsurpassed by any other racial or ethnic group in our country.

Based upon the information provided to our office by Mr. Stafford it is evident that he has done his research and aligned himself with people in financing, government and plasma collections. The Rainbow PUSH Coalition is standing firm with Mr. Stafford to ensure that he and his company is given a fair opportunity.



# NATIONAL HEADQUARTERS

930 East 50th Street
Chicago, Illinois 60615
Phone: (773) 373-3366  *  Fax: (773) 373-3571

**National Headquarters**
**Community Services**
**International Trade Bureau**
**LaSalle Street Project**
930 East 50th Street
Chicago, IL 60615
Phone: (773) 373-3366
Fax: (773) 373-3571

**Public Policy Institute &**
**Telecommunications Project**
727 15th St. NW
Suite 1200
Washington, DC 20005
Phone: (202) 393-7874
Fax: (202) 393-1495

**Wall Street Project**
5 Hanover Square
2nd Floor
New York, NY 10004
Phone: (212) 425-7874
Fax: (212) 968-1412

**Entertainment Project**
1313 8th Street
Suite 232
Los Angeles, CA 90019
Phone: (323) 734-3900
Fax: (323) 734-3913

**Technology Project**
560 20th Street
Oakland, CA 94612
Phone: (510) 869-2202
Fax: (510) 763-2680

**Peachtree Street Project**
Herndon Plaza
100 Auburn Avenue
Suite 101
Atlanta, GA 30303
Phone: (404) 525-5663 or 5668
Fax: (404) 525-5233

**Automotive Project**
First National Building
660 Woodward Avenue
Suite 1433
Detroit, MI 48226
Phone: (313) 963-9005
Fax: (313) 963-9012

**Energy Science Project**
2616 South Loop West
Suite 100 C
Houston, TX 77054
Phone: (713) 432-0209
Fax: (713) 218-7072

The solution to these urgent and widely recognized issues involves increased public awareness of the disparity to incite a breakup of the monopolization of blood plasma donation center ownership in the United States.

We appreciate your time and attention concerning this matter.

Sincerely,

*Jesse L. Jackson Sr.*

Rev. Jesse L. Jackson, Sr.

cc: Janice L. Mathis, Esq.
    Randolyn Jones



June 11, 2009

Mr. Furquan R. Stafford,Sr.
2755 Ocean Valley Drive
College Park, Georgia 30349

Mr. Stafford:

Thank you for allowing us the opportunity to review your request for financing.  Upon review of your presentation and proposal, we will seriously entertain funding up to 80% of your request, once you have secured the initial round of seed capital for your project and have a valid plasma agreement or contract.

In order for this to materialize, you will need to provide the additional 20% to complete the financing phase of your project.

Again, thank you for considering Capitol City Bank & Trust Company for your financing needs.

Sincerely,

Chador Adams, AVP



**C.P. Plasma Center, Inc.**
*"There's Life in the Blood"*
College Park, Georgia U A
www.cpplasmacenter.org

<u>*Sent - Via Email*</u>

**January 23, 2009**

**Investitori Associati S.p.A**
Mr. Paolo Melloni - melloni@investitoriassociati.com
*Partner*
Via Agnello n. 8
20121 Milano Italy

**RE:** *Plasma Contractual Agreement with Kedrion S.p.A*

Dear Mr. Melloni,

Regarding your email of December 1, 2008, relative to a plasma contract with Kedrion, jointly we hold the keys for a serious win-win business opportunity. After additional research and conducting a financial analysis it appears that the demand for plasma will continue to increase for the next 8 to 10 years. In light of that anticipated market, I am proposing the following in addition to the draft contract already submitted:

- Kedrion to pay $150.00 USD per liter of Source Plasma or the current market value, whichever is higher. Pricing will be re-negotiated every October.
- A minimum of 5% increase after initial year.
- Kedrion to reimburse C.P. Plasma Center, Inc. for all required testing for Source Plasma:
    1. Viral Marker panel: $10.50 USD
    2. NAT panel-All five markers to include resolution - (HIV, HCV, HBV, HAV & Parvo B-19): $10.00 USD
- Kedrion agrees to purchase up to 50,000 liters of plasma each year.
- This will be a Seven (7) year agreement.
- Kedrion agrees to pay for all transportation and storage fees.

Mr. Melloni, I appreciate your time and attention towards this important matter. I look forward to our discussing this project at your earliest opportunity.

Respectfully,

Furquan Rahman Stafford, Sr. – FStaffordSr@cpplasmacenter.org
Chairman, President & Chief Executive Officer
C. P. Plasma Center, Inc. (CPPC)

   **Cc:** Paolo Marcucci - P.Marcucci@kedrion.com
   Lucio Stucco - LStocco@haemopharm.com
   Paola Ferrari - P.Ferrari@kedrion.com

**Attachments:** Kedrion S.p.A Information_Proposal SGM Architects, Inc.



## NON-DISCLOSURE AGREEMENT

In order to protect certain confidential information, Company Limited and its corporate affiliates, "Company", and the "Participant" (identified below) agree that:

1.    Disclosing Party: The party disclosing confidential information is *both parties*.

2.    Primary Representative: Each party's representative for coordinating disclosure or receipt of confidential information is:

Company: C.P. Plasma Center, Inc. (CPPC)

Participant: Kedrion, S.p.A.

3.    Description of Confidential Information: The "Confidential Information" disclosed under this Agreement shall include information, data and details relating to the parties' past, present and future proprietary technology, intellectual property (including, without limitation, trade secrets), systems, equipment, products, operations, strategies, market positions, and customers. The existence of this agreement and the fact the parties are entering these discussions are considered confidential and shall not be disclosed to any third party.

4.    Use of Confidential Information: The Confidential Information is being disclosed so that the parties can evaluate potential business relationships between the parties (the "Purpose"). Confidential Information shall not be used except as necessary to perform the Purpose and neither party shall analyse or reverse-engineer any Confidential Information owned by the other party, or permit any third party to do so. Confidential Information may only be used internally by the parties and only disclosed to the parties' personnel on a "need to know" basis. Confidential Information shall not be disclosed to any third party for any reason.

5.    Confidentiality Period: This Agreement and the receiving party's duty to protect confidential information from disclosure will expire in two (2) years after the execution of this agreement.

6.    Standard of Care: The receiving party shall protect the disclosed confidential information by using the same degree of care, but no less than a reasonable degree of care, as the receiving party uses to protect its own confidential information.

7.    Exclusions: This Agreement imposes no obligation upon the receiving party with respect to information that (a) was in the receiving party's possession before receipt from the disclosing party; (b) is or becomes a

matter of public knowledge through no act of the receiving party; (c) is rightfully received by the receiving party from a

third party without a duty of confidentiality; (d) is independently developed by the receiving party; or (e) is necessary to be disclosed in judicial or administrative process.

8.    Warranty: Each party warrants that it has the right to make the disclosures contemplated by this Agreement. NO OTHER WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT. ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS".

9.    Rights: Neither party acquires any intellectual property rights under this Agreement.

10.    Return of Confidential Information: Each party agrees to return all Confidential Information owned by the other party at the other party's request.

11.    Miscellaneous:

(a)    This Agreement imposes no obligation on either party to purchase, sell, license, transfer or otherwise dispose of any technology, services or products; (b) This Agreement does not create any agency or partnership relationship; (c) All additions or modifications to this Agreement must be made in writing and must be signed by both parties; (d) This Agreement is made under, and shall be construed according to, the laws of the State of Georgia, USA.

Company

By 
(Authorized Signature)

Furquan R. Stafford, Sr. / Chairman, President & CEO
(Name & Title)

Date: June 13 2008

Participant

By
(Authorized Signature)

PAOLO MARCUCCI     MANAGING DIRECTO
(Name & Title)

KEDRION SPA
(Company Name)

Date: 26|06|2008 .



**C.P. Plasma Center, Inc.**
*"There's Life in the Blood"*

March 18, 2004

**CSL Limited**
Dr. Brian McNamee
Managing Director & CEO
45 Poplar Road
Parkville, Victoria 3052
Australia

Greetings Dr. McNamee:

The purpose of this letter is to briefly introduce myself as C.P. Plasma Center's Founder, Chairman, and CEO. I am delighted to send this introductory packet to you in hopes that you will deem it possible to initiate an opportunity for College Park Plasma Center, Inc. (CPPC) to embark in fair as well as equitable purchasing activities from CSL Limited.

I have just completed the groundwork efforts of building a stable corporation and am now keen to meet with CSL Limited. It would be my pleasure to demonstrate CPPC's capabilities and show you how the unique features of our company would benefit CSL Limited. You will immediately see the advantages. We are proud of our company and our commitment to excellence.

Accordingly, as a first step in my customer familiarization process, I would like for you to review the enclosed mini-CD as a means to understand the scope of CPPC and to identify just how committed national and local supporters are to this historic development.

To set up a meeting for this at your convenience, I propose to call your office in seven business days. It is my hope that we will be able to arrange a telephone conference by the end of this month.

Please call to set a telephone conference appointment at your convenience. I will make efficient use of your time to show how we can assist you in meeting your specific requirements and the significant savings you can realize by working with C.P. Plasma Center, Inc.

I look forward to meeting with you and learning more about your company in the near future.

Respectively Yours,

Furquan R. Stafford, Sr.
Founder, Chairman & CEO
C.P. Plasma Center, Inc.

---



JOHN LEWIS
5TH DISTRICT, GEORGIA

SENIOR CHIEF DEPUTY DEMOCRATIC WHIP

COMMITTEE:
WAYS AND MEANS

SUBCOMMITTEE:
HEALTH
COMMITTEE:
BUDGET

## Congress of the United States
## House of Representatives
## Washington, DC 20515-1005

WASHINGTON OFFICE:
343 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1005
(202) 225-3801
FAX: (202) 225-0351

DISTRICT OFFICE:
THE EQUITABLE BUILDING
100 PEACHTREE STREET, N.W.
SUITE # 1920
ATLANTA, GA 30303
(404) 659-0116
FAX: (404) 331-0947

February 19, 2004

Mr. Furquan Stafford
C.P. Plasma Center
2943 Landrum Drive, Suite 1
Atlanta, Georgia  30311

Dear Mr. Stafford:

I write to express my support for your efforts through C.P. Plasma Center to increase minority participation in the field of blood and plasma products.

Your persistence and perseverance in this work is to be commended.  I appreciate all that you are doing to encourage African-Americans to not only donate blood plasma, but also to contribute whole blood in the effort to address sickle cell anemia.  Educating people about the importance of plasma and blood donations and encouraging their participation will benefit our health care system.

I again commend you for your work and offer my support for your effort to make the C.P. Plasma Center an active and vibrant participant in the plasma industry.

Sincerely,

John Lewis
Member of Congress

JL: gd

a recent visit to Azerbaijan, Azerbaijan provides multi-faceted support for U.S. and NATO operations in Afghanistan and is a key part of the Northern Distribution Network providing ground and naval transit for roughly 25 percent of the Coalition's supplies bound for Afghanistan.

Beyond support for U.S. security interests in the region, Azerbaijan plays a paramount role in strengthening U.S. and European energy security and is expanding its commercial and economic ties with the United States. Azerbaijan is a secular Muslim country that maintains close friendly ties with Israel and supplies roughly a quarter of Israel's oil.

My colleagues are encouraged to join me in honoring Azerbaijan on the occasion of its 93rd Republic Day and celebrating a robust U.S.-Azerbaijan relationship.

---

## TO COMMEMORATE THE 100TH ANNIVERSARY OF THE MV "PRUDENCE"

### HON. WILLIAM R. KEATING
OF MASSACHUSETTS

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Mr. KEATING. Mr. Speaker, I rise today to commemorate the 100th anniversary of the MV *Prudence*, what is believed to be the oldest continuously operated, fully documented merchant vessel in the United States.

The MV *Prudence* was originally christened as the *Madeline* in 1911 and commissioned for Former Boston City Councilor and Dedham State Representative Frank Gethro. Upon completion, the *Madeline* operated until 1920 providing ferry service from Marine Park in the City Point area of South Boston to Castle Island in South Boston and other Boston Harbor Islands.

The *Prudence* received her name in 1921 when the *Madeline* was sold to the Prudence Island Navigation Company in Bristol, Rhode Island. For over four decades, ferry goers were serviced by the *Prudence* between Bristol, Rhode Island and Prudence Island, Rhode Island. Following the 1960 election of President John F. Kennedy of Massachusetts, the *Prudence* was purchased by Hyannis Harbor Tours, Inc. founders, Richard "Dick" and Robert "Bob" Scudder in 1962 and returned to its home state.

Since 1962, millions of Cape Cod tourists have been serviced by the *Prudence*'s sightseeing cruises from Hyannis Harbor to the Kennedy Compound in Hyannisport, Massachusetts. Hundreds more have been provided employment by the *Prudence*'s reliable passenger service. Today, I honor the *Prudence*'s role as a celebrated cultural icon and reliable employer for residents of my district.

With the celebrations of the MV *Prudence*'s 100th year of service scheduled to begin on May 26, 2011, I extend my deepest congratulations to the vessel and its operators on this incredible achievement.

---

### BREANN HOLTER

### HON. ED PERLMUTTER
OF COLORADO

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Mr. PERLMUTTER. Mr. Speaker, I rise today to recognize and applaud Breann Holter for receiving the Arvada Wheat Ridge Service Ambassadors for Youth award. Breann Holter is a 12th grader at Ralston Valley High School and received this award because her determination and hard work have allowed her to overcome adversities.

The dedication demonstrated by Breann Holter is exemplary of the type of achievement that can be attained with hard work and perseverance. It is essential students at all levels strive to make the most of their education and develop a work ethic which will guide them for the rest of their lives.

I extend my deepest congratulations to Breann Holter for winning the Arvada Wheat Ridge Service Ambassadors for Youth award. I have no doubt she will exhibit the same dedication and character in all her future accomplishments.

---

### PERSONAL EXPLANATION

### HON. MIKE QUIGLEY
OF ILLINOIS

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Mr. QUIGLEY. Mr. Speaker, on May 11th, my vote on rollcall No. 309 was incorrectly recorded as "aye," when I intended to vote "no." I did not see the error until it was too late. I ask that the RECORD reflect my strong opposition to H.R. 1229 and my intention to vote no on this legislation.

---

## HONORING REVEREND FURQUAN R. STAFFORD. SR.

### HON. HENRY C. "HANK" JOHNSON, JR.
OF GEORGIA

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Mr. JOHNSON of Georgia. Mr. Speaker, I submit the following Proclamation.

Whereas, the works of Dr. Charles R. Drew have been and continue to be credited for medical innovation and saving lives throughout the world; and

Whereas, Reverend Furquan R. Stafford, Sr., has given of himself to continue the works of Dr. Drew in the U.S. Plasma Collection Industry and to educate and motivate our youth; Reverend Stafford has given exceptionable and distinguished service to our citizens by providing guidance, service and leadership; and

Whereas, Reverend Stafford is a proven leader and advocate with the heart of a lion and the spirit of an angel; and

Whereas, his determination and will is a testament that one man can make a difference; and

Whereas, Georgia is proud to have Reverend Stafford, who gives of himself daily without any need for praise and fame; he always serves valiantly and with honor, a modern-day knight; and

Whereas, the U.S. Representative of the Fourth District of Georgia has set aside this day to honor and recognize Reverend Furquan R. Stafford, Sr., for his outstanding leadership and service to our District;

Now therefore, I, HENRY C. "HANK" JOHNSON, JR. do hereby proclaim May 19, 2011 as Reverend Furquan R. Stafford, Sr. Day in the Fourth Congressional District of Georgia.

Proclaimed, this 19th day of May, 2011.

---

### BREANNA MARTIN

### HON. ED PERLMUTTER
OF COLORADO

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Mr. PERLMUTTER. Mr. Speaker, I rise today to recognize and applaud Breanna Martin for receiving the Arvada Wheat Ridge Service Ambassadors for Youth award. Breanna Martin is an 8th grader at Arvada K–8 and received this award because her determination and hard work have allowed her to overcome adversities.

The dedication demonstrated by Breanna Martin is exemplary of the type of achievement that can be attained with hard work and perseverance. It is essential students at all levels strive to make the most of their education and develop a work ethic which will guide them for the rest of their lives.

I extend my deepest congratulations to Breanna Martin for winning the Arvada Wheat Ridge Service Ambassadors for Youth award. I have no doubt she will exhibit the same dedication and character in all her future accomplishments.

---

### PERSONAL EXPLANATION

### HON. CORRINE BROWN
OF FLORIDA

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, May 24, 2011*

Ms. BROWN of Florida. Mr. Speaker, unfortunately, I was unavoidably detained yesterday hosting a Job Fair in Jacksonville, Florida. Had I been able to attend the vote here yesterday, I would have voted, "yea" on rollcall Vote 330. I support H.R. 1627 Honoring American Veterans Act of 2011. This bill will allow certain monuments to be placed at Arlington National Cemetery, allow for a memorial marker to honor the memory of the Jewish chaplains who died while on active duty in the Armed Forces of the United States to be placed on Chaplains Hill in Arlington National Cemetery.

On rollcall vote 331, I would have voted, "yea" to support H.R. 1383, Restoring GI Bill Fairness Act of 2011. This bill resolves a provision that certain veterans who were retroactively affected by a provision of the Post-9/11 Veterans Educational Assistance Improvements Act of 2010. The tuition these veterans were paying was increased by as much as $10,000 a year, and they should not be penalized for a change in law after they have begun

Case 1:20-cv-04970-SCJ    Document 1    Filed 12/08/20    Page 162 of 186

Senate Resolution 74

By: Senators James of the 35th, Henson of the 41st, Rhett of the 33rd, Butler of the 55th, Tate of the 38th and others

## A RESOLUTION

1 Encouraging the development of minority owned plasma centers; and for other purposes.

2 WHEREAS, for many years, people have suffered from medical deficiencies which could
3 be controlled by drugs made from human plasma; and

4 WHEREAS, there are numerous U.S. Food and Drug Administration licensed plasma
5 donation centers in the United States; and

6 WHEREAS, statistics have shown that in 2008, there were 18.8 million plasma donations
7 made in the United States at federally licensed plasma collection centers; and

8 WHEREAS, statistics have further shown that 20 million liters of plasma are used worldwide
9 every year to manufacture plasma protein therapies for patients with blood clotting disorders,
10 sickle cell disease, immune deficiencies, neurological disorders, pediatric HIV, and
11 hemophilia; and

12 WHEREAS, worldwide sales exceed $8 billion annually; and

13 WHEREAS, it is reported that more than 80 percent of United States plasma donations come
14 from African Americans; and

15 WHEREAS, no African American owns a plasma collection center in the United States.

16 NOW, THEREFORE, BE IT RESOLVED BY THE SENATE that the members of this body
17 encourage the United States plasma industry to open its markets and allow equal opportunity
18 for African Americans to participate in the process by executing plasma collection
19 agreements with them.

LC 108 0081

20   BE IT FURTHER RESOLVED that the Secretary of the Senate is authorized and directed

21   to make appropriate copies of this resolution available for distribution to members of the

22   public and press.



**New Leadership Center At Morehouse page 3**



**Furquan Stafford**

**Entrepreneur Struggling To Open Plasma Facility For Blacks page 7**



**Will Tyson-Lewis Bout Be Held In D.C.? page 11**

**FREE!!**

See Viewpoints



Atlanta Daily World

www.atlantadailyworld.com

*"News & History Since 1928"*

**FREE!!**

See Viewpoints



Volume 74 Number 45 Telephone 404-659-1110   Atlanta, Georgia (30303-2503)   Thursday - Wednesday Feb. 28 - Mar. 6, 2002  Price 50 cents

www.atlantadailyworld.com                    Atlanta Daily World Thursday - Wednesday Feb. 28 - Mar. 6, 2002

# 2002 Black History Month

# Young Entrepreneur Plans To Open African American Plasma Center

**By MASHAUN D. SIMON**
www.atlantadailyworld.com

t the young age of 29, Furquan . Stafford has a clear vision of s true purpose.

For eight years, he has worked get financial backing and a ontract to open the first African merican owned plasma center the West End community.

"The majority of plasma nors are African American," id Stafford. "However, they get nly) $15, $20 for their dona-n, though the companies who ll the plasma receive hundreds d millions of dollars.

"There are no African mericans, or people of color for at matter, benefiting from the dustry" Stafford continued.

As senior founder and chair-an of C.P Plasma Center Inc., afford hopes to follow in the otsteps of Dr. Charles Drew, ho created the model blood and asma storage still used by the nerican Red Cross today.

Ironically, Drew himself died cause he wasn't admitted to a hite-owned hospital for a blood ansfusion after being injured in ar accident in 1945.

"Dr. Drew mentored and ined many African Americans compete in the field of medi-

cine," said Stafford. "That is only a small part of what I want to do. In addition, I want to create more opportunities for African Americans to 'have a piece of the pie.'"

The donation of Blacks make up close to 80 percent of the plasma supply in this country, according to Stafford, who has committed himself to learning all aspects of the plasma industry.

For several years, he worked for a plasma center and conducted internal research.

U.S. companies supply 90 percent of plasma and its products nationwide, but the majority of donors do not reap the benefits said Stafford.

"I want to give back to the community, make jobs, and make competition for the other leaders in the industry. The only obstacle I have in my way is getting started," said Stafford who claims he's been denied entrance into the 'blood plasma fraternity.'

Plasma contracts are issued to European and Asian operations to begin and extend their centers, "but C.P. Plasma Center, Inc. has been denied the opportunity to receive a contract," he said.

To combat the rejections, Stafford has partnered with civil

rights organizations like the Atlanta branch of Rainbow/PUSH and spiritual leaders Creflo Dollar and Bishop





*Photos Courtesy of Furquan Stafford*

*Dr. Charles Drew (right) a scientific pioneer and creator of blood plasma transfusion, is the inspiration of Furquan Stafford (left) who hopes to build the first Black owned Plasma Center in the West End community.*

Eddie Long. "With all the work that I have placed into this dream of mine, I cannot go on without expressing some gratitude and thanks to those who have supported me while I was receiving nothing but heartache and rejection," he said. "These people are

working with me to see through the situations, the work. They are working with me to succeed, stay dedicated, faithful and spiritually based.

"Having the support from these key people has truly helped me," Stafford continued. "I have not

always received the most support for what it is I am trying to do. mainly because many of those people did not understand what it is I am trying to do."

The entrepreneur remains committed to one day opening a center and said he's put in faith in

God to make his dream a reali

"A friend of mine told something recently, that made of this make sense," s Stafford. "He said, 'God had have the right person to lead this endeavor, and he chose right one.'"

8 * Atlanta Daily World     **Thursday - Wednesday**     **October 7 - 13, 2010**     www.atlantadailyworld.co

# Vitality

# African American Researcher Uses Human Plasma Analysis To Address Issues That Plague The Black Community

**By AKILAH S. RICHARDS**
**INTERVIEW BY:**
**DANIELA GOMES**
*Special Reporter - Brazil*

In Brazil-a country whose black population represents about 50% of all citizens - the National Health System, which guarantees free medical care to all citizens, has joined the Ministry for the Promotion of Racial Equality to create a series of programs designed to improve the health of the country's black population.

Sickle Cell Anemia, a genetically transmitted disease that affects one in every 500 black Brazilians, and HIV/AIDS, are among the diseases the program will work to weaken. Despite Brazil being recognized as having one of the best programs to combat HIV/AIDS worldwide, its black population still is the most adversely affected.

Brazil hopes to make significant strides in the improvement of black people's health, and other countries are already making progress. In the U.S., Furquan R. Stafford, Sr., owner of C.P. Plasma Center, is the



**FURQUAN R. STAFFORD, SR.**

first African American male to own a center where blood plasma from healthy donors is collected for manufacturing into medicine. Stafford's goal is to find treatments for diseases that are affecting the black population in particular.

**GOMES:** You've led an interesting life. Tell us how you transitioned from a boy who grew up with social and financial hardships to a successful businessman?

**STAFFORD, SR.:** Books, along with my studies at Georgia State University (GSU) gave me the

opportunity to educate myself for about 10 years. I dropped out of GSU in 1997 but continued to use the campus for support. Seeing people of all nationalities studying inspired me as well. My experiences at New Birth Missionary Baptist Church where I observe and learn from Bishop Eddie L. Long, have a lot of influence in my development too. The rejections and disappointments that come with walking the pavement, sending letters and emails, making cold phone calls and going to meetings help me shape my presentation to get where it is today.

**GOMES:** How did you choose the health area and more specifically how did you start to work with plasma?

**STAFFORD, SR.:** My mother has been in the healthcare profession for over 25 years, and her life was the catalyst for my direction. In 1994, my first real job at the American Plasma Center in Houston, Texas was where I fell in love with the plasma business and the process of collecting blood plas-

ma. I would come in early and stay late reading manuals, and worked in almost every area of the plasma collection business. As a junior nursing student, I transferred to GSU in the summer of 1996 and took another job working at a plasma collection center. Eventually, I realized that true stability would come only from owning my own business, so in the winter of 1997, I set out on my own.

**GOMES:** How specifically can your efforts help black people around the world?

**STAFFORD, SR.:** Sickle cell disease is an inherited blood disorder that affects red blood cells. Intravenous Immune Globulin (IVIG) is a human plasma based product that is currently in clinical trials in the United States. This disease affects people worldwide, and I'm honored to be a part of the research that may make this disease more manageable. The supposition is that IVIG from human plasma will act quickly to reduce uncomplicated acute pain flare-ups and thus pain scores, narcotic use, and length of hospitalization for sickle cell ane-

mia patients. From an inspirational perspective, I hope my efforts in the Plasma Collection industry will inspire people of color around the globe to focus more on Health and Science.

**GOMES:** Tell our readers about your 16-year mission.

**STAFFORD, SR.:** Dr. Charles Richard Drew (1904-1950), the pioneer of Blood Plasma, created the first American Red Cross mobile blood bank and is credited for saving lives through his plasma distribution to the injured soldiers in World War II. Today, African Americans are the number one donors for a multi-billion dollar industry and are not represented in the business sector in this industry. My struggles over the past 16 years have been undertaken with the mission in mind to level the playing field for diversity inclusion. The Plasma Protein Therapeutics Association (PPTA) is the umbrella for the U.S. Plasma Collection Industry. It provides valuable regulatory information to meet FDA requirements and beyond, but does

not have involvement with i Global Members daily operation These companies have a chain plasma collection centers in t United States, thus eliminatin entrepreneurship in this particul arena for persons of color. Today face a Global Boycott. Without plasma contract from the Glob Members of this industry, C. Plasma Center, Inc. remai stymied.

**DANIELA GOMES:** In yo opinion, how can members of va ious communities help with t programs and processes that w further this particular cause?

**STAFFORD, SR.:** I believe will take a) organizations in th public and private sectors to co tinue to work together to educa themselves on the global boyco and its effects and b) more fina cial assistance from the U.! Government to address health di parities that affect people of colo

Visit http://www.cpplasmacen ter.org/, Facebook/ FurquanRStaf ordSr and Twitter/ FRS_Sr for mo information.

# What is Blood Plasma?



# What is Blood Plasma?



# Plasma and Plasma Products Industry Organization:





*Through contract, fractionators custom fractionate Red Cross plasma and return it to them for sale to end-markets.

Community blood banks sell plasma directly to fractionators who in turn manufacture the products and sell them to end-markets.

**Hospital Pharmacies, Laboratories and Home Care Companies**

www.pptaglobal.org

# *Customer Business Planning*
# *Critical Success Factors to Consider*

- **Agreement with a purchaser of plasma products**

- **An industry experienced quality system to manage governmental regulations**

- **Information Management System to meet regulatory requirements and maintain compliance**

- **Financial backing to cover start up and operating costs in the millions until the center is licensed**

**HAEMONETICS**



**WASHINGTON BUREAU · NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
1156 15TH STREET, NW SUITE 915 · WASHINGTON, DC  20005 · P (202) 463-2940 · F  (202) 463-2953
E-MAIL:  WASHINGTONBUREAU@NAACPNET.ORG · WEB ADDRESS WWW.NAACP.ORG

September 1, 2011

## RE: THE C.P. PLASMA CENTER, INC.

To Whom It May Concern:

It has come to the attention of the NAACP that currently in the United States there is a lack of racial and ethnic diversity in the ownership and operations of plasma collection centers throughout our Nation. As a matter of facts, we have not been able to identify a single plasma collection center owned and operated by an African American, despite the fact that the percentage of African Americans who donate plasma is unsurpassed by any other racial or ethnic group in our country.

Accordingly, the NAACP hopes that you will give thorough, fair and serious consideration to C.P. Plasma Center, Inc.'s (CPPC) proposal.  CPPC is lead by Furquan Stafford, Sr., who has an Associate Degree in Pre-Nursing from McCook Community College in McCook, Nebraska and has also studied Pre-Nursing and Nursing at Texas Southern and Georgia State Universities. Professionally he has worked in the plasma field as a Phlebotomist, Lab Technician, Supervisor, and Asst. Manager at Sera-Tec, Inc. Atlanta, Georgia, and American Plasma Center, Inc. in Houston, Texas.

According to Mr. Stafford, CPPC has attracted qualified financial backing to cover start up as well as operating costs and is ready to begin work immediately.  The action plan for CPPC is to develop fully operational collection facility in eighteen months from the time of an executed plasma agreement.

Thank you in advance for any attention you may give to this letter and to Mr. Stafford's request, and if I can be of further assistance in your consideration of Mr. Stafford's proposal please call me at (202) 463-2940.

Sincerely,

Hilary O. Shelton
Director, NAACP Washington Bureau &
    Senior Vice President for Advocacy and Policy

# Morgan Stanley

March 20, 2012

## Medical Technology
## The Day After Alzheimer's

### Investment conclusion

IVIG in Alzheimer's is the biggest plasma catalyst in years.  If Phase III data is positive in 1H13, we see potential upside of 15-20% for Baxter, 80%+ for Grifols, and 30-35% for CSL.  We'd own BAX and GRFS into the data, but commercialization may be more complicated than consensus appreciates.

### Where we differ

We focus more on the operational and commercial implications given a successful AD trial than the probability of clinical success.  Practical considerations in executing on the (very large) opportunity, include (i) large capital investments in 4-5 year projects to build capacity (ii) challenges of potentially recruiting millions of new donors, and (iii) lower profitability of single-product production. The most crucial variable may be IVIG price.

### What's next

Phase III data releases from J&J/Pfizer's bapineuzumab (mid-2012) and Lilly's solanezumab (3Q12) will be catalysts with read-through to IVIG.

**Risk-Reward Is Skewed to the Upside, Particularly for Grifols**



AD NPV % Current Market Cap   ■ Risk-adjusted 25%   ■ PIII Success

Source: Morgan Stanley Research

MORGAN STANLEY RESEARCH
North America

Morgan Stanley & Co. LLC

**David R. Lewis**
David.R.Lewis@morganstanley.com
+1 (1)415 576 2324
**James Francescone**
James.Francescone@morganstanley.com
+1 (1)212 761 3222

Morgan Stanley & Co. International plc

**Karl Bradshaw**
Karl.Bradshaw@morganstanley.com
+44 (0)20 7425 6573

Morgan Stanley Australia Limited

**Sean Laaman**
Sean.Laaman@morganstanley.com
+61 2 9770 1559

Morgan Stanley does and seeks to do business with companies covered in Morgan Stanley Research. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of Morgan Stanley Research. Investors should consider Morgan Stanley Research as only a single factor in making their investment decision.

**For analyst certification and other important disclosures, refer to the Disclosure Section, located at the end of this report.**

+= Analysts employed by non-U.S. affiliates are not registered with FINRA, may not be associated persons of the member and may not be subject to NASD/NYSE restrictions on communications with a subject company, public appearances and trading securities held by a research analyst account.

Probabilities for the scenarios in this presentation are illustrative, and are assigned subjectively based on our assessment of the relative likelihood of each scenario.

Morgan Stanley

MORGAN STANLEY RESEARCH
The Day After Alzheimer's
March 20, 2012

## Finding New Donors May Be More Difficult Than Building New Plants

**Recruiting new plasma donors could be biggest operational challenge of AD commercialization**

- Supporting one Alzheimer's patient would require 12 donors donating twice a month
- 1% AD penetration could require the number of US donors to increase ~40%

**Additional supply may have to come from US source donations**

- US is one of the few jurisdictions in which compensation for plasma donations is allowed
- Recovered plasma is a byproduct of whole blood donations, which should remain stable

**Fractionators might need to increase donor payments to recruit more donors, but this hurts margins**

- Doubling current compensation to $70 from $35 would reduce gross margins from ~30% to ~15%

### Over Half of Global Plasma Supply Comes From Compensated US Donors



2012e Plasma Supply Volumes (Millions of Liters)

**Source:** Morgan Stanley Research

### 1% AD Penetration Requires Number of US Plasma Donors to Increase ~40%



Number of US Plasma Donors (000's)

**Source:** Morgan Stanley Research

11

Morgan Stanley

## Summary And Conclusions: Alzheimer's is a Potentially Transformative Event

### Alzheimer's is the largest potential catalyst in the plasma space in years

- Our analysis suggests strong clinical results could drive 15-20% upside for Baxter and 80%+ upside for Grifols, with more bullish scenarios driving even stronger performance
- Assuming 75% odds of total failure, we estimate the current NPV of Alzheimer's program at ~$2.50 per share for Baxter and ~€3 per (Class A) share for Grifols.
- If the trial were to successfully meet its primary endpoints, we estimate this value would increase to $10 for Baxter and ~€13 for Grifols.

**Risk-Reward Is Skewed to the Upside, Particularly for Grifols**



Source: Morgan Stanley Research

**WW IVIG Market Today: Top Three Players Control ~75% of $6.0-6.5 Billion Market**



Source: Morgan Stanley Research

2

Morgan Stanley

MORGAN STANLEY RESEARCH
The Day After Alzheimer's
March 20, 2012

## Finding New Donors May Be More Difficult Than Building New Plants

### Recruiting new plasma donors could be biggest operational challenge of AD commercialization

- Supporting one Alzheimer's patient would require 12 donors donating twice a month
- 1% AD penetration could require the number of US donors to increase ~40%

### Additional supply may have to come from US source donations

- US is one of the few jurisdictions in which compensation for plasma donations is allowed
- Recovered plasma is a byproduct of whole blood donations, which should remain stable

### Fractionators might need to increase donor payments to recruit more donors, but this hurts margins

- Doubling current compensation to $70 from $35 would reduce gross margins from ~30% to ~15%

**Over Half of Global Plasma Supply Comes From Compensated US Donors**



2012e Plasma Supply Volumes (Millions of Liters)

Source: Morgan Stanley Research

**1% AD Penetration Requires Number of US Plasma Donors to Increase ~40%**



Number of US Plasma Donors (000's)

Source: Morgan Stanley Research



**MOREHOUSE**
SCHOOL OF MEDICINE
*Department of Medicine*

December 2, 2013

Consejo Cultural Mundial
A.Postal 10.1083
Col. Lomas de Chapultepec
C.P. 11002 México, D.F.
MEXICO.

To Whom It May Concern,

It is my pleasure to nominate Furquan R. Stafford Sr., the founder/CEO of C.P. Plasma Center, Inc., for the Albert Einstein World of Science Award for his tireless efforts to eradicate the racial, health and economic disparities in the human blood plasma industry. I have known him since the year 2000, when he approached me about assisting with C.P. Plasma Center.

Mr. Stafford has expended his energy in establishing a plasma center after noting minorities have been the highest volume of plasma donors without benefits economically. He has further educated multiple local and regional offices on the importance of plasma in health care research and treatment of diseases.

For Mr. Stafford's efforts in educating vast audiences about plasma significance in research and treatment of diseases, encouraging plasma donations and tireless efforts to establish C.P. Plasma Center, Inc, I nominate him for the Albert Einstein World of Science Award.

Sincerely,

Marvin L. Crawford, M.D., M.Div., FACP
Associate Professor of Clinical Medicine
Director of Student Medical Education
Department of Internal Medicine

*MLC/kms*

# Executive Summary

Plasma is a composite mixture of more than 700 proteins and other substances which are vital for the smooth functioning of the human body. Plasma is the liquid component of blood, constituting around 50% of the total blood volume. Plasma in itself is approximately 90% water, with the remaining 10% comprising of proteins, minerals, clotting factors, hormones, and immunoglobins. Plasma is the raw material for the extraction of various proteins which are used for their therapeutic values. Plasma proteins cannot be manufactured rather the same are obtained or collected from a large pool of donors.

With the swift progression in the field of biomedical/healthcare technology, companies operating in the healthcare/pharmaceutical/therapeutic industry are now surmounting in the respective realm. Also, on account of the escalating incidences of health related issues originating due to changing lifestyle and continuously changing surroundings, blood plasma industry's growth is augmented. In order to address the unmet medical needs related to blood disorders, autoimmune diseases and liver function impairment among others, associated companies are coming up with novel and improved treatment options like IVIG, albumin, clotting factors etc. which are derived from human blood plasma.

The blood plasma industry is highly regulated to ensure the safety of collected plasma and protect donors. The market is characterized by fast pace developments in the clinical technology and testing methodology. This report elicits the global blood plasma market with focus on segmental markets like IVIG, albumin and hemophilia market. Also the regions including the US and China are covered. Moreover, market dynamics like the key trends, industry developments, growth drivers and challenges are analyzed in detail.

Furthermore, the competitive landscape of the industry is highlighted. The rivalry prevalent in the global blood plasma market is quite fierce with numerous local and global players contenting for the market share. On the 8 billion dollar global front, the key players are:

1. CSL 27%
2. Grifols 25%
3. Baxter25%,
4. Octapharma 8%
5. Kedrion4%
6. LFB4%
7. Other 4%
8. Biotest3%



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Consumer Response Center

October 10, 2012

Furquan Stafford

356 Hunters Pace Dr

Lathonia,GA 30038

RE: FTC Ref. No. 32530823

Dear Furquan Stafford:

Thank you for your recent contact to the Federal Trade Commission ("the Commission"). The Federal Trade Commission acts in the public interest to stop business practices that violate the laws it enforces. Contacts from consumers and businesses are very important to the work of the Commission. They are often the first indication of a problem in the marketplace and may provide the initial evidence to begin an investigation.

The Commission does not resolve individual complaints. The Commission can, however, act when it sees a pattern of possible violations developing.

The information you have provided will be recorded in our secure online database that is used by thousands of civil and criminal law enforcement authorities worldwide. This database enables law enforcement to identify questionable business practices that may lead to investigations and prosecutions.

Thank you for providing information that may be used to develop or support Commission enforcement initiatives.

Sincerely Yours,

Consumer Response Center

# PLASMA SUPPLY AGREEMENT
between
### C.P. Plasma Center, Inc.
1234 Plasma
City, State 12345 USA
and
### Plasma Fractionation Company
Address
City, State 12345

THIS PLASMA SUPPLY AGREEMENT and its Annexes ("Agreement") will come into effect on Month Day, Year and are made by and between C.P. Plasma Center, Inc. (CPPC) 1234 Plasma, City, State 12345, USA ("Supplier"), Plasma Fractionation Company and ("Fractionator"). Supplier and Fractionator agree that the following provisions shall govern the supply of Plasma as later defined in this Agreement. In this Agreement, Supplier and Fractionator are also referred to individually as "Party" and commonly as "Parties".

WHEREAS, C.P. Plasma Center intends establishing a plasma supply business by erecting new Donor Centers within the United States, headquartered in College Park, Georgia,

WHEREAS Plasma Fractionation Company is a fractionator of human plasma into pharmaceutical products for human use,

WHEREAS, C.P. Plasma Center commits itself to sell plasma collected in such new Donor Centers to Plasma Fractionation Company under the terms and conditions hereunder while retaining the discretion to sell source plasma to other parties,

WHEREAS, Plasma Fractionation Company commits itself to purchase plasma collected by C.P. Plasma Center Donor Centers under the terms and conditions hereunder,

NOW, THEREFORE, the Parties have agreed as follows:

## Definitions

*Agreement*                              shall mean this Plasma Supply Agreement, including the Appendices attached hereto

*Donor Centers*                          shall mean plasmapheresis collection facility (as listed in Appendix 1) already under construction or in the planning phase, which will collect Source Plasma from the donors

and meet all the requirements set out hereunder.

| | |
|---|---|
| *Source Plasma* | Shall mean Source Plasma ("Plasma") meeting the specifications defined in the respective Standard Quality Assurance Agreement as well as the current FDA and EU Plasma Guidelines and Directives. |
| *Standard Quality Assurance* | Shall be the Plasma Fractionation Company Standard Quality per Standard Operating Procedures. |
| *Agreement* | Assurance Agreement, including e.g. Look-Back Procedures, attached hereto as Appendix 2 and constituting an integral part to the Plasma Supply Agreement and subject to revisions from time to time. |

### *Article 1.*   <u>Deliveries</u>

1.1   Supplier hereby agrees to supply and sell to Plasma Fractionation Company and Plasma Fractionation Company, hereby agrees to purchase Plasma supplied from the Donor Centers according to the respective Standard Quality Assurance Agreement.

1.2   The respective Standard Quality Assurance Agreement, which contains the testing requirements, the quality requirements, as well as the Look Back Notification procedure, defines the quality requirements of the Plasma to be supplied hereunder. Completion and accordance with the respective Standard Quality Assurance Agreement is thus a condition precedent for the fulfillment of this Agreement.

1.3   The Plasma shall be delivered in the following amounts and equally distributed as deliveries on a monthly basis in the calendar year or as separately agreed with *PLASMA FRACTIONATOR*, respectively:

| | |
|---|---|
| Year 1: | up to 30,000 liters of Plasma |
| Year 2: | up to 60,000 liters of Plasma |
| Year 3: | up to 70,000 liters of Plasma |
| Year 4: | up to 80,000 liters of Plasma |
| Year 5: | 90,000 liters of Plasma, or more, if mutually agreed upon between the Parties until December 31, 2018. |

provided by the Donor Center(s) under the condition that the respective Donor Center(s) are awarded fulfillment of the requirements stated in the Standard Quality Assurance Agreement and are awarded an FDA-license to procure Source Plasma.

Following the receipt of FDA licensure, the minimum delivery of Plasma shall always amount to a min of 60,000 liters per annum.

### Article 2.  **Prices and Terms of Payment**

2.1   The price shall be as follows for the calendar year 2014:

USD $155.00 per liter of Plasma (excluding Viral Marker, HIV, HCV, HBV, HAV & Parvo B-19-NAT testing costs). The testing laboratory will be an FDA-approved facility, at the discretion of the Plasma Fractionation Company.

2.2   Immediately following FDA licensure, the Plasma price per liter is subject to an annual evaluation and review by both parties. Price discussions must begin six months prior to calendar year end and conclude prior to the end of the calendar year.   However, is not subject to changing more than +5% per annum.

2.3   Performance of required Viral Marker, HIV, HCV, HBV, HAV & Parvo B-19-NAT/PCR testing of the Plasma by using a test method approved and licensed by the FDA, Supplier will charge Plasma Fractionation Company an additional amount of USD $12.00 per liter of Plasma for all five NAT/PCR markers to include resolution. Supplier will charge Plasma Fractionation Company an additional amount of USD $10.10 per liter of Plasma for Viral Marker. The Parties shall agree to adjust the amount of USD $12.00 according to the real increase or decrease of costs for the performance of the (HIV, HCV, HBV, HAV & Parvo B19 - NAT testing).  The Parties shall agree to adjust the amount of USD $10.10 according to the real increase or decrease of costs for the performance of the Viral Marker testing.

2.4   If additionally binding guidelines and/or laws issued by the Plasma Fractionation Company, national authorities or the EU authorities require the introduction of additional tests, the price per liter of Plasma will be adjusted according to the real increase in costs for the performance of these additional tests.  If these changes entail savings for the Supplier, the Supplier agrees to pass the savings to Plasma Fractionation Company.

2.5   The Plasma will be picked up at the Donor Center by a carrier designated by Plasma Fractionation Company on' Plasma Fractionation Company own expenses. The passing of ownership to Plasma Fractionation Company will occur when the Plasma leaves the Donor Center premises.

2.6   The terms of payment are 15 (fifteen) days from receipt of Invoice at Plasma Fractionation Company.

2.7   Plasma collected in centers prior to FDA licensure:

For each liter of Plasma collected in Plasma Fractionation Company - audited and approved new Donor Centers prior to FDA licensure, and later supplied to

Plasma Fractionation Company, Plasma Fractionation Company will pay 90% (ninety percent) of the agreed annual Plasma price based on invoices issued by Supplier. The remaining 10% will be paid by Plasma Fractionation Company within 30 (thirty) days of the FDA granting Source Plasma Licensure. The terms of payment are 15 (fifteen) days from date of Invoice.

2.8    The Plasma will be picked up at the Donor Centers by a carrier designated by Plasma Fractionation Company at' Plasma Fractionation Company own cost. The passing of ownership to Plasma Fractionation Company occurs upon Plasma leaving the Donor Center.

2.9    The Plasma Fractionation Company, agrees to provide USD $5 MM, as a show of goodwill, upon initiation of this contract. This sum of money shall be used for the purposes of achieving FDA pre-licensure. Within 1 (one) working day from the signing of this contract by all parties, the Plasma Fractionation Company will transfer $5 MM to CPPC's business account.

## *Article 3.*    **Donor Centers**

3.1    Plasma Supplier hereby warrants that all Donor Centers supplying Plasma under this Agreement will enter into a direct Standard Quality Assurance Agreement with Plasma Fractionation Company and fill in the required forms as attached hereto as Appendix 2.

3.2    Plasma Supplier further warrants that he will grant Plasma Fractionation Company maximum support in having the Standard Quality Assurance Agreement signed and implemented.

3.3    Whereas Plasma Fractionation Company undertakes to carry out audits with each Donor Center within 3 (three) months from the date the Donor Center is opened for donors and starts plasma collections.

3.4    Plasma Supplier accepts that Plasma Fractionation Company may, with advance written notice and agreement between both parties, exclude any Donor Center as a supplier of Plasma if the Standard Quality Assurance Agreement is not fulfilled or if any changes or amendments required by Plasma Fractionation Company in order to fulfill effective guidelines and regulations issued by national or EU authorities.

3.5    Plasma Supplier is jointly and severally liable with the Donor Center for the fulfillment of the current Standard Quality Assurance Agreement.

## *Article 4.*    **Force Majeure**

4.1    Unforeseen breakdowns like strikes, lockouts, transportation disturbances, official dispositions, especially prohibitions of use for Plasma of such origin because of epidemics, or similar and other cases of Force Majeure release the concerned party from its obligations of the production, delivery or purchase of Plasma under this agreement and other circumstances of similar nature that cannot be overcome by the affected party by due diligence.

4.2   The Parties agree to give immediate written notice if such disturbances arise. The Parties agree that they will endeavor to reduce the effects of the disturbances

4.3   The Parties agree not to lay claim to supplementary production, delivery or purchase for failing quantities of Plasma caused by such disturbances. The Parties will jointly verify if the failing quantities could wholly or partly be produced, delivered or purchased at a later period.

### *Article 5.*   Term and Termination

5.1   This Agreement shall be valid and binding until December 31, 2018.  A revised contract must be agreed upon 6 (six) months prior to this date.  If a contract is not agreed up by midnight on December 31, 2018, this agreement is subject to automatic renewal for 1 (one) year periods in perpetuity, or at the discretion of the *Supplier* at the base rate of USD $200 per liter.   Testing and shipping fees will be incurred in addition to this base liter charge.

5.2   The Agreement may be terminated by either party at any time in accordance with the applicable law for due and sufficient cause.

### *Article 6.*   Specifications

The Plasma supplied hereunder shall conform to all current applicable US - FDA directives, to the European Pharmacopeia Monograph for Human Plasma for Fractionation. Furthermore, the Plasma shall be supplied in accordance with the respective Standard Quality Assurance Agreement, that is an integral part of this Agreement, yet to be signed separately by the Supplier and each Donor Center, and, if necessary, will be modified.

### *Article 7.*   Liability

Supplier shall be liable that the Plasma conforms to the specifications as per Article 6 here above. In case the Plasma should not conform to the required specifications, Supplier shall not supply Plasma Fractionation Company with such Plasma.

### *Article 8.*   Venue / Applicable Law

All disputes arising in connection with this agreement shall be finally and exclusively settled under the United States Rules State of Georgia. The domicile of such arbitration court shall be the city of Atlanta, Georgia USA. The language of the proceedings shall be English. The presiding arbitrator shall have the right to request from the Plasma Supplier the designation of a person in the State of Georgia to receive for it and on its behalf service of process. If either party fails to designate such person, the arbitration court shall designate such person and the service of process to such person shall be valid affected for such party, at such party's cost. Applicable law shall be USA law. The decision of the arbitration shall be final and binding and shall be enforceable by any court having jurisdiction.

*Article 9.*   <u>**General**</u>

9.1   Changes, supplementations and notice of this Agreement requires written form for their effectiveness. This applies also for the cancellation of the written form requirement.

9.2   If 1 (one) or several provisions of the contract are or will become ineffective, the parties commit to replace the ineffective provisions by other effective provisions, which are similar to the ineffective provisions in an economic success so the parties can reasonably accept that both parties had made a contract also with this clause.

9.3   If such a rule cannot be found, the ineffectiveness of one or more provisions don't have consequences for the validity of the whole contract, except the ineffective provisions have an essential meaning so that the parties wouldn't have accept the contract without the effective provisions.

9.4   This Agreement is considered as unrestricted to all successors in interest of the parties. A whole or partial transmission of rights and obligations from the contract to third parties or subsidiaries requires the agreement of the other party, exceptional the transmissions takes place in connection with a business assumption.

9.5   This Agreement suspends all existing Plasma Supply Agreements between Plasma Fractionation Company and the Plasma Supplier, if any.

9.6   This Agreement has been prepared and signed in 2 (two) originals, both of equal validity. Each Party shall receive 1 (one) signed original copy.


IN WITNESS WHEREOF, the authorized representatives of the Parties have signed this Agreement on the day of Month Date, Year in the State of Georgia, USA.


**Plasma Fractionation Company**            **C.P. Plasma Center, Inc.**
                                            Mr. Furquan R. Stafford
                                            Owner & CEO


_____                     _____


**Date:**                                   **Date:**

**NOTE: ALL APPENDICES (2 – 2d) SHALL BE SUPPLIED BY _(PLASMA FRACTIONATOR)_**

Appendices:

Appendix 1:      List of Donor Centers under construction or planning

Appendix 2:      Standard Quality Assurance Agreement

Appendix 2a:    General Information Form

Appendix 2b:    Form Epidemiological Data Report with description

Appendix 2c:    Form "Look Back Notification" and for "Deviation Reporting"

Appendix 2d:    Form for testing certificate